E-filing

530

1    PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

2    Name  GREEN        AYANNA        Z.
           (Last)        (First)        (Initial)

3    Prisoner Number  W75617

4    Institutional Address  P.O. Box 96-V.S.P.W.; Chowchilla, CA. 93610-

5    0096; (B4-17-04Low).

6    ================================================
                    UNITED STATES DISTRICT COURT
7                   NORTHERN DISTRICT OF CALIFORNIA

8    AYANNA Z. GREEN
     (Enter the full name of plaintiff in this action.)        CV      08        3422
9                                                                               JSW
                         vs.                          Case No. _____
10   TINA HORNBECK (WARDEN)                           (To be provided by the clerk of court)

11                                                    PETITION FOR A WRIT
                                                      OF HABEAS CORPUS  (PR)
12

13

14   (Enter the full name of respondent(s) or jailor in this action)

15

16   ================================================
              Read Comments Carefully Before Filling In

17   When and Where to File

18        You should file in the Northern District if you were convicted and sentenced in one of these

19   counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20   San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21   this district if you are challenging the manner in which your sentence is being executed, such as loss of

22   good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23        If you are challenging your conviction or sentence and you were not convicted and sentenced in

24   one of the above-named fifteen counties, your petition will likely be transferred to the United States

25   District Court for the district in which the state court that convicted and sentenced you is located. If

26   you are challenging the execution of your sentence and you are not in prison in one of these counties,

27   your petition will likely be transferred to the district court for the district that includes the institution

28   where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS        - 1 -

1  <u>Who to Name as Respondent</u>

2      You must name the person in whose actual custody you are. This usually means the Warden or

3  jailer. Do not name the State of California, a city, a county or the superior court of the county in which

4  you are imprisoned or by whom you were convicted and sentenced. These are not proper

5  respondents.

6      If you are not presently in custody pursuant to the state judgment against which you seek relief

7  but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8  custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9  was entered.

10  <u>A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE</u>

11      1. What sentence are you challenging in this petition?

12          (a)    Name and location of court that imposed sentence (for example; Alameda

13          County Superior Court, Oakland):
14  SANTA CLARA COUNTY SUPERIOR COURT      SAN JOSE, CA.

15              Court                  Location

16          (b)    Case number, if known __201285__

17          (c)    Date and terms of sentence 8/7/98; 25 to Life w/10 years

18          (d)    Are you now in custody serving this term? (Custody means being in jail, on

19              parole or probation, etc.)        Yes _X_    No _____

20              Where?

21              Name of Institution: __VALLEY STATE PRISON FOR WOMEN__

22              Address: __P.O.BOX 96; CHOWCHILLA, CA. 93619-0096__

23      2. For what crime were you given this sentence? (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known. If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26  P.C. 187-FIRST DEGREE MURDER

27  P.C. 12022.5-PERSONAL USE OF A FIREARM

28

PET. FOR WRIT OF HAB. CORPUS    - 2 -

1   3. Did you have any of the following?

2       Arraignment:                                    Yes  X      No _____

3       Preliminary Hearing:                            Yes  X      No _____

4       Motion to Suppress:                             Yes _____   No  X

5   4. How did you plead?

6       Guilty _____    Not Guilty  X    Nolo Contendere _____

7       Any other plea (specify) _____

8   5. If you went to trial, what kind of trial did you have?

9       Jury  X     Judge alone_____   Judge alone on a transcript _____

10  6. Did you testify at your trial?                   Yes _____   No  X

11  7. Did you have an attorney at the following proceedings:

12      (a)   Arraignment                               Yes  X      No _____

13      (b)   Preliminary hearing                       Yes  X      No _____

14      (c)   Time of plea                              Yes  x      No _____

15      (d)   Trial                                     Yes  x      No _____

16      (e)   Sentencing                                Yes  X      No _____

17      (f)   Appeal                                    Yes  X      No _____

18      (g)   Other post-conviction proceeding          Yes  X      No _____

19  8. Did you appeal your conviction?                  Yes  X      No _____

20      (a)   If you did, to what court(s) did you appeal?

21            Court of Appeal                           Yes  X    No _____

22            Year: 2001      Result:  DENIED _____

23            Supreme Court of California    Yes  X    No _____

24            Year: 2001      Result:  DENIED _____

25            Any other court                Yes  X    No _____

26            Year: 2008      Result: Pending in U.S. Ct. of App.
                                       for the 9th Cir.

27

28      (b)   If you appealed, were the grounds the same as those that you are raising in this

| | | | | |
|---|---|---|---|---|
| 1 | | petition? | Yes _____ | No  X  |
| 2 | (c) | Was there an opinion? | Yes  X  | No _____ |
| 3 | (d) | Did you seek permission to file a late appeal under Rule 31(a)? | | |
| 4 | | | Yes _____ | No  X  |
| 5 | | If you did, give the name of the court and the result: | | |

6

7 _____

8   9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9   this conviction in any court, state or federal?                      Yes  X        No _____

10   [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11   challenged the same conviction you are challenging now and if that petition was denied or dismissed

12   with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13   for an order authorizing the district court to consider this petition. You may not file a second or

14   subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15   U.S.C. §§ 2244(b).]

16         (a)     If you sought relief in any proceeding other than an appeal, answer the following

17               questions for each proceeding. Attach extra paper if you need more space.

18               I.    Name of Court: SUPERIOR COURT

19                     Type of Proceeding: WRIT OF HABEAS CORPUS

20                     Grounds raised (Be brief but specific):

21               a. ILLEGAL 10 YEAR ENHANCEMENT

22               b. MULTIPLE PUNISHMENT

23               c._____

24               d._____

25                     Result: DENIED                         Date of Result: 5/18/07

26               II.   Name of Court: COURT OF APPEAL

27                     Type of Proceeding: WRIT OF HABEAS CORPUS

28                     Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS          - 4 -

1          a. ILLEGAL 10 YEAR ENHANCEMENT

2          b. MULTIPLE PUNISH MENT

3          c. _____

4          d. _____

5          Result: DENIED _____ Date of Result: 10/12/07

6     III.  Name of Court: SUPREME COURT OF CALIFORNIA

7          Type of Proceeding: WRIT OF HABEAS CORPUS

8          Grounds raised (Be brief but specific):

9          a. ILLEGAL 10 YEAR ENHANCEMENT

10          b. MULTIPLE PUNISHMENT

11          c. _____

12          d. _____

13          Result: DENIED _____ Date of Result: 6/11/08

14     IV.  Name of Court: _____

15          Type of Proceeding: _____

16          Grounds raised (Be brief but specific):

17          a. _____

18          b. _____

19          c. _____

20          d. _____

21          Result: _____ Date of Result: _____

22     (b)  Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                          Yes X    No____

24          Name and location of court: U.S. COURT OF APP. FOR THE 9TH CIR.
                                        P.O. BOX 193939
25  B. GROUNDS FOR RELIEF             SAN FRANCISCO, CA. 94119-3939

26     State briefly every reason that you believe you are being confined unlawfully. Give facts to

27  support each claim. For example, what legal right or privilege were you denied? What happened?

28  Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS        - 5 -

1    need more space. Answer the same questions for each claim.

2    [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3    petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4    499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5    Claim One: ALLOWING SENTENCING JUDGES TO IMPOSE ENHANCED
     SENTENCES BASED ON THEIR DETERMINATION OF FACTS NOT FOUND
6    BY THE JURY VIOLATED THE SIXTH AMENDMENT.

7    Supporting Facts: The United States Supreme Court made a favor-

8    able decision on January 22, 2007 in Cunningham V. Cali-

9    fornia, 549 U.S.___ that affects the petitioner's sen-

10   tence and/or the way she was sentenced. The petitioner...

11   Claim Two: THE ILLEGAL 10 YEAR ENHANCEMENT RAN CONSECUTIVE
     TO THE PETITIONER'S SENTENCE CONSTITUTES MULTIPLE PUNISH-
12   MENT.

13   Supporting Facts: If there is a current conviction for more than

14   one felony count not committed on the same occasion, and

15   not arising from the same operative facts, the court must

16   sentence the defendant consecutively on each count. By...

17   Claim Three:_____ N/A

18

19   Supporting Facts:

20

21

22

23   If any of these grounds was not previously presented to any other court, state briefly which

24   grounds were not presented and why:

25   ALL GROUNDS WERE PRESENTED TO THE ABOVE STATE COURTS.

26

27

28

**CLAIM ONE**

1   was given an illegal upper term enhancement of 10 years by the

2   judge based on judicial fact finding, denying the petitioner her

3   right to a jury trial. As any fact that exposes the petitioner to

4   a greater potential sentence must be found by a jury, not a judge,

5   and established beyond a reasonable doubt, not merely by a prepon-

6   derance of the evidence.

7       Under California's Determinate Sentencing Law (DSL) the of-

8   fense is punishable by one of three precise terms of imprisonment;

9   a lower term of 3 years, a middle term of 4 years, or an upper

10  term of 10 years. The sentencing judge illegally enhanced the

11  petitioner with the upper term.

12      In the instant case petitioner should have received the lower

13  term of 3 years as this was the petitioner's first offense, not

14  the upper term of 10 years, based on the United States Supreme

15  Court's recent decisions.

16      The Court has failed to set forth sufficient facts or law to

17  show cause why the relief requested in the petition should not be

18  granted.

19      **B.   The sentence imposed violates the federal constitution**
        **because the court relied upon factors not found true**

20      **beyond a reasonable doubt by the jury.**

21      Any fact that increases the penalty for a crime beyond the

22  prescribed statutory maximum must be submitted to a jury, and

23  proved beyond a reasonable doubt. No aggravating fact, apart from

24  the elements of the offense found by the jury, supported an upper

25  term sentence.

26      The United States Supreme Court held that California's deter-

27  minate sentencing law violates a defendant's federal constitution-

28  al right to a jury trial and proof beyond a reasonable doubt by

1   allowing the judge to impose an aggravated sentence based on facts

2   found by the judge by a preponderance of the evidence. The facts

3   relied upon by the trial court to give the petitioner the upper

4   term violated the rule of Apprendi V. New Jersey (2000) 530 U.S.

5   466, Blakely V. Washington (2004) 542 U.S. 296, Cunningham V.

6   California, supra. The United States Supreme Court did not state

7   that the Cunningham decision was not retroactive.

8       **C.  The issue is not forfeited or waived.**

9       Petitioner was sentenced in August of 1998. Blakely was not

10  decided until June of 2004. Hence, there was no waiver under People

11  V. Scott (1994) 9 Cal.4th 331, 351, because a timely objection to a

12  constitutional error that had not been recognized yet would not

13  have furthered the goal of judicial economy. Further, petitioner

14  did not personally waive her right to a jury trial on the issue of

15  aggravating factors/enhancement. Cunningham established that a de-

16  fendant has a federal constitutional right to a jury trial as to

17  all factors, other than the fact of a prior conviction, that are

18  used to impose the upper term. Petitioner's waiver of that right

19  must be knowing and voluntary and must appear on the record; it

20  will not be presumed. (Boykin V. Alabama (1969) 395 U.S. 238, 243;

21  see also, California Constitution, article I, section 16; People V.

22  Ernst (1994) 8 Cal.4th 441, 445.)

23      Therefore, the failure to object in the Superior Court does

24  not forfeit appellate review of this issue.

25      As stated in another Apprendi, supra, related opinion issued

26  the same day as Blakely, supra, (and also authored by Justice

27  Scalia): "When a decision of this Court results in a 'new rule',

28  the rule applies to all criminal cases still pending on direct re-

1   view. [Citation.]" The petitioner's case was denied on direct re-
2   view in the Supreme Court of California on June 20, 2001, however
3   Apprendi, supra, was decided in 2000, before the petitioner's con-
4   viction became final on direct review.

5       **D.   Petitioner's sentence must be reduced.**

6       In this case, the only permissible remedy is to strike the
7   upper term and impose the lower term or the middle term because
8   current California law does not permit submission of aggravating
9   sentencing factors to a jury.

10      The term of imprisonment that may be imposed based solely on
11  the jury's verdict is the middle term. The judge is specifically
12  prohibited from imposing the upper term based on an element of the
13  underlying offense--the very facts that the jury unanimously found
14  to be true beyond a reasonable doubt.

1   implication, consecutive sentences are not mandated if all of the
2   serious or violent current felony convictions are committed on the
3   same occasion or arise from the same set of operative facts.

4       If, as in the petitioner's case, the crimes were committed on
5   the same occasion or arose from the same set of operative facts,
6   the trial court retains discretion to impose concurrent sentences.
7   There was only one crime committed, the allegation of personal use
8   of a firearm used during the commission of a felony-first degree
9   murder, where there was only one victim.

10      Here, the crimes occured on the same occasion, as that term is
11  normally used, and merited concurrent sentences. As the petitioner
12  has no previous convictions for a serious or violent felony.

13      This illegal 10 year enhancement ran consecutive with the pe-
14  titioner's sentence constitutes multiple punishment. A consecutive
15  term is an enhanced term. When consecutive terms are imposed, the
16  court must state on the record its reasons for doing so.

17      Under California's scheme for imposing consecutive sentences,
18  when the trial court finds an additional fact upon which the conse-
19  cutive sentence is based, the trial court has gone beyond the sen-
20  tence authorized by the jury's verdict and the Sixth Amendment is
21  violated.

22      Petitioner further notes that other state supreme courts have
23  found consecutive sentences imposed under laws similar to that of
24  California to fall within the ambit of Cunningham.

25      The crime was committed one time, at one place, constituting
26  a single period of aberrant behavior. Consecutive sentences are
27  not justified.

28      Assuming that this Court rejects the arguments presented supra

1   this sentence must be stayed pursuant to California Penal Code sec-

2   tion 654 because it violates that statute's prohibition against

3   double punishment. Both the murder charge and the allegation of

4   personal use of a firearm were part of a single course of indivisi-

5   ble conduct carried out to fulfill a single objective.

6       In order to sentence a defendant to consecutive terms a court

7   must necessarily determine facts that were neither presented to,

8   nor found true beyond a reasonable doubt by a unanimous jury. Cun-

9   ningham V. California (2007) 549 U.S. _____ [127 S.Ct. 856], pre-

10  cludes the court from sentencing petitioner to consecutive senten-

11  ces on her convictions because the jury made no finding beyond a

12  reasonable doubt that the offenses occurred on separate occasions.

13      In sum, the petitioner's sentence violates the Sixth and Four-

14  teenth Amendments.

15

**Case names and citations continued:**

16

17  ....Ore 248; In re VanDelft (2006) 158 Wn.2d 731, 147 P.3d 573
    [cert. granted, Washington V. VanDelft, No. 06-1081]; Ohio V. Foster
    et al (2006) 109 Ohio CT.3d 1, 845 N.E.2d 470; cert. den. Foster V.

18  Ohio 2006 U.S. LEXIS 7863 (U.S. Oct. 16, 2006);.); People V. Miller
    (1977) 18 Cal.3d 873, 885; People V. King (2007) 156 Cal.App.4th

19  1526; Schiro V. Summerlin (June 24, 2004; 03-526) 542 U.S. _____,
    2004 WL 1402732 at p. *3.).

20

**Other Statutes**

21

22  California Constitution, article I, section 16
    United States Constitution, Sixth Amendment
    United States Constitution, Fourteenth Amendment

23

                            CONCLUSION

24

25      Accordingly, this court should strike the unconstitutionally

    imposed ten-year upper term and impose the lower term of three years
26

    or the midterm of four years.
27

    DATED:                          Respectfully Submitted,
28

                                    Ayanna Z. Green
                                    In Pro Per

1      List, by name and citation only, any cases that you think are close factually to yours so that they

2  are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3  of these cases:

4  `Cunningham V. California (2007) 549 U.S. _____ [127 S.Ct.856];`
`Apprendi V. New Jersey (2000) 530 U.S. 466; Blakely V. Wash-`
5  `ington (2004) 542 U.S. 296; People V. Scott (1994) 9 Cal.4th`
`331, 351; Boykin V. Alabama (1969) 395 U.S. 238, 243; People`
6  `V. Ernst (1994) 8 Cal.4th 441, 445; State V. Ice (2007) 343...`

7  Do you have an attorney for this petition?   **[Continued at end of CLAIM TWO]**  Yes_____  No x_____

8  If you do, give the name and address of your attorney:

9  _____

10      WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11  this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13  Executed on _June 24 2008_

14        Date                    Signature of Petitioner

15

16

17

18

19

20  (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS     - 7 -

# EXHIBIT A

1

2

3

**F I L E D**

MAY 18 2007

4

KIRI TORRE
Chief Executive Officer
Superior Court of CA County of Santa Clara

5

**SUPERIOR COURT OF CALIFORNIA**    BY _____ DEPUTY

6

**COUNTY OF SANTA CLARA**

7

8

9    In re                                    )    No.: 201285
                                             )
10        AYANNA Z. GREEN,                    )
                                             )    ORDER
11    On Habeas Corpus                        )
                                             )
12

13        Ms. Green(hereinafter Petitioner,) has filed a habeas corpus

14    petition in which she seeks relief based on the United States Supreme

15    Court's holdings in *Cunningham v. California* (2007) 127 S.Ct. 856 and

16    *Blakely v. Washington* (2004) 542 U.S. 296, which apply to the

17    California sentencing triad prior to enactment of SB40.  Petitioner's

18    case was denied review in the Supreme Court on June 20, 2001, and

19    thus was final prior to June 24, 2004 (the date *Blakely, supra,* was

20    decided).  The *Blakely* rule is not retroactive.  (See *In re Consiglio*

21    (2005) 128 Cal.App.4th 511.)  Accordingly, all requested relief or

22    action is denied.

23

24    DATED: May 18 , 2007

25                                    LINDA R. CONDRON
                                     JUDGE OF THE SUPERIOR COURT

26    cc:   Petitioner
          District Attorney
          Research (**)
27        CJIC

28      •

1

191 N. 1ST ST.

SAN JOSE, CA. 95113

TO THE OFFICE OF THE CLERK

RECEIVED

JUL 27 2007

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
BY_____ S Chua _____ DEPUTY

JULY 23, 2007

I SUBMITTED / FILED MY WRIT OF HABEAS CORPUS TO THIS COURT ON APRIL 30, 2007. IT HAS BEEN OVER 600 DAYS YET I STILL HAVE NOT RECEIVED A RESPONSE FROM THE COURT.

CAN YOU PLEASE SEND ME A "CON-FORMED COPY" OF MY WRIT SO I'LL HAVE A CASE # AND OFFICIAL RECORD OF WHEN MY WRIT WAS FILED BY THE COURT.

THANK YOU FOR YOUR TIME AND ATTENTION.

SINCERELY,

AYANNA Z. CORREN W75617
VALLEY STATE PRISON FOR WOMEN
P.O. BOX 90
CHOWCHILLA, CA. 93610-0090

201285
denied - 5/18/07

AYANNA Z. GREEN
CDC NO. W75617
Address: P.O. BOX 96
VALLEY STATE PRISON FOR WOMEN
CHOWCHILLA, CA. 93610-0096

IN PROPRIA PERSONA

COURT OF APPEAL SIXTH APPELLATE DISTRICT

IN AND FOR THE COUNTY OF SANTA CLARA

| | | |
|---|---|---|
| AYANNA Z. GREEN,<br>      Petitioner, | ) ) | CASE NO. 201285 |
| | ) | OPPOSITION TO COURT'S |
| VS. | ) | "ORDER". |
| | ) | |
| TINA HORNBECK (WARDEN),<br>      Respondent. | ) ) | |
| | ) | |
| _____ | ) | |

Petitioner Ayanna Z. Green respectfully request that this
Court order that her 10 year enhancement in Santa Clara County
Superior Court be set aside. This motion is made upon the
following grounds:

**A.** The Court has failed to set forth sufficient facts or
law to show cause why the relief requested in the petition
should not be granted. **Exh. A.**

1.) Any fact that increases the penalty for a crime beyond
the prescribed statutory maximum must be submitted to a jury,
and proved beyond a reasonable doubt. No aggravating fact, apart
from the elements of the offense found by the jury, supported
an upper term sentence.

2.) The United States Supreme Court held that California's
determinate sentencing law violates a defendant's federal
constitutional right to a jury trial and proof beyond a

1

1    reasonable doubt by allowing the judge to impose an aggravated

2    sentence based on facts found by the judge by a preponderance of

3    the evidence. The facts relied upon by the trial court to give

4    the petitioner the upper term violated the rule of Apprendi V.

5    New Jersey (2000) 530 U.S. 466, Blakely V. Washington (2004) 542

6    U.S. 296, and Cunningham V. California (2007) 549 U.S. ____. The

7    United States Supreme Court did not state that the Cunningham

8    decision was not retroactive.

9        3.) The Court erred by imposing the upper term. The

10   petitioner did not personally waive her right to a jury trial on

11   the issue of aggravating factors/enhancement. Petitioner's waiver

12   of that right must be knowing and voluntary and must appear on

13   the record; it will not be presumed. See Boykin V. Alabama (1969)

14   395 U.S. 238, 243. Therefore, the failure to object in the

15   Superior Court does not forfeit appellate review of this issue.

16       4.) As stated in another Apprendi, supra, related opinion

17   issued the same day as Blakely, supra, (and also authored by

18   Justice Scalia): "When a decision of this Court results in a 'new

19   rule', the rule applies to all criminal cases still pending on

20   direct review. [Citation.]" (Schiro V. Summerlin (June 24, 2004;

21   03-526) 542 U.S. ____,2004 WL 1402732 at p. *3.) The petitioner's

22   case was denied direct review in the Supreme Court on June 20,

23   2001, however Apprendi, supra, was decided in 2000, before the

24   petitioner's conviction became final on direct review.

25       In this case, the only permissible remedy is to strike the

26   upper term because current California law does not permit

27   submission of aggravating sentencing factors to a jury. Also,

28   Ground #2 on the petition was never addressed.

**B.**   1.) On July 23, 2007 the petitioner notified the Santa Clara County Superior Court that she still had not received a response from the Court on the petition for writ of habeas corpus she submitted on April 20, 2007 [the actual correct date the petitioner submitted/filed her petition in the Superior Court was **May 09, 2007**, on "April 20, 2007" the petitioner filed her Request for a C.O.A. in district court]. **Exh. B.**

2.) On August 6, 2007 the petitioner received a response from the Superior Court, and attached was a copy of the Court's ORDER. **Exh. C.**

3.) The attached **Inmate Legal Mail History Report**, which the petitioner received via institutional mail on Aug. 13, 2007 and issued by the Mail Room staff in Valley state Prison for Women, verifies that the petitioner never received a response from the Superior Court after filing her petition on May 09, 2007 until August 06, 2007. **Exh. D.**

Therefore, the relief sought in this petition should be granted.

DATE:_____    _____
                                AYANNA Z. GREEN
                                IN PRO PER

3

# EXHIBIT B



# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

In re AYANNA Z. GREEN,

on Habeas Corpus.

H032099
(Santa Clara County
Super. Ct. No. 201285)

Court of Appeal - Sixth App. Dist.

**F I L E D**

OCT 1 2 2007

MICHAEL J. YERLY, Clerk

By ————————————————
DEPUTY

BY THE COURT:

The petition for writ of habeas corpus is denied.

(Premo, Acting P.J., Elia, J., and Duffy, J., participated in this decision.)

Dated ___**OCT 1 2 2007**___      ___**PREMO, J.**___ Acting P.J.

# EXHIBIT C

S158952

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re AYANNA Z. GREEN on Habeas Corpus

The petition for writ of habeas corpus is denied.

SUPREME COURT
**FILED**

JUN 1 1 2008

Frederick K. Ohlrich Clerk

Deputy

**GEORGE**

Chief Justice

## PROOF OF SERVICE

RE:    GREEN V. HORNBECK, United States District Court for the
       Northern District of California


       I, Ayanna Green, declare that I am over 18 years of age, and
a party to the within cause; my address is P.O. Box 96 (V.S.P.W.),
Chowchilla, CA. 93610-0096. I served a true copy of the attached

       PETITION FOR A WRIT OF HABEAS CORPUS

       PRISONER'S APPLICATION TO PROCEED IN FORMA PAUPERIS

on the following, by placing a copy in a envelope addressed to the
party listed below, which envelope was then sealed by Correctional
Officer _C Mc-fmel Clllcub_ and with postage fully prepaid thereon
was on June 28, 2008, deposited in the United States mail at
Chowchilla, California.

       Office of the Clerk, United States District Court
       Northern District of California
       450 Golden Gate Avenue
       San Francisco, CA. 94102-3483

       California Attorney General
       San Francisco Office
       455 Golden Gate Avenue, #11000
       San Francisco, CA. 94102-3664

       I declare under penalty of perjury that the foregoing is true
and correct.

       Executed on June 28, 2008, at Chowchilla, California.


                                   _____
                                   Ayanna Green
                                   In Pro Per

08-3422 JSW

# EXHIBIT A

1825.)  In particular, counsel pointed to Officer Hill, arguing
that his actions regarding the crack sale comment were
deliberate.  (RT 1825.)  Counsel asserted that the prosecutor "is
trying to poison this trial with this drug stuff by not following
the Court's orders.  And I think a mistrial is appropriate, and
the prosecutor ought to be cited for misconduct because he is
deliberately doing this against court order."  (RT 1826.)  In
response to questions by the court, the prosecutor's attempt to
explain his actions fell well short of the mark.

The Court:     Mr. Schon, what about your disregard for the
               Court's in limine rulings?

Mr. Schon:     I haven't disregarded the Court's in limine
               rulings.

The Court:     Why did the evidence of the drugs come out before
               the jury?

Mr. Schon:     Because as for now I don't know, I told Officer
               Hill my recollection is that the drugs were out of
               this and that was a month ago.  Everything about
               drugs had been severed out of this trial.  And
               I'll admit to the Court I didn't reaffirm that
               today, I assume he knew that.  Maybe I should have
               done that today, and I apologize for that.  That
               was as unexpected to me as it was to defense
               counsel. . .

31

(RT 1828-1829.)   The prosecutor went to another subject and then
returned to the question of whether he was at fault:

Mr. Schon:         . . . [M]y recollection is I told Officer Hill
                   back when he was in here before was that all the
                   drug stuff was severed out of the case, okay, all
                   the drug stuff was out.  I didn't remind him of
                   that now this morning, and I assume that he knew
                   that.  And I didn't ask any questions concerning
                   drugs.  My question wasn't designed to elicit
                   that.  That statement that he made, Judge, was not
                   even in the police reports.  And I would ask the
                   Court to review those police reports to determine
                   that that last tidbit that he added, I don't even
                   think was in there.

The Court:         Well --

Mr. Kirchick:      It's in there.  Approach [with] the reports if you
                   want [me] to.

Mr. Schon:         I was asking about the telephone conversation.

The Court:         Wait a second . . .

Mr. Kirchick:      . . . Judge, if I may, it's right in the middle.
                   [']He knew something was up and Harry and KK were
                   having problems selling crack.[']  That's in the
                   police report.  The question was very open.
                   Review your report and refresh your recollection.
                   What was that conversation.  It's a one-paragraph
                   police report.

Mr. Schon:         Well, I stand corrected.

                        *        *        *

Mr. Kirchick:      . . . [A]n apology won't do it.  The poison is out
                   there. . . [H]e's telling your Honor in response
                   to this motion is, gee, if I elicit enough
                   evidence from these witnesses, I can change the
                   Court's mind on this order.  He's ignoring the
                   Court's order and trying to elicit -- in violation
                   of the Court's order trying to get the evidence
                   out.  And that is very problematic for me as an
                   officer of the Court.  And, again, it's just --
                   it's deliberate and intentional disregard of the
                   Court's order.  The jury has been poisoned enough.

32

CLAIM THREE

1    who killed the guy." (CT 40-43.) This was not the statement read

2    to the jury, prejudicing the jury against the petitioner, since

3    they received inaccurate information about Silva's statements.

4    (RT 40-43.) Silva also admitted reading a newspaper article that

5    named the petitioner as a suspect, Garrett as the victim, and

6    mentioned details about the case. (CT 58-59.)

7    (Newspaper Article.)

8        The following day when Silva was re-arrested, for possession

9    of crack cocaine for sale, she offered the arresting Officer,

10   Officer Paul Kelly, information regarding another homicide. A

11   stabbing or shooting involving a man named "Tiny". (Silva/Kelly

12   Interview; Doc. No.C9740812, Pg.14,16,19-20.) Which was never es-

13   tablished to be true. Jailhouse informant testimony is perhaps in

14   a class by itself when it comes to lack of reliability. Silva is

15   a classic jailhouse snitch: reading newspapers and hearing rumors

16   about the incident, coming forward with the story just after her

17   arrested, benefitting with the dropping of her charges. This

18   error is of federal constitutional dimension.

19       The prosecution claimed that Silva was allegedly unavailable

20   for trial, and asked to present her preliminary hearing testi-

21   mony. There were two hearings on the Due Diligence search for

22   Silva. (AOB 59, 61.) The court erred in admitting the preliminary

23   hearing testimony. The prosecution clearly failed to demonstrate

24   Due Diligence to secure Silva's attendance at trial and the tes-

25   timony was unreliable. (D.D.Rptr.) Denying both the California

26   and the Federal guarantee for the petitioner the right to be

27   confronted with the witnesses against her. Here, the record

28   demonstrates that the prosecution failed to carry this burden on

7

CLAIM THREE

1   both accounts: due diligence was inadequately shown and the
2   testimony was too unreliable to be admitted. The prosecutor's
3   request of the issuance of a bench warrant and the questioning
4   of the witness' mother concerning the witness' whereabouts did
5   not amount to due diligence, the efforts in this case did not
6   raise to the level of diligence needed to justify the use of
7   Silva's prior statement. The prosecution employed only minimal
8   attempts to serve Silva after February 3. The court held that
9   "there has been a good faith effort in this inquiry", and part
10  of the alleged jail conversation was read into evidence for the
11  jury. (AOB 61.) The petitioner was denied a fair trial. The pro-
12  secution did not sustain its burden of establishing that due
13  diligence has been exercised in the effort to procure the atten-
14  dance of this witness for trial for the purpose of admitting
15  her preliminary hearing testimony. It is not enough to show
16  that the witness has not been found, it contemplates something
17  more than a desultory and indifferent search, but connotes per-
18  severing application and untiring efforts. Silva was an adverse
19  witness and the defense's motive and interest for direct exami-
20  nation at the preliminary hearing were not similar to motive
21  and interest for examination of this witness at trial. A pre-
22  liminary hearing is not a trial on the issue of guilt or inno-
23  cence. The court erred in making this ruling. The prosecution
24  did not demonstrate the elements that allow the reading of
25  prior testimony, especially due diligence and reliability, by
26  competent evidence. (AOB 65-68.) Importantly, petitioner is
27  asserting not just the failure of due diligence requirement,
28  but the unreliability of the testimony as well. The showing in

8

CLAIM THREE

1   trial court was insufficient to fulfill the prosecutions
2   burden.

3       Silva contradicted herself in a number of times during
4   her preliminary hearing testimony regarding the details of
5   what the petitioner had purportedly said. (CT 123-131.) This
6   too was not properly presented to the jury, therefore, mislead-
7   ing the jury. (RT 123-131.) Even apart from the due diligence
8   question, the question of reliability remains. As noted by the
9   petitioner's trial counsel, there was new information to con-
10  front Silva with regarding the date of the purported conversa-
11  tion. (RT 1507-1508.) Given her vagueness at the preliminary
12  hearing, this could of been a very important part of the process
13  of cross-examination and confrontation. There was a minimum
14  effort of due diligence in searching for Silva by the prosecu-
15  tion. Silva became a witness in this case on June 5, when code-
16  fendant Wagner was arrested with his "girlfriend" Debra Mike-
17  Lee. (S.J.P.D. Case No.97-156-1088, pg.91; S.J.P.D. Case No.97-
18  156-1275.) Which lead to the re-arrest of Silva, less than 24
19  hours after she was released from the County Jail. Not once in
20  the prosecution's due diligence search for Silva did they re-
21  turn to where the police originally came into contact with her,
22  at Debra Mike-Lee's home. Nor did the prosecution question
23  Mike-Lee about Silva's whereabouts. The prosecution made or
24  helped, by lack of due diligence, a material witness unavail-
25  able. The court erred in admitting Silva's preliminary hearing
26  testimony against the petitioner at trial. Causing the jury to
27  be sufficiently bias towards the petitioner.

28      The court erred in allowing the only evidence of a weapon

9

CLAIM THREE

1  to be excluded. Which Silva also testified to. (Motion In Limine
2  by Wagner's counsel, pg.3.)

3       After Silva gave information to the police about two homi-
4  cides she claimed to have personal knowledge of, Officer Kelly
5  said he would "work things out and make them a little bit better
6  for you." (Silva/Kelly Interview, pg.27, Ln.24-26.) Soon after,
7  the following month all the charges against Silva were complete
8  ly dropped. (CT 81.) (CT 67-68.) This undue influence can no
9  more be considered harmless than the introduction of a coerced
10 confession. (9/26/97 Silva/Davis P.I.Rptr.)

11      Had Silva been found and questioned at trial, it would of
12 been proven by the defense that she gaved purgered testimony,
13 that Silva and the petitioner were never in processing toget-
14 her, as well as prove that this alleged conversation did not
15 take place. (S.J.P.D. Case No.9740812, Tape No.12 (interview)
16 pg.27.) Silva being questioned at trial would of conceivably
17 benifited the petitioner.

# EXHIBIT A

1    PLEASE?

2    A    I SEEN HER IN -- WHILE I WAS IN JAIL I READ THE

3    ARTICLE, WHAT HAD HAPPENED. AND I WAS STANDING RIGHT THERE

4    AND SHE WAS TELLING ME THAT SHE DIDN'T DO IT. SHE WASN'T

5    AT FAULT. AND SHE DIDN'T KILL HIM. AND SHE WAS TELLING ME

6    THAT SHE HAD SHOT HIM AND THE OTHER PERSON SHE WAS WITH WAS

7    THE ONE WHO KILLED THE GUY.

8    Q    LET'S GO BACK, THEN.

9         DID YOU -- DID YOU READ A NEWSPAPER ARTICLE THAT

10   LISTED MISS GREEN'S NAME AS BEING ARRESTED FOR THE MURDER

11   THAT HAPPENED AT KING AND MC KEE WHERE HARRY GARRETT WAS

12   KILLED?

13   A    NO, IT WAS AN ARTICLE THAT SHE WAS CAUGHT WITH SOME

14   KIND OF DRUG IN HER POCKET AND THEY HAD A PICTURE OF HER.

15   AND -- I DON'T REMEMBER EXACTLY WHAT IT SAID. BUT IT JUST

16   SAID THAT SHE WAS -- GOT BUSTED DOWNTOWN WITH HALF AN OUNCE

17   OF A DRUG. AND -- I DON'T KNOW --

18   Q    ALL RIGHT. THIS WAS IN THE SAN JOSE MERCURY NEWS

19   PAPER?

20   A    I THINK IT WAS. I'M NOT TOO SURE.

21   Q    DO YOU KNOW WHETHER THE ARTICLE ALSO SPOKE ABOUT HER

22   BEING ARRESTED FOR THE MURDER OF --

23         MR. BECKER: OBJECTION, LEADING, YOUR HONOR.

24         THE COURT: OVERRULED.

25   Q    (BY MR. SCHON) -- FOR THE MURDER OF HARRY GARRETT?

26   A    I DON'T REMEMBER EXACTLY WHAT THE ARTICLE SAID. I

27   READ THE ARTICLE, YOU KNOW. I KIND OF -- I WASN'T REALLY

28   AMUSED WITH IT. I JUST READ IT, BUT THAT WAS LIKE THE TALK

1   OF EVERYTHING GOING ON THERE.

2   Q    WELL, YOU -- IT IMPRESSED YOU, BECAUSE YOU KNEW

3   MISS GREEN?

4   A    YES, IT DID.

5   Q    ABOUT WHAT TIME WAS THIS DURING THE DAY THAT YOU WERE

6   IN THIS ROOM WITH MISS GREEN?

7   A    IT WAS ABOUT AFTER LUNCH, I AM PRETTY AWARE IT

8   WAS.  IT WAS ABOUT -- OH BOY.

9        I DON'T REALLY KNOW THE TIME.

10  Q    WELL, LET'S SEE IF WE CAN DO IT THIS WAY.  DID YOU

11  HAPPEN TO NOTICE WHAT WAS ON THE TELEVISION?

12  A    NO, I DIDN'T.

13  Q    SO THERE WASN'T A PARTICULAR SOAP OPERA ON THAT YOU

14  RECOGNIZED, ANYTHING OF THAT NATURE?

15  A    NO, IT WAS REALLY FAST WHEN I WENT IN THERE.  I WASN'T

16  EVEN IN THERE MAYBE THREE MINUTES, FOUR MINUTES.

17  Q    OKAY.  SO MISS GREEN TOLD YOU THAT SHE -- WHAT DID SHE

18  TELL YOU, BASICALLY?

19  A    SHE TOLD ME SHE WAS IN HERE FOR ATTEMPTED MURDER.  AND

20  THAT SHE DIDN'T DO IT.  AND THAT, YOU KNOW, SHE KIND OF

21  LIKE REALLY TOLD ME THEY HAD GOT IN A PREVIOUS FIGHT.

22  Q    SHE TOLD YOU WHO HAD GOTTEN IN A PREVIOUS FIGHT?

23  A    HER AND HARRY GARRETT.

24  Q    DID SHE GIVE YOU ANY MORE DETAILS ABOUT THAT FIGHT?

25  A    NO, ALL SHE WAS TELLING ME IS THEY HAD A FIGHT.  AND,

26  YOU KNOW -- AND I GUESS THE DAY BEFORE, A COUPLE DAYS

27  BEFORE -- I'M NOT TOO SURE.  I THINK IT WAS THE DAY BEFORE.

28  AND HER AND A FRIEND WENT BACK, I GUESS, FOR RETALIATION.

42

```
 1   Q   SHE TOLD YOU --
 2           MR. KIRCHICK:  I'M GOING TO OBJECT AND MOVE TO
 3   STRIKE AS TO WHAT SHE IS GUESSING.
 4           MR. SCHON:  I WANT TO CLARIFY THAT, IF I MIGHT,
 5   JUDGE.
 6           THE COURT:  SURE.  OBJECTION IS OVERRULED.
 7   Q   (BY MR. SCHON)  DID MISS GREEN TELL YOU THAT SHE
 8   WENT -- HER AND HER FRIEND WENT TO SHOOT HARRY GARRETT
 9   BECAUSE OF THE FIGHT?
10   A   NO.
11           MR. BECKER:  OBJECTION, YOUR HONOR, MISSTATES THE
12   TESTIMONY.  SHE DIDN'T SAY ANYTHING ABOUT SHOOT --
13           MR. KIRCHICK:  OBJECTION.
14           THE COURT:  OVERRULED.
15           MR. KIRCHICK:  COULD THAT ANSWER BE STRICKEN?
16           THE COURT:  THE ANSWER IS NO.  DO YOU WANT THE
17   ANSWER STRICKEN?
18           MR. KIRCHICK:  I DON'T WANT THE D.A. TO LEAD THIS
19   WITNESS.
20           MR. SCHON:  I'M NOT TRYING TO.
21           THE COURT:  OKAY.
22   Q   (BY MR. SCHON)  WHAT DID SHE SAY IN THAT RESPECT,
23   ABOUT THE FIGHT?
24   A   SHE JUST TOLD ME THEY HAD GOT -- LET ME BE EXACT
25   BECAUSE IT WAS SUCH A FAST CONVERSATION.
26   Q   DO THE BEST YOU CAN.
27   A   BOY, THIS IS KIND OF HARD.
28           SHE JUST LIKE -- SHE TOLD ME THEY GOT IN A
```

1  FIGHT. AND SHE WAS GETTING BLAMED FOR A MURDER THAT SHE

2  DIDN'T DO. THAT ALL SHE DID WAS SHOOT HIM, BUT SHE DIDN'T

3  KILL HIM.

4  Q    SHE SAID SHE SHOT THIS PERSON, MR. GARRETT; SHE USED

5  THE PERSON'S NAME OR SHOT THIS DUDE, HOW DID SHE REFER TO

6  THE VICTIM?

7  A    WELL, I KNEW WHAT SHE WAS TALKING ABOUT, YOU KNOW,

8  BECAUSE SHE WAS LIKE, YEAH, I DIDN'T KILL HARRY. I JUST

9  SHOT HIM.

10  Q   DID SHE INDICATE HOW MANY TIMES SHE SHOT HIM?

11  A   I THINK SHE HAD TOLD ME SHE SHOT HIM TWICE.

12  Q   DO YOU REMEMBER TALKING TO THE POLICE BACK IN JUNE,

13  JUNE 10TH OF '97, AND TELLING THE POLICE THAT MISS GREEN

14  TOLD YOU SHE SHOT THE GUY ONCE AND THE OTHER GUY SHOT HIM

15  THE OTHER TWO TIMES?

16  A   I MIGHT HAVE SAID THAT. IT'S KIND OF HARD, YOU KNOW.

17       SHE COULD HAVE SHOT HIM TWICE -- ONCE, EXCUSE ME,

18  AND HE SHOT HIM TWICE. IT'S JUST, I'M KIND OF NERVOUS

19  RIGHT NOW. IT'S KIND OF HARD TO REMEMBER EVERYTHING

20  EXACTLY.

21  Q   BUT IN ANY EVENT, MISS GREEN INDICATED TO YOU THAT SHE

22  SHOT THE GUY AND THAT THE OTHER GUY SHOT HIM ALSO, CORRECT?

23  A   YES.

24  Q   AND YOU WERE SPEAKING ABOUT HARRY GARRETT?

25  A   YES.

26  Q   DID YOU KNOW HARRY?

27  A   I DIDN'T KNOW HIM, BUT HE'S INTRODUCED HIMSELF IN TO

28  ME MAYBE TWICE.

# EXHIBIT B

SAN JOSE MERCURY NEWS ■ Local ■ SATURDAY, MAY 31, 1997

# Suspect arrested in McKee slaying

By RODNEY FOO
Mercury News Staff Writer

At first, the hunt for the killer of Harry Garrett III focused on a man who was seen running into the night from the scene of the McKee Road shooting.

But the word on the street was that the man San Jose police were looking for was, in fact, a woman.

And on Friday, detectives announced the arrest of the person they believe killed Garrett last week — Ayana Green, a 28-year-old San Jose woman.

Green was booked Thursday into a Santa Clara County jail on suspicion of murder and possessing crack cocaine for sale. Her bail was set at $1 million, said homicide Lt. Joe Neves.

Witnesses told police after the May 22 killing, outside the Mexicana Tapueria/Restaurant, in the 1700 block of McKee, that they had heard Garrett speaking loudly, as if arguing, with another person.

When shots were fired, they saw what appeared to be a man running across McKee toward a fenced empty field. The man, they said, was about 5 feet 7, 18 to 20 years, 140 pounds, and his hair was almost shaved off.

With her hair in braids, Green could appear bald if she pulled them up and put on a hat, police said.

In addition, said Sgt. Wayne Farquhar, "it's so odd to hear about a woman involved in this type of shooting, so it's very easy to assume the shooter is a male."

In the aftermath of Garrett's death, beat officers began asking their contacts about the killer. Soon, investigators learned their suspect was a woman with braids who had a tattoo on her arm that was an epitaph to a slain rapper — "Rest In Peace Tupac Shakur."

Patrol officers then alerted investigators that they had encountered a woman matching that description downtown.

On Thursday, officers arrested Green after finding her at a Taco Bell restaurant on Santa Clara and Sixth streets. A half ounce of crack was found in her possession, Farquhar said.



**Ayana Green**
Bail set at $1 million



## CLEARANCE SALE!

Fast Delivery or
Take Home Today!

**15-50% OFF**

Enjoy HUGE savings on our Giant Selection of
**FLOOR SAMPLE**
Dinette & Game Sets!

C·A·L·I·F·O·R·N·I·A
STOOLS • BARS • DINETTES

Largest Selection
Northern California

Lafayette    San Jose    San Carlos

# EXHIBIT C

DUE DILIGENCE REPORT

**5/20/98**

Drove to Modesto and checked for any contact with Modesto Police. Likewise stopped at the Ceres Police Dept. Both reported no contact with either Sara (under all her AKAs) or her father, Henry Silva.

Drove to 4324 McGee Avenue in the Riverdale area of Modesto, due to a phone listing for Henry Silva there. Both Henry and Sara are unknown to the resident and the number 209-847-6537 is not theirs.

**5/21/98**

Drove to 5745 Almaden Expy #D and met with Anna Silva. Said she has not seen Sara since she saw me last. Sara's daughter, Alice, was there. Joseph is with his mother, Anna said, and she cares for Alice. Refused to let me search her home for Sara.

Spoke to Maria Flores, 5745 Almaden Expy #B 979-0825. Hasn't seen Sara in about one month. Last saw her being affectionate with a black male and riding in his salmon/beige 80's Cadillac.

**5/22/98**

Checked with Sgt Farquhar...description not familiar to him.

**5/23/98**

Faxed a request to San Jose Police Department Operations Support/ACES for a scan of their Field Interview cards.

**5/26/98**

Received SJPD response with 3 addresses: 870 DiFiore Dr, 812 N. Jackson Ave and 1093 Leigh Ave #96...all SJ.

Called Maria Flores...she saw Sara and friend with son back on Saturday, in and out, driving a brick colored Pontiac convertible.

# EXHIBIT D

1 | LAW OFFICES OF THE ALTERNATE DEFENDER
RONALD A. NORMAN, #43013
2 | MARK S. BECKER, #129462
County of Santa Clara
3 | 4 North Second Street, Suite 1270
San Jose, California 95113
4 | Telephone: (408) 299-7200

5 | Attorneys for Defendant

6

7

8 | IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | IN AND FOR THE COUNTY OF SANTA CLARA

10

11 | THE PEOPLE OF THE STATE OF CALIFORNIA,        No. 201285

12 |                                Plaintiff,        MOTIONS IN LIMINE

13 |                 -vs-

14 |                                                  Date: 4/6/98
                                                      Time: 9 :00 a.m.
15 | ANAYA GREEN and CLINTON FRED  WAGNER,            Dept.: 30

16 |                                Defendant.

17 | **TO THE CLERK OF THE ABOVE-ENTITLED COURT, AND
18 | TO THE DISTRICT ATTORNEY FOR SANTA CLARA COUNTY:**

19 |        NOTICE IS HEREBY GIVEN that on the 6th day of April, 1998, at 9:00 a.m., in

20 | Department 30 of the above-entitled court, defendant CLINTON WAGNER will move the court

21 | to grant the following requested motions.  These  motions will be based upon the instant

22 | motions, the attached memorandum of points and authorities, the preliminary hearing transcript

23 | and all evidence and oral arguments presented at the time of the motions.  It is estimated that

24 | these motions will take about 1 hour to hear, argue and submit.

25 | Dated: April 1, 1998                    Respectfully submitted,

26 |                                          RONALD NORMAN
                                             Supervising Attorney
27

28 |                                          _MK S. Bak_
                                             MARK S. BECKER
                                             Alternate Defender

## IV.    EVIDENCE TO BE EXCLUDED PURSUANT TO EVIDENCE CODE §352

Evidence code section 352 states:

> The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.

The defense anticipates the prosecution will seek to admit evidence through witness Sara Silva regarding defendant Wagner's conversation about possessing a "gun."  This conversation is alleged to have occurred 14 days after the shooting.  That evidence is unduly prejudicial because it does not distinguish what type of "gun" was being discussed.  If such statement were made as claimed, it doesn't answer the question which would make such possession of a gun relevant, i.e.; what type of gun.  There is no discrimination in the alleged statement about whether the "gun" was a handgun, shotgun, rifle, machine gun, etc.  There is no evidence that Mr. Wagner could not legally possess a gun.  In addition due to the length of time between the shooting and the supposed conversation there is no probative value to this statement. it would only be relevant and probative if it can detail as fact that Mr. Wagner was speaking of the same or similar type of gun that was used to shoot the victim.  Therefore the defendant respectfully requests the court exercise its power under Evidence code section 352 and exclude any mention of this evidence.

## V. DEFENSE REQUESTS A HEARING PURSUANT TO EVIDENCE CODE §402 FOR ANY STATEMENTS WHICH THE PROSECUTION INTENDS TO ADMIT WHICH ARE ATTRIBUTABLE TO THE DEFENDANT.

Evidence Code section 402 states:

> (a)  When the existence of a preliminary fact is disputed, its existence or non-existence shall be determined as provided in this article.

> (b)  The court may hear and determine the question of the admissibility out of the presence of the jury; but in a criminal action, the court shall hear and determine the question of the admissibility of a confession or admission of the defendant out of the presence of the jury if any party so requests.

The defense requests such a hearing with respect to any statement which the prosecutor intends to offer which is attributable to the defendants. The defense is challenging the

3

# EXHIBIT E

PEOPLE VS. AYANA GREEN/CLINTON FRED WAGNER
DOCKET NO.C9740812
SJPD
INTERVIEW OF: SARA SILVA BY OFFICER PAUL KELLY

| | | |
|---|---|---|
| 1 | KELLY | We're not in the business... |
| 2 | SILVA | Get something on the dude you know, (inaudible). |
| 3 | KELLY | I know. |
| 4 | SILVA | (inaudible). |
| 5 | | |
| 6 | KELLY | Do you understand... |
| 7 | SILVA | I mean, there's possibilities there (inaudible). |
| 8 | KELLY | I know.  But  you understand what the.... |
| 9 | SILVA | I understand. |
| 10 | KELLY | Okay.  I it's hard... |
| 11 | SILVA | Because  (inaudible) and it's like... |
| 12 | KELLY | That's right. |
| 13 | | |
| 14 | SILVA | ...you don't know if people know, they're telling |
| 15 | | the truth, and 'cause like I said, I'm, I'm from |
| 16 | | the beginning, I'm not going to lie, because it's |
| 17 | | not worth it. |
| 18 | KELLY | (inaudible). |
| 19 | SILVA | And you always get up caught in new shit. |
| 20 | KELLY | Yeah.  And that's just it. And you just got dealt |
| 21 | | that card tonight you know? |
| 22 | | |
| 23 | SILVA | (inaudible). |
| 24 | KELLY | It's just the way it goes.  But, there may be a |
| 25 | | way uh, a way we can work things out and make |
| 26 | | them a little bit better for you.  Looks like.  I |

# EXHIBIT F

# THOMAS C. DAVIS & ASSOCIATES

*Investigative and Legal Services*

59 North Santa Cruz Avenue
Suite K
Los Gatos, California 95030
(408) 395-3161
FAX (408) 395-2453

September 26, 1997

Client:        Stuart Kirchick

Re:            People v. Ayana Green

Interview of:  Sara Silva, witness
               Date of birth:  6/20/75
               Residence telephone:  (408) 573-1732
               Pager No. (408) 814-2059
               Employment Telephone:  (408) 979-1424

Tuesday, September 23, 1997

Investigator Gina Serpa contacted and attempted to interview Sara
Silva by telephone at her residence on this date at 5:30 p.m.
Investigator Serpa advised Ms. Silva who she represented and that
the reason for her contacting her was to verify the accuracy of the
police report attributed to the statement given by Ms. Silva at the
time of her arrest.

Ms. Silva became very agitated and stated that she did not want to
discuss any aspect of the case currently pending trial involving
Ayana Green.   Ms. Silva stated that she knew the victim in this
case.

Ms. Silva stated that she knew Ayana Green very well and did not
want any problems.  Ms. Silva went on to state that she was told by
the Investigating Officers that her name would not appear on any
police report. Ms. Silva stated that she was told that she was not
to talk to anyone if contacted regarding this case.  When asked who
told her not to talk to anyone she said she could not reveal who
told her that.

Ms. Silva stated that she has two small children she wants to
protect and could not get involved any further in this case.   Ms.
Silva stated that she knew that no one could protect her or her
children and therefore she did not want to participate any further
in this case.

Respectfully,

Tom Davis

TCD:jr

*All information contained here is confidential*

Thomas C. Davis Lic.-A-6198

# EXHIBIT G

PEOPLE VS. A. GREEN/C. WAGNER
DOCKET NO. C9740812
SAN JOSE POLICE DEPARTMENT
INTERVIEW OF SARA SILVA TAPE #12

| | | |
|---|---|---|
| 1 | | people have been stabbed or shot or killed? |
| 2 | SILVA | No. |
| 3 | OFFICER | Okay. |
| 4 | SILVA | No. (inaudible). |
| 5 | OFFICER | Okay. (inaudible). |
| 6 | SILVA | Yeah, (inaudible). |
| 7 | OFFICER | Did she talk to (inaudible)? |
| 8 | SILVA | Um huh. |
| 9 | OFFICER | Has she said anything to you? |
| 10 | SILVA | No, she told me um, (inaudible) she said um, |
| 11 | | (inaudible). And I kinda like, I didn't even talk |
| 12 | | to her... |
| 13 | OFFICER | Um huh. |
| 14 | SILVA | You know, because I didn't want the officer seeing |
| 15 | | me talking to her and thinking I'm just as bad as |
| 16 | | her, you know? |
| 17 | OFFICER | Um huh. |
| 18 | SILVA | So she said, hi and I said, hello. And um, she |
| 19 | | just goes, yeah, I didn't do it. I didn't do it. |
| 20 | | And I just kind said, whatever and I just turned my |
| 21 | | head and looked out the window and (inaudible). |
| 22 | OFFICER | Where is she housed at? Is she... |
| 23 | SILVA | In red... |
| 24 | OFFICER | Uh? |
| 25 | SILVA | She's got all red. |
| 26 | OFFICER | She's all red? |

THE COURT ERRED IN ADMITTING NESTED HEARSAY EVIDENCE AND
IN ITS INSTRUCTION ON WHICH THE JURY SHOULD APPLY IT.

After initially ruling this evidence inadmissible (RT 1626-
1634, 1713-1717, 1834-1840.), the trial Court had a "change of
heart" (RT 1958-1964.) on this ruling allowing the nested , mul-
tiple hearsay evidence in. Allowing Greg Walton to testify that
on the afternoon of the day of the shooting, Haney had overheard
angry statements between Garrett and the petitioner. No Weighing
of the probative versus prejudicial value was done. The factors
warranted exclusion of this evidence in light of its lack of
probative value and high possibility of undue prejudice towards
the petitioner. This hearsay statement did not meet the require-
ments of an exception to the hearsay rule. The trial Court erred
in allowing the admission of these statements, Haney himself
denied ever telling Walton that he overheard the statement (RT
1634.) (RT 2238.) Thus, the person who supposedly heard the
statement denied that it happened. This hearsay evidence is
inherently unreliable. There was no inherent traditional indicia
of reliability ensuring trustworthiness of such statements.

The Court erred or abused its discretion in not excluding
Walton"s testimony. Initially Walton stated in his interview
with Sgt.Kirby, the lead detective, that he saw the petitioner
and Garrett get into an argument. This argument took place
about 4:00 p.m. The petitioner was by herself at this time, and
she had on different clothes. Walton/Kirby Interview; Case No.
97-142-1247, (W: Kirby K: Walton) pg.7.) Walton was adherent to
these facts. Then when questioned again, by the defense's inves-
tigator, Walton stated that he was in this area about 3:00 or
4:00 p.m. He "did not see Garrett, but did see (the petitioner),
who was talking to Tiger (Haney)." (Walton/Davis Interview, pg.

11

CLAIM FOUR

12.) Walton continued to state that he saw the petitioner at this time when he was at the liquor store. Concurring with his previous statements, again stating that the petitioner was not in the company of anyone at that time. (Walton/Davis Interview, pg. 13-14.)

Harris, the prosecution's key witness, testified that she was with the petitioner this entire afternoon, and between 3:00 and 5:00 p.m. she and the petitioner stayed "downtown". (CT 348-349.) (RT 715-716.) Harris also testified that the petitioner did not change clothes. Completely refuting Walton's testimony.

Walton was later arrested in Palo Alto for possession. (Case No.98-108-016, pg. 4-5.) In the interview following his arrest, with Sgt.Kirby, Walton stressed the fact of how worried he was about this pending case. Also that he needed help getting into a program. Sgt.Kirby then gave Walton his business card and told him when he was assigned an attorney at his arraignment "have him call me and I can work with him to try to get you into whatever program's available to you." (Walton/Kirby; Case No.97-142-1247, pg. 2, 4-5, 12.) On May 21,1998 Mr. Schon, the prose-cutor, not Sgt.Kirby, was notified of the $1,262.29 due in be-half of Mr.Gregory Walton. (Notification Letter.) Walton enter-ed the Horizon South program on April 30,1998 and was currently a resident of their program. During Walton's 402 Hearing, his testimony completely changed. Walton was now stating that he "was not in the area of King and McKee during the daytime hours." "He did not observe any conflict between the petitioner and Garrett." "But it was pretty much everybody knew that." Walton also told Sgt.Kirby that "Tiger, I mean that Haney had

12

CLAIM FOUR

told me that." (5/5/98 402 Hearing, pg. 5, 7-8, 34.) The pro-
secution had no motive for their case. In a effort by the pro-
secution to secure this witness to show motive, the prosecutor
assisted Walton in getting his possession charges dropped, as
well as paid for Walton's drug program.

It is shown that Walton's testimony was of vital impor-
tance to the jury. So much so that the jury asked the court if
Walton's testimony was "just hearsay" or "considered to be
evidence". (CT 1183.) The court erred in its response, misdirec-
ting the jury in a matter of law. Stating in part "the evidence
is hearsay but was addmitted as evidence because of an exception
to the hearsay rule. It may, therefore, be used to prove the
truth of the matter asserted." It was not, according to the pro-
secutor, "offered for the truth of the matter." (RT 1631.) It
could not be assumed that the jury considered such evidence
only to measure credibility. There is reasonable possibility
that such contributed substantially to the verdict. The state-
ments which Walton made were unfounded hearsay. We may assume
they would be admissible for purposes of impeachment. (RT
1634.) But they certainly would not be admissible as substan-
tive evidence. It is reasonable probable that a result more
favorable to the petitioner would have occured had correct in-
structions been given to the jury. When a witness is impeached
by proof of prior inconsistent statements, the effect is merely
to discredit him as a witness, the former statements made by
him are incompetent, for any other purpose. They do not consti-
tute evidence of the truth of the facts so stated by him. This
witness lacks personal knowledge, hence, is not qualified to

13

CLAIM FOUR

1   testify on the matter.

2        Instructions to disregard did not cure error in volunteer-
3   ed response that the petitioner was arrested with drugs and
4   had problems with Garrett selling drugs. (RT 1740.) (RT 1813.)
5   The courts actions caused the jury to be sufficiently bias
6   towards the petitioner. Making them unsuitable to preform
7   their duties. When the misconduct in question supports a find-
8   ing that there is at least a substantial likelihood that at
9   least one juror was impermissibly influenced to the petition-
10  er's detriment, the integrity of the trial was undermined.

11       The petitioner was also prejudiced when the defense was not
12  allowed to question Walton about "Bob" during the trial. Walton
13  "has a voice in his head named Bob, that is constantly negative
14  and usually talks to him while he is on drugs and while he is
15  coming off of drugs, and that is a large part of his most recent
16  existance." "...he has heard voices telling him to kill him-
17  self." Walton's "judgment is impaired" he also "complains of
18  some blurred vision". (11/21/96 Psychiatric Admission Summary,
19  pg.1-2; 11/20/96 Admission Psychiatric Evaluation, pg.1-3;
20  11/22/96 Consultant's Records, pg.1-2; via Sequoia Hospital Dis-
21  trict, Redwood City, California; Med.Rec.No. 60 21 59.) Walton's
22  testimony was of vital importance for the prosecution. So in
23  denying the petitioner to question Walton about "Bob", the peti-
24  tioner was denied her right to fully cross examine Walton. As
25  well as conflicting the jury in its duty to properly weigh the
26  evidence, since it was not all brought forth. The defense was
27  not allowed to bring "Bob" into questioning in front of the
28  jury.

14

CLAIM FOUR

1    Thus, the credibility of the witness, and evidence tends

2    to reasonable show that Walton has motive to fabricate his tes-

3    timony. Which has no probative value, and is prejudicial to the

4    petitioner, so it is an abuse of discretion not to exclude it.

5    The record shows that Walton's testimony caused prejudice,

6    confused the issues, and mislead the jury. No one testified

7    that they saw this argument. No one could test the accuracy of

8    the words, no one could ask or answer questions about what else

9    was said, who was there, what they looked like, where this

10   occured. The credibility of the prosecution's witnesses and the

11   credibility of the petitioner and her witnesses were the key

12   factors. The petitioner was not arrested at the scene of the

13   crime, no weapon was found and the identification evidence by

14   the witnesses on the scene do not corroborate with the state-

15   ments of the prosecution's witnesses. The case essentially be-

16   came a contest between the credibility of the prosecution's

17   witnesses, who all had proven motive to fabricate and give

18   untruthful testimony, and the credibility of the petitioner and

19   the other witnesses. In permitting this case to the jury after

20   the drug evidence of the petitioner had been disclosed to the

21   jury, the trial court permitted the jury to hear improper preju-

22   dicial information that could have had a substantial effect upon

23   the credibility of the petitioner's case. The conviction resul-

24   ted from a trial in which the essential rights of the petition-

25   er were disregarded or denied. Had proper cross-examination

26   been permitted and had the jury not heard the damaging evidence

27   about petitioner's drug sales/possession, and this unfounded

28   argument, it is reasonably probable that a result more favor-

15

CLAIM FOUR

able to the petitioner would have been reached. This was simply a hypothetical confrontation that supplied a crucial inference of premeditation and motive without _any_ real credible or proba- tive weight. Trial by rumor is inconsistant with proper respect for the testing of real evidence through the adversary process.

# EXHIBIT A

```
1    K:   I, I can't recognize that guy.
2    W:   Okay.
3    K:   And um, and like I said Harry was coming down the street
4         and Louis is back in the restaurant now.  And, I don't
5         know.  I guess it was a premonition or something,
6         something in my mind said "leave, there is going to a
7         shooting.
8    W:   Uh, huh [affirmative].
9    K:   You know, cause I saw KK and I saw Harry and they had
10        argued that day, cause he had told her "Hey bitch didn't
11        I tell you not to be up over here selling shit no more
12        and all that?"  And that's when she goes "I'm tired of
13        him, I'm tired of him, it's over."  And then she left.
14        And then when I saw her that night and I saw him,
15   W:   Where you, where you there when they had that argument?
16        Where, ah, ah Harry tells her [inaudible] not be there
17        selling stuff and she says in turn that she's tired of
18        him?
19   K:   Yeah, at the [inaudible] earlier that day.  And then they
20        had [inaudible] by sisters the day before that, when they
21        like ruffed her up a little bit.
22   W:   Where you there on that one?
23   K:   No.  But everybody knew about that.
24   W:   Heard about that?
25   K:   Yeah because she stuck one of them.
26   W:   About what time did this argument take place at David and
27        Sons, where a [inaudible]
28   K:   Maybe about 4.
29   W:   Four o'clock in the afternoon.
30   K:   Maybe four.
31   W:   Was ah, [inaudible] Green by herself at that time?
32   K:   Yeah.  She was buying some weed from Titan.
33   W:   Okay, did she have the same clothes on?
34   K:   No.
35   W:   Okay.
36   K:   Cause it was hot.
37   W:   It was hot?  Okay.  So she got told again not to come
38        down there selling stuff?
39   K:   Yeah.
40   W:   She left pissed off and she said, but what did she say
41        again?
42   K:   It's on.
43   W:   It's on?
44   K:   Yeah.
45   W:   What does that mean? It's on?
```

# EXHIBIT B

| | | |
|---|---|---|
| 1 | GREG | Just some dirty clothes. |
| 2 | DAVIS | Uh hum. O.K. And so you arrived, had you been to that parking lot earlier that day at all? |
| 3 | GREG | That day? |
| 4 | DAVIS | That day. |
| 5 | GREG | I'd been up by (inaudible) house that day. |
| 6 | DAVIS | And when were you there? |
| 7 | GREG | About three or four o'clock. |
| 8 | DAVIS | In the afternoon? |
| 9 | GREG | Yeah. |
| 10 | DAVIS | O.K. And were you alone at that point in time? |
| 11 | | |
| 12 | GREG | I went there alone. |
| 13 | DAVIS | Sure. And who did you meet there or see there? |
| 14 | GREG | I didn't meet anybody there. There was just people I used to hang out with. |
| 15 | | |
| 16 | DAVIS | Did you go there for any particular reason? |
| 17 | GREG | No. (inaudible) |
| 18 | DAVIS | And when you arrived, who did you see there that..did you see Harry Garrett? |
| 19 | GREG | At three, four o'clock in the afternoon, no. |
| 20 | DAVIS | O.K. Did you see Ayanna Green? |
| 21 | GREG | Yeah. |
| 22 | DAVIS | And who was she with? |
| 23 | GREG | She was talking to Tiger. |
| 24 | DAVIS | Do you know Tiger by another name? |
| 25 | GREG | (inaudible) At that time yeah. Harry was leaving (inaudible) Harry was leaving and from what I heard, I didn't see, |
| 26 | | |
| 27 | | 12 |
| 28 | | |

# EXHIBIT C

| | | |
|---|---|---|
| 1 | DAVIS | O.K. |
| 2 | GREG | From what I heard, Harry had approached her |
| 3 | | and told her, bitch didn't I tell you not to be over here no more and this and that. This |
| 4 | | is what I heard and not what I seen. |
| | DAVIS | O.K. Now Greg.. |
| 5 | | |
| 6 | GREG | Now she.. apparently said to, not to him or anyone in particular, I'm tired of him |
| 7 | | fucking with me, it's on. |
| 8 | DAVIS | O.K. And that's what you heard from other people not from Harry Garrett or anybody |
| 9 | | involved in this homicide? |
| | GREG | Uh hum. No, yeah. |
| 10 | | |
| 11 | DAVIS | Is that true, O.K? Would you give me who, the name of the person you heard that from? |
| 12 | | |
| | GREG | I'd rather not. |
| 13 | | |
| | DAVIS | O.K. But do you know who that person is? |
| 14 | | |
| | GREG | Yeah. |
| 15 | | |
| 16 | DAVIS | O.K. Now who else was there? Do, do you remember Mr. Lewis being there. |
| 17 | GREG | Lewis wasn't there at that time. |
| 18 | DAVIS | O.K. Um and this was all at about, what three, four o'clock in the afternoon? |
| 19 | GREG | Yeah and then prior to that, three or four |
| 20 | | days before that, Harry had allegedly came across, um roughed her up a little bit for |
| 21 | | selling on their block, as they call it. |
| 22 | DAVIS | Uh hum. |
| 23 | GREG | And he told her not to come back over there selling nothing. |
| 24 | DAVIS | Uh huh. |
| 25 | GREG | And uh.. |
| 26 | DAVIS | And when you say allegedly, who did you hear |
| 27 | | 13 |
| 28 | | |

| | | |
|---|---|---|
| 1 | | that from? |
| 2 | GREG | It was the talk of the whole block, everybody knew. |
| 3 | | |
| 4 | DAVIS | Everybody knew. O.K. can you give me any names.. |
| 5 | GREG | No. |
| 6 | DAVIS | of anybody who was talking about that. |
| 7 | GREG | No. No. |
| 8 | DAVIS | O.K. Now, when, how long were you at that uh liquor store when you saw Ayanna Green, uh there? |
| 9 | | |
| 10 | GREG | What liquor store? |
| 11 | DAVIS | Daves, is it. |
| 12 | GREG | At three, four o'clock in the (inaudible) |
| 13 | DAVIS | At three, four o'clock in the (inaudible) |
| 14 | GREG | How long I go by there? |
| 15 | DAVIS | How long did you stay there? |
| 16 | GREG | No at that time, maybe ten, fifteen minutes. |
| 17 | DAVIS | O.K. And did you buy any alcohol? |
| 18 | GREG | No. |
| 19 | DAVIS | O.K. Um did you, who did, did you see Ayanna Green leave? |
| 20 | GREG | Walk away, yeah. Then I don't know where she went after that or.. |
| 21 | | |
| 22 | DAVIS | Was she in the company of anyone? |
| 23 | GREG | No. |
| 24 | DAVIS | What kind of clothes was she wearing? |
| 25 | GREG | I don't recall. |
| 26 | DAVIS | O.K. Then what did you do? Did you go back home or... |
| 27 | | |
| 28 | | |

14

# EXHIBIT D

| NARCO & DRUG/ POSS. OF CRACK COCAINE | PALO ALTO POLICE CONTINUATION | CASE NUMBER 98-108-016 |
|---|---|---|

## SYNOPSIS

2
3  The suspect was the driver of a vehicle which was stopped for CVC violations.  The suspect
4  had a suspended license with valid service.  The suspect's person was searched based on
5  this arrest and based on his consent.  During this search, a usable amount of crack cocaine
6  and a crack pipe was located.  The suspect was booked into the main jail for H&S 11350, H&S
7  11364 and CVC 14601.1(a).
8
## INVESTIGATION
10
11  On today's date, I was in a full police uniform driving a marked vehicle (#581).  At 0826 hours,
12  I was traveling S/B on HW 101 near University Av. when I first saw the suspect's vehicle, a red
13  1993 Toyota pick up with a red camper shell.  When I saw it, I noticed that there was a subject
14  who was seated in the rear of the pick up not secured by a seatbelt in violation of CVC
15  21712(a)(b).  I drove in front of this same vehicle and also noticed that it did not have a front
16  license plate in violation of CVC 5200.  As a result, I made an enforcement stop on the vehicle
17  on S/B HW 101 near Shoreline Blvd.  I approached and asked the driver for his CDL,
18  insurance and registration for the vehicle.  The driver, Walton, gave me his CDL and advised
19  that the front passenger, Flournoy was the R/O of the vehicle.  I therefore asked Flournoy if he
20  had the registration and insurance for the vehicle.  I also asked him if he would let me see his
21  CDL.  He gave me both his CA ID card and the vehicle's registration.  I then asked Walton and
22  Flournoy who the subject in the rear of the pick up was.  They both said that they did not know
    who he was, but that they were giving him a ride to San Jose.  When I asked them why they
    were going to San Jose, Walton explained that they came from San Jose to E. Palo Alto to
25  see a friend and were returning to San Jose to do a weekend work program.  Walton further
26  advised that the rear passenger, whose name he did not know, was not going to the weekend
27  program, but just somewhere in San Jose.  I then asked the subject in the rear of the pick up if
28  he had any identification with him.  He gave me an old parole identification which identified
29  himself as Williams, but advised that he was no longer on parole.
30
31  I then had a computer check performed on all three of the subjects.  This check revealed that
32  Walton's CDL was suspended as of 2-15-98 with valid service.  Near this time, Ofc. Powers
33  arrived to assist.  When she arrived, I asked Walton to exit the vehicle so I could question him
34  about his license.  I then asked him if he knew that his license was suspended.  He said that
35  he thought that it was currently valid.  He did admit that he had recently been arrested for a
36  drunk driving event and that the officer had taken his CDL, but he had gotten a new CDL from
37  the DMV in 3/98.
38
39  I then asked Walton if he had anything illegal on his person.  He said that he did not.  I asked
40  "so do you mind if I search your pockets to make sure?"  He said, "Sure, go ahead".  I then

| OFFICER'S NAME FRENCH | ID NUMBER F0063 | DATE 4-18-98 | SHIFT 12 | SUPERVISOR REVIEW | ID NUMBER | DATE |
|---|---|---|---|---|---|---|

Page 4

| NARCO & DRUG/ POSS. OF CRACK COCAINE | PALO ALTO POLICE CONTINUATION | CASE NUMBER 98-108-016 |
|---|---|---|

proceeded to search Walton based on this consent and as he was under arrest for driving on a
2 suspended license. Prior to searching him, I had Walton face away from me, place both of his
3 hands in the small of his back ,interlace his fingers and spread his feet . Walton followed all of
4 these instructions and I began to search his person.
5
6 Evidence
7
8 In Walton's left front pant pocket, I removed a GPC cigarette package (evidence item #3). I
9 opened this box and saw that instead of cigarettes, there was a tissue which appeared to have
10 something wrapped in it. I manipulated this tissue and saw a used, glass crack pipe (evidence
11 item #2). Upon finding this, I handcuffed Walton. I then continued to look within this cigarette
12 box. Also in this box, I found a "bobby" pin (evidence item #4). I continued to open this tissue
13 which contained the crack pipe and found several small white rocks (evidence item #1). At the
14 scene, I tested this substance in a Narkit Jr. This substance tested presumptive positive for
15 crack cocaine. I collected all of these small rocks as well as another small rock which was at
16 the bottom of the cigarette box and placed all of them into a small, zip lock bag. When Walton
17 saw that I was collecting the pieces of crack cocaine he spontaneously said, "Oh, come on,
18 you're not going to arrest me for those bits are you?"
19
20 I then had Walton's truck which he was driving towed per 14602.6 CVC. I then released both
21 Williams and Flournoy at the scene.
22
23 I then read Walton his Miranda rights from my department issued Miranda card. Walton
24 replied, "I know my rights" to understanding his rights and "yeah" to wanting to give a
25 statement.
26
27 Statement of Suspect, Walton
28
29 Walton said that he bought a "ten piece" of crack cocaine somewhere in San Jose in the early
30 morning hours of 4-18-98. He said that soon after buying it, he smoked it by himself. He said
31 that he had been smoking crack cocaine for several years. Walton added that both the pieces
32 of crack and the crack pipe which I found on his person were his.
33
34 I next proceeded to transport Walton to the main jail. While at the main jail Donna Nixon who
35 is a evidence specialist responded and drew a sample of Walton's blood. After drawing this
36 sample, Nixon deposited it to San Jose AIB's refrigerator where it would later be taken to the
37 county crime lab.
38
39 I then booked Walton in the main jail for H&S 11350, H&S 11364 and CVC 14601.1(a).
40

| OFFICER'S NAME FRENCH | ID NUMBER F0063 | DATE 4-18-98 | SHIFT 12 | SUPERVISOR REVIEW | ID NUMBER | DATE |
|---|---|---|---|---|---|---|

# EXHIBIT E

```
 1    W:    State prison.
 2    K:    State prison.
 3    W:    Okay, and he wants to screw somebody over?
 4    K:    Yeah, you know, cause, you know, cause Lewis and
 5          [inaudible] fed up, and you know, and they know that I
 6          know that,[inaudible] oh they just [inaudible].
 7    W:    Would you talk to Albert, uh, personally, that uh--.
 8    K:    No, he didn't say nothing to me.
 9    W:    Okay.  So you heard this through just knowledge?
10    K:    Yeah, and a couple of other people mentioned it, you
11          know.  Like, "Where you been hiding at?"
12          [inaudible][traffic sounds][inaudible]
13    W:    So, so--.
14    K:    You, I'm gonna admit, I was, I was, you know, I was using
15          up until about a week ago, up until last week.
16    W:    Uh, huh [affirmative].
17    K:    Then, ah. last Saturday, I was driving this other dude's
18          truck and I had a damn crumb in my cigarette pack, I
19          mean, hardly big enough for the eye to see.
20    W:    Yeah.
21    K:    Then, ah, the Palo Alto police stopped us and pulled us
22          over and searched us and they found that in my, in my uh,
23          cigarette pack.
24    W:    Uh, huh [affirmative].
25    K:    It wasn't even, it wasn't even fucking a dollars worth
26    W:    Yeah.
27    K:    I didn't even know it was in there and they gave me a
28          possession for that.
29    W:    Uh, huh [affirmative]
30    K:    And know I am fucking worried about that and--.
31    W:    Okay.  Let's talk about what your concerns are, uh,
32          currently about uh, your testimony, um
33    K:    Thursday?
34    W:    Yeah. What time did you, did you uh,--.
35    K:    I'm supposed to be there at nine.
36    W:    At nine o'clock, Okay, just to let you know, that you
37          know I'll be picking you up.
38    K:    Yeah.
39    W:    Uh, I'll give you a ride to, to and from so you don't
40          have to worry about that.   The um, the concerns that you
41          have about you know people doing, doing you harm, or
42          stuff like that, if anybody that you know of personally
43          come up and talked to you and said --.
44    K:    Not yet.
45    W:    That they are going do something or--.
```

Gregory Walton
Tape #__; Side One                                             2

```
 1             them in jail. Okay, so that's why there are so many
 2             people talking and knowing about whose going to court and
 3             what's going on because it's a good case for the
 4             neighborhood.
 5    K:       Yeah.
 6    W:       Uh.  There is a lot of devastation that those people were
 7             doing, not only this, but drug sales that they were
 8             pushing in the neighborhood
 9    K:       Uh, huh [affirmative]
10    W:       and a lot of other violence that was going on:  gun
11             dealing, you know, shooting up other people, and stuff
12             like that.  All that's eliminated and [inaudible] can
13             attest to that, but as, being a [inaudible] out here,
14             there has been a low in activity because we have those
15             people off the street.  And so your testimony is very key
16             and very paramount to keep this neighborhood a little bit
17             safer.  Uh, and once it's all done, and these people get
18             sent away, then, I'll, I'll be honest with you, there
19             were probably be another group to take their place, and
20             we'll go through this same cycle again, uh,  with other
21             players and other people, but it's a process we've gotta
22             go through.
23    K:       Yeah, but, yeah, I understand that.  You know, I going to
24             do it, you know, regardless, but I need some help getting
25             into this program.
26    W:       Okay.
27    K:       And this one year program that I read about that I think
28             Judge Manly handles.
29    W:       Okay.
30    K:       Its like a narcotics program?
31    W:       Yeah.
32    K:       Okay.
33    W:       You know, I ain't got, the, the OR guy, he had me to call
34             the Gateway--.
35    K:       Uh, huh [affirmative]
36    W:       Program and I, I called them.  I'm already set up with
37             them, but they said you can't leave there to go to court.
38    W:       Oh, Okay. If you are in the Gateway program?
39    K:       Yeah.  Otherwise, [inaudible] in the, in the detox part
40             for seven days.
41    W:       Okay.
42    K:       So, and then after that then you go into whatever 6 month
43             or 1 year program that they--.
44    W:       Okay.
45    K:       Put you in.
```

Gregory Walton
Tape #__; Side One                                              4

```
 1   W:   So Gateway was offered to you once already, or--.
 2   K:   Well, yeah.  I, I called them on my own before I talked
 3        to the SOR guy and then when I went to see the SOR guy
 4        today, and ah, he gave me the paperwork, you know, to do
 5        it--.
 6   W:   Sure.
 7   K:   So I told him I already did that, but you know, about,
 8        when I, when I go to court and stuff, you know, I, I need
 9        some help you know, getting into this one year program,
10        you know.
11   W:   Okay.
12   K:   Cause I want, you know, to get off this shit.
13   W:   Sure.
14   K:   You know, I want to get out of this environment.
15   W:   Do you have an attorney that's representing you?
16   K:   Not yet.
17   W:   Okay.  When, uh, have you been arraigned on that uh,
18        possession from Palo Alto?
19   K:   Uh no, the court date is on May 4th.
20   W:   May 4th, Okay.  When you get assigned an attorney, I'll
21        give you my business card, you can have him call me and I
22        can work with him to try get you into whatever program's
23        available to you.
24   K:   I, I think the one Judge Manly does is, is straight year.
25   W:   Straight year.  Its like you're off the street, you're in
26        a, in a--.
27   K:   Residential [inaudible]--.
28   W:   Residential area.
29   K:   Yeah.
30   W:   Okay.
31   K:   Treatment program for a, for a year.
32   W:   Okay.  Alright.
33   K:   That's what I need.
34   W:   Okay.
35   K:   Have you heard about, um, Pat and Virgil?  They live
36        right, you know where you go into my driveway?
37   W:   Uh, huh [affirmative].
38   K:   And to the left of the flat?
39   W:   Uh, huh [affirmative].
40   K:   Right there.
41   W:   Uh.
42   K:   There's big selling going on in there.
43   W:   Pat and Virgil, two girls?
44   K:   No.  Virgil is a guy.
45   W:   Uh, huh [affirmative].  [inaudible].
```

Gregory Walton
Tape #___; Side One                                              5

```
 1           dates and times and that's why I ask, you know, between
 2           what time frame--.
 3     K:    Uh, huh [affirmative].
 4     W:    when uh, Louis got beat up to when Harry got, uh, taken
 5           off and you know, how you recognized [inaudible] Green--.
 6     K:    Uh, huh [affirmative].
 7     W:    Have you bought dope from her before or
 8     K:    I have.
 9     W:    Have you?  How many years have you known her, and --.
10     K:    [inaudible] not even a year.
11     W:    You bought dope from her in that neighborhood or
12           downtown?
13     K:    No, by "Sisters," right by the other liquor store by the
14           restaurant.
15     W:    Okay.  "Sisters" being that hair salon place?
16     K:    Uh, huh [affirmative].
17     W:    So you, you got, you know, face knowledge of her, uh,
18     K:    Uh, huh [affirmative].
19     W:    You talked with her, you knew about the fight that she
20           had --.
21     K:    Uh, huh [affirmative].
22     W:    And stuff like that.  So those are the kind of questions
23           that they are going to ask.  All you do is give an honest
24           answer like you been telling me here today--.
25     K:    Yeah.
26     W:    And, uh, you know, there are so many people that are
27           testifying about little increment parts, about what
28           everybody saw and the jury is just going to put it all
29           together and they are going to say "Hey these people are
30           believable or they're not" and then they are going to
31           make a decision on it.
32     K:    Uh, huh [affirmative].
33     W:    That's about all we can do.  Uh, we are not twisting
34           anybody's arm, you know, like yourself, uh, I appreciate
35           you, you know, calling me and getting in touch with me so
36           I can at least give you the opportunity to give you a
37           ride down and--.
38     K:    Yeah.
39     W:    Get you coming and going so you don't have to worry about
40           taking the bus or anything. Uh, like I said, I'll, I'll
41           help your attorney, whatever I can to get you in that
42           drug uh rehab program.
43     K:    Uh, huh [affirmative].
44     W:    Uh, that's important for everybody, to have that
45           opportunity at least to get clean, cleaned up and get
```

Gregory Walton
Tape #__; Side One                                            12

# EXHIBIT F

**HORIZON
SOUTH**



650 S. Bascom Ave.
San Jose. CA 95128
(408) 295-6675
(408) 295-8544 Fax



A program of
Horizon Services, Inc.

May 21, 1998

John Schon
District Attorneys Office
70 West Hedding
San Jose. CA 95110

RE:  Gregory Walton

Dear Mr. Schon,

The current fee of  $41.50 a day, not exceeding $1262.29 is due
in behalf of Mr. Gregory Walton. He entered our program on
April 30, 1998 and is currently a resident of our program.

Should you wish any further information regarding our
program, please feel free to contact me.

Sincerely.

Marvirich J. Torcedo
Administrative Coordinator / Counselor

# EXHIBIT G

| | | |
|---|---|---|
| 1 | Q | Have you been a long time user of crack cocaine? |
| 2 | A | Two years. |
| 3 | Q | And are you currently now in a drug program? |
| 4 | A | Yes, I am. |
| 5 | Q | And that's being paid for by the District Attorney's |
| 6 | | office? |
| 7 | A | That's what I'm told. |
| 8 | Q | And you've been in that program how long now? |
| 9 | A | Since the 24th of last month. |
| 10 | Q | And 24th of -- you're right, it is May already. |
| 11 | | Was the 24th of May the first day that you ever -- |
| 12 | | THE COURT: April, you mean. |
| 13 | Q | (BY MR. SCHON) 24th day of April the first day you ever |
| 14 | | met me? |
| 15 | A | Yes. |
| 16 | Q | And in the time that you've met me, have we ever |
| 17 | | discussed the facts of this case or your testimony in any |
| 18 | | way? |
| 19 | A | None whatsoever. |
| 20 | Q | Now, did you actually go into a detox program then on |
| 21 | | the 24th of May that first day that you met me? |
| 22 | | THE COURT: April. |
| 23 | Q | (BY MR. SCHON) April, that you first met me? |
| 24 | A | Yes, I did. |
| 25 | Q | Now, in connection with Ms. Green, I would like to ask |
| 26 | | you whether -- let me start over. |
| 27 | | Do you remember an individual by the name of Harry |
| 28 | | Garrett? |

1    from Harry?

2    A    Maybe three times.

3    Q    Did Harry have a friend by the name of Carlos Miller?

4    A    Yes.  I don't know Carlos' last name, I just knew him

5    by Carlos.

6    Q    You knew Carlos.  And was Carlos in the business?  And

7    the business is what we're talking about here.

8    A    Yes.

9    Q    Did you buy from Carlos?

10   A    Yes.

11   Q    Did you see Carlos sell cocaine at that area?

12   A    Yes.

13   Q    And how often would you see Carlos sell it as opposed

14   to the fact that you never saw Harry?

15   A    Mostly when you see Harry, you see Carlos.

16   Q    They were pretty inseparable when you observed them?

17   A    I would say so.

18   Q    Now, on the day that Mr. Garrett was killed, were you

19   in the area of King and McKee?

20   A    Yes, I was.

21   Q    In the afternoon hours?

22   A    It was at night.

23   Q    All right.  But that day during the daytime, were you

24   down in the area of King and McKee during the daytime hours?

25   A    No.

26   Q    In the afternoon?

27   A    I don't think so.  Not that particular day, no.

28   Q    All right.  Did you ever personally observe any sort of

8

```
 1    conflict between Ms. Green and Mr. Garrett?
 2    A    Personally, no.
 3    Q    All right.  So anything that you know about a conflict
 4    between Ms. Green and Ms. Garrett -- Mr. Garrett would be
 5    what, rumor or from what other people told you?
 6    A    Yes, it was pretty much everybody knew that.
 7    Q    It was general knowledge?
 8    A    Yes.
 9    Q    Reputation in the community?
10    A    Well, everybody knew they had a confrontation.
11    Q    Do you remember being interviewed in an automobile with
12    Sergeant Louie Hill?
13    A    Yes.
14    Q    And Sergeant Kirby?
15    A    Yes.
16    Q    Do you remember in the course of that conversation
17    telling Sergeant Kirby and Officer Hill that you actually
18    observed this argument?
19    A    No, I said someone told me that.  And they asked me
20    who, and I said I would rather not say.
21    Q    Okay.  So you never did see an argument to that effect?
22    A    No.
23    Q    Very good, sir.
24         Did you know an Edward Haney?
25    A    Yes.
26    Q    And where did you know Edward Haney from?
27    A    We live in the same I would say complex.
28    Q    All right.  Are you friendly with Mr. Haney?
```

JOAN E. SCHAFER, CSR NO. 6053

1    will reflect the parties are present with their attorneys,

2    and People present represented by Mr. Schon.  The witness,

3    Mr. Walton, has returned to the witness stand.

4         MR. SCHON:  Your Honor, may I ask one or two more

5    questions?

6         THE COURT:  Sure.

7    Q    (BY MR. SCHON) Now, Mr. Walton, in your discussions

8    with Sergeant Kirby, do you ever remember giving him a time

9    that the argument occurred on the day Mr. Garrett was

10   killed?  The argument I'm referring to was between Ms. Green

11   or KK and Mr. Garrett.

12   A    I remember saying something to him, but I told him that

13   Tiger -- I mean that Haney had told me that.  I didn't say

14   that I observed it.

15   Q    All right.  Okay.  Did you tell him that this

16   occurred --

17        MR. KIRCHICK:  Objection; non-responsive.  I'm

18   sorry I was late on my objection, Your Honor.  Objection was

19   non-responsive.  Move to strike.  The D.A. asked what time

20   it was.

21        THE COURT:  I think the answer was -- I think the

22   answer was he didn't really know the time.  He said it in a

23   round about way.  I'll overrule the objection.

24        Go ahead, Mr. Schon.

25   Q    (BY MR. SCHON) Did you ever indicate to Sergeant Kirby

26   it was around four o'clock that this occurred?

27   A    I could have.  I mean Tiger said it was in the evening,

28   you know.  He was telling me all this stuff, you know.

# EXHIBIT H

PATIENT: WALTON, Gregory                          MED.REC.#:  60 21 59

DR:      Jonathan Kaplan, M.D.                    ADMITTED:   11/21/96

This is the first Sequoia Hospital and possibly the first psychiatric admission for this 42-year-old male who enters the hospital because of suicidal ideation. He reasoned that if he had a knife when the police came that he would threaten to kill himself with the knife and threatened them that they would shoot him and that is what he wanted to happen. However, he was overpowered and brought to Chope Hospital and then transferred at the latter part of his 5150 to Sequoia Hospital.

The patient gives a history of many months of high levels of drug-taking, primarily cocaine and alcohol, but he told the drug treatment counselor that he also was using crank. The patient has had a long history of drug abuse, but most recently feels that it was fueled by the relationship he has with his girlfriend of 14 years. They have an 11-year-old child from that relationship and she has three other more grown children from her previous relationship who still consider him their primary parent. The patient says what brought on the suicidal ideation, in addition to stopping drugs, was the fact that she has been seeing other men and has told them that she really does not want to be part of a relationship with him any more. The other men involve a convicted rapist who is in jail, as well as other people that sound highly self-destructive, and he realizes that she has very low self-esteem and is somewhat unstable herself.

In addition to the depression, the patient states that he has a voice in his head named Bob, that is constantly negative and usually talks to him while he is on drugs and while he is coming off of drugs, and that is a large part of his most recent existence. He has tried a number of residential treatment programs, including Pathways, but has never been able to stay in them. He is currently employed. He says he makes a little over $9 an hour and has been using a large part of his money for the purchase of drugs, stating that he has not used dishonest means to acquire them.

The patient comes across as quite angry and quite controlling, although he is interpersonally respectful and compliant.

MENTAL STATUS EXAMINATION:
Reveals a man who looks his stated age, who is alert and oriented in all three spheres, and appears intense, but not particularly sad. He still states that he has suicidal ideation and states that he has decided what he wants to do is stay in the hospital for a while since he has no place to go, and he is kind of against residential drug treatment because it would not allow him to work. He admits to many of the vegetative signs of depression, but this is clouded by his high levels of drug abuse. He has had difficulty sleeping, he has had decreased appetite, although he still has been drinking large amounts of beer. He figures he drinks about seven cans a day, but he has suffered a 60-pound weight loss over the last year. He has some negative feelings about himself, but does not feel particularly worthless and useless, and does not feel hopeless. He states that if he gets a definitive statement from his girlfriend that she does not want to be part of the relationship, he can go on from there. However, he does state that he is still suicidal when questioned.

PSYCHIATRIC ADMISSION SUMMARY

Sequoia Hospital District
Redwood City, California
Department of Behavioral Sciences

Page 2

PATIENT: WALTON, Gregory                    MED.REC.#: 83 21 59

DR:    Jonathan Kaplan, M.D.                ADMITTED:  11/21/96

Continuation  . . .

There is some evidence of a formal thought disorder, with his negative voices,
but he denies persecutory delusions or ideas of reference.  He appears to be of
at least average intelligence with very little psychological-mindedness and very
little insight, but he seems to be exceedingly sophisticated when it comes to
mental health systems, medications, and drugs.  The patient has never been in
a psychiatric facility before, but all attempts to try to treat his drug problem
have been unsuccessful today.  It is still hard to see how he could afford a
$70-a-day habit.

DIAGNOSTIC IMPRESSION: ·
Axis I:                    1.    Polydrug abuse in acute withdrawal, including alcohol
                                 and cocaine.
                           2.    Possible major depression with psychotic features.

Axis II:                   Mixed personality disorder.

Axis III:                  Acute alcohol and drug withdrawal.

Axis IV:                   Moderate precipitant.

Axis V:                    Current GAF:  60-70.
                           Highest GAF in last year: Approximately the same.

PLAN:
Treat the patient with p.r.n. Valium to get him through the acute withdrawal
space and start Navane 2 mg b.i.d. for the auditory hallucinations.  The patient
will benefit primarily from a residential treatment program and efforts will be
made to get him into such a program.

                                                    Jonathan Kaplan, M.D.

D:  11/22/96 1107
T:  11/22/96 1438
4964
vhrs-17

PSYCHIATRIC ADMISSION SUMMARY

4:30 = Tues  11/26/96
12 Noon = TVES  Kathais
MR# 4522741

FENTON, GEORGE

DOB: 3-5-54

**NANDA NAYAK, M.D.**

## ADMISSION PSYCHIATRIC EVALUATION
## AND
## DISCHARGE SUMMARY

**DATE OF ADMISSION:** 11-20-96          **DATE OF DISCHARGE:** 11-21-96

**DISCHARGE DIAGNOSES:**

**AXIS I:**       ADJUSTMENT DISORDER WITH DEPRESSED MOOD;
              COCAINE DEPENDENCE;
              ALCOHOL DEPENDENCE;
              MARIJUANA DEPENDENCE

**AXIS II:**      DEFERRED

**AXIS III:**     HISTORY OF WEIGHT LOSS IN PAST THREE MONTHS;
              HISTORY OF BEING ON ANTI-TUBERCULOSIS MEDICATIONS
              IN THE PAST

**AXIS IV:**      PSYCHOSOCIAL STRESSORS = 3 = MODERATE

**AXIS V:**       HIGHEST LEVEL OF ADAPTIVE FUNCTIONING IN
              THE PAST YEAR = 70
              ADMISSION GAF = 60
              DISCHARGE GAF =

**IDENTIFYING DATA:**          This patient is a 42-year-old single
African-American male, working as a stock clerk in shipping and
receiving for the past one year. He reportedly called the suicide
crisis line, verbalizing suicidal intent, with plans to shoot
himself or jump off the bridge. On arrival, the police found that
he had a knife in his hand and the family members were trying to
take it away from him. He kept asking the officers to shoot him
and had stated that he was going to San Francisco and jump off the
bridge.    The patient subsequently was placed on a 5150-hold as
danger to self and taken to Valley Medical Center. The patient was
seen at Emergency Psychiatric Services and subsequently transferred
to Charter Behavioral Health System of Northern California at San
Jose for further stabilization.

**CHIEF COMPLAINT:**          "I had a relationship with a girlfriend
for fourteen years; she broke up with me. I'm not sure why; partly
due to my drinking and drug habits and partly because she is trying
to have an affair with another man. I don't want to live. I know
I can't get any help. If you let me out of here, I am going to
kill myself. I don't care what you do with me."

CHARTER BEHAVIORAL HEALTH SYSTEM OF NORTHERN CALIFORNIA/SAN JOSE

Discharge Summary

HISTORY OF PRESENT ILLNESS:        The patient reports that he has
had a relationship with a girl for the past fourteen years. She had
also been on welfare and he describes her as welfare-dependent for
several years.    Reportedly, the welfare authorities came to know
that she had been living with Gregory and they were investigating.
She got off welfare and took a job at a restaurant in Milpitas.
The patient reports that for the past couple of months since
working, she has been ignoring him, and he is strongly suspicious
of her having an affair at her work, although she reportedly is
denying this. He reports being distraught over this and feels that
life is not worth living without her.   He has been experiencing
difficulty sleeping at night and sleeps only about 1-2 hours per
night. He has been working as a stock clerk for the past one year.
He reports he has been working steadily but is unable to tolerate
"the emotional pain." He reports very poor appetite and complains
of 32 pound weight loss in the past four months. He used to weigh
210 pounds, and currently weights 168 pounds. He reports that he
is  fearful  that  he  might  lose  his  job  secondary  to  poor
concentration and ineffective work habits secondary to his drug
habits. He reports bouts of irritability and thoughts of self-harm
over the past week or two since she broke up with him.    She
reportedly still lives with him but does not want to have anything
to do with him. The patient reports he has been hearing voices for
about a year, but he was keeping it to himself without getting
help; on occasions, he has heard voices telling him to kill
himself.

PAST PSYCHIATRIC HISTORY:          None.    No prior history of
suicide attempt.    He reports he tried to attempt suicide by
overdosing on cocaine but did not require any hospitalization.

PAST MEDICAL HISTORY:        The patient reports he has been tried
on anti-tuberculosis medication but does not remember the details
or when he had been on this.    History of weight loss, history of
bleeding ulcers, alcohol gastritis.

ALLERGIES: NONE KNOWN.

MEDICATIONS:        None at this time.

ALCOHOL/DRUG HISTORY:        Daily use of alcohol for the past six
months. His last use was Wednesday morning. Daily use of cocaine
for the past several months; last use on Wednesday morning.    He
reports he uses up to $60-70 of cocaine. He denies any intravenous
drug abuse or history of marijuana dependence.  He reports he has

CHARTER BEHAVIORAL HEALTH SYSTEM OF NORTHERN CALIFORNIA/SAN JOSE

WALTON, GREGORY          #002516
Admission Psychiatric Evaluation/Discharge Summary
Wanda Wazir, M.D.
Page 3

been to Mariposa Lodge for a short period of time and did not benefit from the program.

FAMILY HISTORY:          Both parents are deceased. Mother died of cancer; father died of alcoholic cirrhosis. He has two brothers and one sister. One brother died from stomach cancer. He has an 11-year-old son. The patient reports he has been told that he has alcoholic liver damage but has not had any workup done. He reports he had been coughing up blood and was given anti-tuberculosis medication. The patient had a chest x-ray done at Valley Medical Center on 11/20/96 which showed apical pleural thickening, consistent with prior granulomata exposure.

MENTAL STATUS EXAMINATION UPON ADMISSION:    The patient is a 42-year-old African-American male, rather than, neatly dressed. The patient was alert and oriented in all spheres. He appeared somewhat withdrawn but cooperative with the interview. He described his mood as hopeless and affect as constricted. He admits to feeling increasingly depressed and despondent, and he reports harboring self-destructive thoughts and has intent and plan to kill himself either by jumping off the bridge or by stabbing himself. He reports he is very distraught by the breakup of his relationship and does not see any hope for him in the future. He rates himself as a 0 on a 0-10 scale of depression. He is threatening to harm himself when discharged from the hospital. He is not found to be overtly psychotic, although he reports hearing voices. No hallucinatory activity noted. His attention span is fair. He is able to do digits forward and backward without difficulty. Fund of knowledge is consistent with academic background. His memory for recent and remote events is found to be intact. Recent memory was tested by asking him to recall 4 objects at the end of the interview. Remote memory was tested by asking him to recall historical information. He is still in denial of his drug problems. Judgment is impaired.

HOSPITAL COURSE:          The patient was admitted around 2245 of 11/20/96. He reportedly slept through the night. He did not participate in any of the offered activities. He did participate in the detoxification protocol. He did not display any self-destructive activity on the unit. He was placed on q.15 minute checks to prevent dangerous behavior to self. He reportedly was found to be very withdrawn and verbalized harboring self-destructive thoughts and was unable to contract for safety. Char Howard of Kaiser Hospital (Santa Teresa) was contacted and authorized patient's hospitalization at Sequoia Hospital. He ate 75% of his lunch. He requested to be hospitalized here at Charter Behavioral Health System of Northern California at San Jose to be

CHARTER BEHAVIORAL HEALTH SYSTEM OF NORTHERN CALIFORNIA/SAN JOSE

[illegible header text]

DR:    GARY ARON, M.D.                               DATE:    11/22/96
cc:    Jonathan Kaplan, M.D.
cc:    William T. Riley, M.D.

## INTERNAL MEDICINE CONSULTATION

IDENTIFICATION:
The patient is a 42-year-old male with a long history of alcoholic, marijuana,
and cocaine usage admitted to the Mental Health Unit because of depression with
suicidal ideation.

PAST MEDICAL HISTORY:
In 1989, he had surgery for a perforated ulcer. He states that as a child he
was exposed to tuberculosis and was placed on medication for a period of time.
According to the records that came with him, a chest x-ray does reveal evidence
of apical scarring consistent with previous granulomatous disease.

CURRENT MEDICATIONS:
He states he was given a prescription for ulcers several months ago, but he never
got this filled. He takes at least ten Tums per day.

ALLERGIES:  No known drug allergies.

REVIEW OF SYSTEMS:
| | |
|---|---|
| HEENT: | He states he gets severe headaches several times a week. This has been going on for the last five months. He treats this by drinking alcoholic. He complains of some blurred vision. |
| Respiratory: | He states while he is at work he frequently has to stop to take a deep breath. |
| Cardiovascular: | He states that his "heart flutters a lot." |
| Gastrointestinal: | He has chronic abdominal pain. He does get relief with eating. He states he used to get relief with Tums but that these are no longer helping. He recently has had some problems with constipation. |
| Genitourinary: | He states that his urine has been dark recently. |
| Musculoskeletal: | He complaints that his hands and feet "stiffen up." |
| Neuropsychiatric: | As noted above. |

SOCIAL HISTORY:
The patient is single. He works in shipping and receiving as a stock clerk and
also a forklift operator. He smokes about a half a pack of cigarettes a day.
He drinks approximately a case of beer per day. He smokes cocaine and marijuana
on a daily basis. He denies any IV drug use.

FAMILY HISTORY:
The patient's father died from alcoholic cirrhosis. Patient's mother died from
gastric cancer. Patient has a brother with whom he has had no contact in the
last couple of years. The patient states that his brother is a user. He has
a sister who is disabled secondary to a gunshot wound.

Sequoia Hospital District
Redwood City, California
CONSULTANT'S RECORD

Page 2

PATIENT: WALTON, MELVIN                          MED.REC.#:  60 21 59

DR:    GARY ARON, M.D.                           DATE:      11/22/96

Continuation . . .

PHYSICAL EXAMINATION:

General:            Patient is a 42-year-old male who appears rather angry.
                    He is well-nourished, well-developed, and in no acute
                    distress.
Vital Signs:        Blood pressure 110/72, pulse 64, respiratory rate 16.
HEENT:              Pupils are equal and reactive to light. Extraocular muscles
                    and visual fields are intact.  Fundi are not visualized.
                    ENT unremarkable.
Neck:               No adenopathy.  Thyroid is not palpable.
Lungs:              Clear.
Heart:              Regular rate and rhythm without murmurs, rubs, or gallops.
Abdomen:            Soft and nontender.  No masses or organomegaly.  Bowel
                    sounds are normoactive.
Extremities:        No cyanosis, clubbing, or edema.  Pedal pulses are intact.
Neurologic:         Deep tendon reflexes are somewhat hypoactive but
                    symmetrical.  No focal neurologic deficits.

LABORATORY DATA:
CBC and chemistry panel unremarkable.  Urine toxicology screen was positive for
cocaine and benzodiazepines.

IMPRESSION:
1. Depression.
2. Polysubstance abuse.
3. History of peptic ulcer disease with prior perforated ulcer.
4. Abdominal pain, presumed to be secondary to history of ulcer disease.
5. History of prior tuberculosis infection.

DISCUSSION/RECOMMENDATIONS:
I have ordered Prilosec for the patient's abdominal pain.  Clearly, he needs to
be in some type of treatment program regarding his drug use.  I have no other
recommendations at this time.

Thank you for asking me to see Mr. Walton.

                                              GARY ARON, M.D.

D:  11/22/96 1107
T:  11/23/96 1653
4953
vhrs-22

TRIAL COUNSEL FAILED TO PROPERLY INVESTIGATE OR PROVIDE
AN ADEQUATE DEFENSE.

Trial counsel failed to properly interview and investigate a vital material witness, Chavon Anderson, the "best friend" of Harris. Anderson informed the police that she "heard that Harry (Garrett) had been killed and knew that Candice (Harris) was involved in a confrontation against Harry a few days prior to Harry's death." (S.J.P.D. Case No.97-142-1247, pg. 60.) Yet this "confrontation against Harry", or the cause of it, was never investigated. (9/18/97 Anderson/Davis Interview, pg. 1-2.)

Trial counsel was ineffective for failing to obtain substantial material evidence favorable to the defense. Trial counsel's errors were prejudicail to the petitioner. Trial counsel failed to file a motion to get a court order to have Candice Harris's residence searched for evidence. Harris was the initial suspect, who later received immunity for testifying for the prosecution. The only searches that were conducted for evidence were of the petitioner and codefendant Wagner's residence's and vehicals, to which no evidence was found. Petitioner alleges that trial counsel must at a minimum conduct a reasonable investigation enabling him to make informed decisions about how to represent his cli-ent, trial counsel has a duty to make reasonable investigations or to make reasonable decisions that make particular investigations unnecessary. Thus, I have found trial counsel to be ineffective where he neither conducted reasonable investigations nor made a showing of strategic reasons for failing to do so. The failure to conduct a reasonable investigation constitutes deficient performance. The suspect described by the witnesses did not fit the profile of the petitioner, but did match the profile of Candice Harris. These same witnesses, who had nothing to lose or gain from the prosecution for giving their

17

CLAIM FIVE

testimony, stated that the person they saw shoot the victim
was not the petitioner. Mrs. Ruiz stated "the photograph of the
young black woman charged with this homicide that she observed
on the television is not the same person she saw fleeing from
the front of her restaurant." (Rosanna Ruiz/Davis 9/8/97 Inter-
view, pg. 1-2.) Mr. Turner stated at "the Mexican restaurant
when he bumped into Harry Garrett drinking a beer...(Turner was
the only witness who testified to this evidence; S.J.P.D. Tech-
nical Evidence Log No.3.)...Turner observed the passenger door
behind the driver on the drivers side open and an individual
who was wearing dark clothing exit the vehicle." Turner "didn't
think that the shooter was KK (the petitioner) because she is
taller than he is and the shooter was shorter than him." (John
W. Turner/Davis 9/22/97 Interview, pg. 1-3.) Ms. Soriano stat-
ed that "she had waited on and served food to Ayanna Green on
at least two maybe three occasions approximately 2+ months
before this shooting occured on 5/22/97. Ms. Soriano said that
she recalled Ayanna Green to be quite tall and that Ms. Green
was taller than the person she saw running from the scene on
McKee Road shortly after the shots were fired." (Maria Soriano/
Davis 1/22/98 Interview, pg. 1-3.) It was never brought to the
court or the jury's attention by trial counsel that it is more
than probable that Candice Harris could possibly be the shooter.
Considering there was credible evidence to show merit of this
claim. Showing not only trial counsel's ineffectivness but, his
incompetence to properly investigate and prepare an adequate
defense. (Harris/Farquhar 5/29/97 Interview; S.J.P.D. Doc. No.
C9740812, pg. 23.)

18

CLAIM FIVE

1        Trial counsel did not properly investigate and interview

2  important potential witnesses, and there is no conceivable tac-

3  tical reason for his refusal to do so. Harris told the police

4  and testified that Pam Norwood was with she and the petitioner

5  on the following night at a Motel, on May 23, 1997. (S.J.P.D.

6  Doc. No. C9740812, pg. 4-5, 11, 15-17.) The petitioner also in-

7  formed her trial counsel that Pam Norwood was also present on

8  the evening that the petitioner got into an altercation with

9  an associate of Garrett's, not Garrett. Pam Norwood was never

10  interviewed. Not only was Pam Norwood an eye witness to two

11  different incidents, she was available as a witness. Her testi-

12  mony would of proved that the petitioner did not get into an

13  altercation with Garrett, nor did there seem to be any personal

14  problems between the two. Norwood was also needed to prove the

15  demeanor of Harris the following day, which did not coincide

16  with what Harris stated. Norwood's testimony was also vital to

17  the defense. Harris also told the police, and testified that

18  about fifteen minutes after the shooting, Wagner dropped she

19  and the petitioner off downtown by the petitioner's car. Where

20  "We went stright to my house." Harris stated that she did not

21  get home until "a little after 12:00...It was like late, before

22  1:00 O'clock," (CT 234.) This crime occured at approximately

23  9:00p.m. There was a three to four hour time frame that Harris

24  could not account for. Harris also stated that "When she (the

25  petitioner) left she said she was going over this girl's, named

26  Trina house. (S.J.P.D. Doc. No. C9740812, pg. 51, 53.) The pe-

27  titioner also informed her trial counsel that Harris actually

28  went with her to Trina's house on this night of May 22. Which

CLAIM FIVE

1  would of explained why Harris could not account for those 3 to
2  4 extra hours it took her to get home. Trina Reese was also
3  available as a witness. Pam Norwood and Trina Reese's testimony
4  would have been both material and favorable to the defense,
5  had they been interviewed. Trina Reese could of testified to
6  the clothing worn by both the petitioner and Harris, which
7  would not coincide with Harris statements. Reese could of also
8  testified to the demeanor of Harris and the petitioner on this
9  night. Since they both arrived at Reese's residence within the
10  hour.

11      Trial counsel's ineffectivness is generally clear in the
12  context of complete failure to investigate, because counsel
13  can hardly be said to have made a strategic choice when he has
14  not yet obtained the facts on which such a decision could be
15  made. A lawyer has a duty to investigate information, poten-
16  tial eye-witnesses, even if he later decides not to put them
17  on the stand. Neglect even to interview available witnesses to
18  a crime simply cannot be ascribed to trial strategy and
19  tactics. Essential to effective representation is the indepen-
20  dent duty to investigate and prepare. Counsel must conduct
21  careful investigations of all defenses of fact and law available
22  to the petitioner. The failure of defense counsel to investigate
23  witnesses who could corroborate the petitioner's defense consti-
24  tutes ineffective assistance of counsel. The trial attorney in
25  this case was incompetent for failing to investigate properly
26  and to develope an accurate defense. Counsel was ineffective for
27  failing to adequately investigate the case.
28      More importantly, this "confrontation" between Harris and
   Garrett, had it been investigated, would have undermined the

20

CLAIM FIVE

1  prosecution's entire case. The record discloses that counsel had

2  no rational tactical purpose for his act or omission. Counsel

3  failed to perform with reasonable competence and that it is

4  reasonably probable a determination more favorable to the peti-

5  tioner would have resulted in absence of counsel's failings.

6  The testimony of these witnesses would of conceivably benefited

7  the petitioner. Had these witnesses been interviewed, the newly

8  discovered evidence would be such as to render a different

9  result probable on a retrial of the cause. Based on the funda-

10  mental principles of due process. The record shows that coun-

11  sel's omissions did not result from an informed tactical choice

12  within the range of reasonable competence. Counsel never con-

13  ducted an investigation of Norwood, Reese, or Anderson suffi-

14  cient to establish that these witnesses would have refused to

15  reveal what they knew. Or give favorable evidence for the de-

16  fense. There is no tactical reason to avoid evaluating these

17  witnesses usefulness as defense witnesses. There is no concei-

18  vable tactical basis for counsel's errors. There is a reason-

19  able probability that, but for counsel's deficient performance,

20  the jury would have reached a more favorable verdict.

21

22

23

24

25

26

27

28

# EXHIBIT A

| REPORT TYPE  ☒SUPPLEMENTAL | SJPD CONTINUATION | CASE NO. ___ POLICE DEPARTMENT |
|---|---|---|
| 187  HOMICIDE | | 97-144-0503 |

___ NO: ___

1. OF A JUVENILE, CHAVON ANDERSON D.O.B. ▮▮▮▮,
2. WHO HAD DISCOVERED THAT THE MISSING PERSON, CANDICE
3. HARRIS WAS IN DANGER. I CALLED CHAVON ANDERSON &
4. RECEIVED THE FOLLOWING STATEMENT REGARDING CASE # 97-144-0503.
5.
6. STATEMENT OF CHAVON ANDERSON : CHAVON IS THE BEST FRIEND OF
7.                              CANDICE. BOTH WERE FRIENDS OF
8. HARRY GARRETT. CHAVON HEARD THAT HARRY HAD BEEN KILLED
9. AND KNEW THAT CANDICE WAS INVOLVED IN A CONFRONTATION
10. AGAINST HARRY A FEW DAYS PRIOR TO HARRY'S DEATH.
11.    CANDICE IS ALSO A GOOD FRIEND OF "K.K."
12. "K.K." HAS BEEN HANGING AROUND THE AREA OF RANCHO
13. VERDE & MCKEE RD TRYING TO SELL DRUGS. "K.K."
14. IS NOT FRIENDS WITH HARRY AND CLAIMS THAT SHE
15. WAS JUMPED BY HARRY AND FRIENDS A FEW DAYS
16. PRIOR TO HARRY'S DEATH.
17.    I ASKED CHAVON "WHY DID ALL OF THIS CONFLICT START?"
18. SHE EXPLAINED THAT A COUPLE OF WEEKS AGO THERE WAS
19. A STABBING ON N. KING RD SOMEWHERE IN THE AREA
20. OF ALUM ROCK AVE. THE SUSPECTS SOMEHOW INCLUDED HARRY
21. & THE VICTIM WAS EUSEF WILLIAMS (UNKNOWN SPELLING).
22. WILLIAMS IS A GOOD FRIEND OF K.K'S. THIS INCIDENT
23. COMBINED WITH K.K. TRYING TO SELL DRUGS IN HARRY'S
24. AREA, AND K.K. GETTING JUMPED, LED TO K.K.'S INVOLVEMENT
25. IN HARRY'S DEATH.
26.    CHAVON RECEIVED HER INFORMATION FROM CANDICE &
27. CARLOS (HARRY'S BEST FRIEND). CHAVON BELIEVES THIS IS WHY
28. CANDICE RAN AWAY & CHAVON HEARD THAT GANG MEMBERS
29. WILL AFTER CANDICE TO REVENGE HIS DEATH.
30.

| OFFICER'S NAME | ID NUMBER | DATE | SHIFT/DAYS OFF | SUPERVISOR REVIEW | ID NUMBER | DATE | PG 3 OF 7 |
|---|---|---|---|---|---|---|---|
| Raya | 3541 | 05-27-97 | DAYS/M-TW | | | | |

# EXHIBIT B

## THOMAS C. DAVIS & ASSOCIATES

*Investigative and Legal Services*

59 North Santa Cruz Avenue
Suite K
Los Gatos, California 95030
(408) 395-3161
FAX (408) 395-2453

September 18, 1997


Client:          Stuart Kirchick

Re:              People v. Ayana Green

Interview of:    Chavon Anderson, witness
                 Residence address:   293 Gunacaste Court, San
                  Jose, California
                 Residence telephone:  (408) 926-4981


<u>Monday, September 15, 1997</u>

This investigator contacted and interviewed Chavon Anderson at her residence address on this date at 5:00 p.m.  Present and giving her consent was Mrs. Anderson.  I advised both Mrs. Anderson and Chavon Anderson that I represented Ayana Green and her attorney Stuart Kirchick as it relates to the current homicide charge filed against Ms. Green.

Chavon Anderson stated that Candice Harris is a friend of hers but is not necessarily her best friend.

According to Chavon Anderson, Candice Harris has told her nothing about her observing or witnessing this homicide to take place. Chavon Anderson stated that she has heard on the streets from people who she cannot remember the names of at this time that the death of Harry Garrett was drug related over territory and that a friend of Candice Harris' named KK was probably the one who shot Harry Garrett.

Chavon Anderson stated that she heard on the streets from individuals whose names she cannot recall at this time that Harry Garrett and some of his friends got into a fight with KK a few days to a week before Harry Garrett was shot.

Chavon Anderson said she knows nothing of a stabbing involving Harry Garrett or anyone involved in this case which might have occurred a couple of weeks before the shooting of Harry Garrett.

Chavon Anderson stated that she has been told by people on the streets that KK was trying to sell drugs, probably cocaine or crack, in the area known as Rancho Verde.

Page Two
Stuart Kirchick
September 18, 1997

Chavon Anderson stated to this investigator that she does not know
someone named Carlos, however, has heard that Carlos was a good
friend of Harry Garrett.

I asked Chavon Anderson if Candice Harris told her that she
witnessed the shooting of Harry Garrett and Chavon Anderson replied
"No, but I knew she was lying to the police at first because she
was afraid to get her friend KK in trouble with the police".    I
asked Chavon Anderson how she knew this and she would not explain
it any further to me at this time.

Mrs. Anderson at that point in time stated that she did not want
this interview to be conducted any further and that she didn't want
her daughter Chavon Anderson to be involved in such a case as the
death of Harry Garrett.

Respectfully,

Thomas C. Davis

TCD:jr

# EXHIBIT C

# THOMAS C. DAVIS & ASSOCIATES

*Investigative and Legal Services*

59 North Santa Cruz Avenue
Suite K
Los Gatos, California 95030
(408) 395-3161
FAX (408) 395-2453

September 8, 1997


Client:         Stuart Kirchick

Re:             People v. Ayana Green

Interview of:   Rosanna Ruiz, witness
                Owner of the Mexican restaurant located at 1729
                McKee Road, San Jose, California


## Friday, September 5, 1997

This investigator presented Mrs. Ruiz with a business card at which time she advised me that she spoke and understood very little English and would need a Spanish interpreter in order to be interviewed. Mrs. Ruiz's older daughter who was at the business acted as an interpreter at which time I was advised that Maria Soriano who was the reporting party and witness to this homicide is currently in Mexico and will not return until mid November 1997.

I then asked Mrs. Ruiz through her daughter acting as an interpreter if she could describe the person she saw in front of her restaurant at the time the shots were fired who later ran from the scene. Mrs. Ruiz said that this individual was a young looking black man with very dark skin, short and skinny, wearing black or dark brown pants and a black or dark brown long sleeved shirt. This individual was not wearing a hat or any sort. This individual also had really short hair but she could not recall if it was braided or not.

Mrs. Ruiz said that she did not observe any vehicle associated to this person or the shooting and that the person who fled from the front of her restaurant ran west toward the bus stop and out of her sight on McKee Road.

Mrs. Ruiz stated that she was working in the kitchen area and that when she looked to the front after hearing the first shots fired, some of her vision was obstructed by the food counter and the front windows along with the plants.

Mrs. Ruiz stated that she just basically saw very briefly what she thought to be a young black male running very fast away from the front of her restaurant west on McKee Road after the shots had been fired.

Page Two
Stuart Kirchick
September 8, 1997

Mrs. Ruiz then stated that the photograph of the young black woman
charged with this homicide that she observed on the television is
not the same person she saw fleeing from the front of her
restaurant.

Mrs. Ruiz then agreed to have her son Ruben who was also at the
restaurant on the evening and time of this shooting give this
investigator a call regarding what his observations were.

                              Respectfully,


                              Thomas C. Davis

TCD:jr

# EXHIBIT D

# THOMAS C. DAVIS & ASSOCIATES

*Investigative and Legal Services*

59 North Santa Cruz Avenue
Suite K
Los Gatos, California 95030
(408) 395-3161
FAX (408) 395-2453

September 22, 1997


Client:          Stuart Kirchick

Re:              People v. Ayana Green

Interview of:    John Willie Turner, witness
                 Black male adult
                 Date of birth:  11/3/62
                 Family residence address:  3436 Pieces Drive, San
                 Jose, CA


Friday, September 19, 1997

This investigator contacted and interviewed Mr. Turner at the Santa
Clara County Main Jail where he is housed in cell 27 in the old
jail.  Mr. Turner is currently charged with possession of four
rocks of cocaine and a pipe.  Mr. Turner advised this investigator
that he is a candidate for three strikes, however, they just
recently reduced it to a two strikes with priors case.  I presented
Mr. Turner with a business card and explained to him that I
represented Ayana Green and her attorney Stuart Kirchick on the
current homicide charge filed against Ayana Green.  Mr. Turner then
agreed to answer any questions I might have regarding his
observations of what occurred on 5/22/97.

Mr. Turner stated that approximately four to five days prior
5/22/97 he had casually bumped into Ed Haney also known as Tiger
who was speaking with KK (Ayana Green).  According to Mr. Turner it
was just casual conversation and was not related to drugs or street
crime.

Mr. Turner said he had met KK three to four times on the streets
prior to 5/22/97 through his friend Ed Haney.

Mr. Turner said that he knew Harry Garrett for approximately one
month prior to 5/22/97.  Mr. Turner said he casually met Mr.
Garrett in the neighborhood through other acquaintances and knew
that Mr. Garrett did deal in selling cocaine.

Mr. Turner stated that on the evening of 5/22/97 he was walking
with his bicycle to the area of the bus stop located on the north
side of McKee Road just west of the Mexican restaurant when he
bumped into Harry Garrett drinking a beer and also walking slowly

# SAN JOSE POLICE DEPT.
# TECHNICAL EVIDENCE LOG

| CASE # | 97-142-1247 | | | | PAGE # 2 |
|---|---|---|---|---|---|
| CRIME | 187 P.C. | DATE 5-22-97 | TIME 2100 HRS | SUSPECT | LOCKER# |
| | | | | VICTIM HARRY GARRETT | |

| NO | LAB # | Item Description | Owner | Location & Time Found | Officer's Name | Chain Of Evidence | Date & Time |
|---|---|---|---|---|---|---|---|
| 3 | | Brown paper bag with broken bottle of Old English 800 been | unk | 1729 McKee Rd. N of sidewalk 12'1" N/N curbline McKee 0'8" E of light pole. MAY 2 2 1997 1105 GOULD SCHNUTENHAUS | GOULD SCHNUTENHAUS | TECH EVID. RM. PROPERTY ROOM | MAY 2 3 1997 0220 |
| P- | | | | | GOULD SCHNUTENHAUS | | |
| 4 | | Glass from bottle | | N of sidewalk 13'6" N/N curbline McKee 7'3" W of light pole. MAY 2 2 1997 1105 GOULD SCHNUTENHAUS | GOULD SCHNUTENHAUS | TECH EVID. RM. PROPERTY ROOM | MAY 2 3 1997 0220 |
| P- | | | | | GOULD SCHNUTENHAUS | | |
| 5 | | Spent shell casing | | In street between front of parked car (marked IV) and back of AMC 2'4" S/N curb line 14'7" W of light pole MAY 2 2 1997 1105 GOULD SCHNUTENHAUS | GOULD SCHNUTENHAUS | TECH EVID. RM. PROPERTY ROOM CRIME LAB. | MAY 2 3 1997 0220 |
| CS P- | | | | | GOULD SCHNUTENHAUS | | |
| 6 | | spent shell casing | | In street between front of parked car (marked V) and back of AMC 0'3" S/N curb line 11'7" W of light pole MAY 2 2 1997 1105 GOULD SCHNUTENHAUS | GOULD SCHNUTENHAUS | TECH EVID. RM. PROPERTY ROOM CRIME LAB. | MAY 2 3 1997 0220 |
| CS P- | | | | | GOULD SCHNUTENHAUS | | |

| Received From: | GOULD, #2496 SCHNTENHAUS, #2012 | Received By : | Date | Time |
|---|---|---|---|---|

Page Two
Stuart Kirchick
September 22, 1997

toward the Mexican restaurant.    According to Mr. Turner, Mr.
Garrett said he was looking for a black male approximately 40 years
of age named Louis who owed him some money and that he was going to
meet Louis at or near this Mexican restaurant.    Mr. Turner stated
that Mr. Garrett was calm and did not appear to be agitated or
anxious in any way.

Mr. Turner said that he then stopped walking his bicycle at the bus
stop while Mr. Garrett continued walking on alone toward the front
of the Mexican restaurant a short distance away.

Mr. Turner stated that it was within moments of talking with Mr.
Garrett that he observed a vehicle whose color now he states he
cannot recall and does not recall telling the investigating officer
it was possibly maroon in color.    Mr. Turner said that the vehicle
was definitely a 4-door and of a foreign non-American make.    Mr.
Turner does not recall telling the investigating officer that it
looked like a Jetta.    Mr. Turner stated that there were definitely
four people seated inside this vehicle and the windows were tinted
so all he could see were four heads and no distinct facial features
such as race or gender.    Mr. Turner said that none of the
individuals in the vehicle to the best of his recollection were
wearing hats.    This vehicle then drove up and stopped over the
sidewalk area at the entry exit driveway between the bus stop and
the Mexican restaurant.

When the vehicle came to a complete stop, Mr. Turner observed the
passenger door behind the driver on the drivers side open and an
individual who was wearing dark clothing exit the vehicle.    This
individual also had a hood pulled up from the upper garment over
their head.    Once this individual was out of the vehicle and shut
the door, the vehicle immediately pulled away driving westbound on
McKee Road toward King Road.

Mr. Turner said he observed the individual who exited this vehicle
to run quickly over to Mr. Garrett at which time the individual
with their left arm extended fired four to five shots in quick
succession at Mr. Garrett who then fell to the ground as if he had
been shot.

Mr. Turner said he could not see the handgun because the clothing
worn by the indivudal who was doing the shooting was baggy or loose
and covered up the hand of the shooter.

Mr. Turner said that there was no conversation between the shooter
and Mr. Garrett and that it all happened very quickly and that the
shooter then immediately turned and ran on the sidewalk directly
toward Mr. Turner who was still standing holding his bicycle at the
bus stop.    According to Mr. Turner, the individual ran by

Page Three
Stuart Kirchick
September 22, 1997

approximately three to four feet from him westbound on the sidewalk
on McKee Road toward King Road. Mr. Turner stated that he turned
his back when this individual was running toward him thinking that
the individual might shoot him as running by. Mr. Turner said that
he said nothing to this individual and the individual said nothing
to him while running by. Mr. Turner said he assumed this person
was black and possibly a male but that he could not tell the gender,
or the skin color. Mr. Turner did state that the person who ran by
him was shorter than he was and he is 5' 9". I asked Mr. Turner
how much shorter and he said at least 1" to 2". Mr. Turner said
that he did not see where this indivudal ran to and did not look
after the person ran by him to see where the person was going.

Mr. Turner stated that the shooter was definitely left handed and
that the left arm was extended when the shots were being fired.

Mr. Turner did state that he had heard rumors and talk on the
streets after this homicide occurred that KK had been looking for
Mr. Garrett because of a prior fight that she and Mr. Garrett had
been in.

Mr. Turner said that he could not identify the vehicle if shown
photographs of vehicles.

Mr. Turner stated that he told the officer who was interviewing him
at the Elmwood Facility days after this homicide occurred that he
didn't think that the shooter was KK because she is taller than he
is and the shooter was shorter than him. Mr. Turner said that the
Officer who interviewed him at the Elmwood Facility told him that
if he helped them they would help him in his case. After telling
the Officer what he knew, the Officer told Mr. Turner he wasn't
telling them enough and then left. Mr. Turner said he still has
the Officers business card who interviewed him at the Elmwood
Facility. Mr. Turner said he has not been contacted or interviewed
since that time.

I asked Mr. Turner if he wore glasses and he stated no. I asked
Mr. Turner if he was on any medication and he said Prozac. I asked
Mr. Turner if he had consumed any alcohol or drugs on the evening
prior to making these observations and he stated that he had
consumed several beers and a joint of marijuana and considered his
state to be "high". Mr. Turner said he consumed no cocaine on the
evening prior to making these observations.

Respectfully,

Thomas C. Davis

TCD:jr

# EXHIBIT E

# THOMAS C. DAVIS & ASSOCIATES

*Investigative and Legal Services*

59 North Santa Cruz Avenue
Suite K
Los Gatos, California 95030
(408) 395-3161
FAX (408) 395-2453


January 22, 1998


Client:    Stuart Kirchick

Re:       Ayanna Green


Interview of:        Maria Soriano, Witness
Employed:            Taqueria La Mexicana
                     1729 McKee Road, San Jose, California
Business Telephone:  (408) 251-2563


Thursday, January 22, 1998

This investigator contacted and interviewed Maria Soriano at her
place of employment on today's date at 2:00 p.m.  I presented Ms.
Soriano with a business card and advised her that I represented
Ayanna Green on her current charge and that I wanted to go over the
police report regarding her statement to determine its accuracy.
Ms. Soriano agreed to answer any questions I might have regarding
her witnessing the shooting and subsequent death of Harry Garrett
which occurred on 5/22/97 in front of the Taqueria La Mexicana.

Ms. Soriano stated that on 5/22/97 she, her mother and younger
brother, Reuben Soriano, were getting ready to close the restaurant
at approximately 10:00 p.m. Ms. Soriano said that, to the best of
her recollection, the only individuals inside the restaurant were
a hispanic couple seated at a table eating some food and Mr. Lewis,
who occasionally part time work cleaning up at the restaurant, who
was standing at the front counter with his back to the street
talking with her brother, Reuben Soriano, who was standing on the
other side of the counter facing the cash register.  Ms. Soriano
said that her mother, Rosario Ruiz, was standing in the food
preparation or kitchen area.  Ms. Soriano stated that she did not
observe Mr. Garrett standing or walking in front of the restaurant
on the sidewalk prior to his being shot.

Ms. Soriano stated that the two hispanic male and female customers
who were seated together at a table eating their food fell to the
floor after hearing the first shots fired.  This couple, after the

Page Two
Stuart Kirchick
January 22, 1998

shooting, immediately left the restaurant without finishing their
meal and she has not seen them since.  Ms. Soriano has no idea who
this couple was and does not know how to reach them.

Ms. Soriano said she then turned toward the kitchen and began
walking in that direction with her back to McKee Road when she
heard the first two shots fired in rapid succession.   Prior to
hearing those shots she did not hear any conversation or unusual
noise or voice to the front of the restaurant.  Ms. Soriano said
she then began crying and immediately thought that maybe someone
was attempting to shoot her brother, Reuben, or Mr. Lewis who were
in the front of the restaurant.  It was at this time that she and
her mother ran the very short distance of approximately 15-20 feet
from the kitchen area to where they found and observed Reuben
Soriano crunched behind the front counter by the cash register and
asked him if he was alright, and he replied that he was.  It was at
this time that Ms. Soriano, to the best of her recollection,
believes she heard an additional three shots in rapid succession
with the sound of those shots coming from the front of the
restaurant slightly to the east.  Ms. Soriano said she still did
not see anyone in the area of the front of the restaurant and
slightly to the east if one was facing McKee Road.

Ms. Soriano said she then looked out the front window of the
restaurant in a westerly direction towards the bus stop on the
north side of McKee Road and observed an individual running in a
westerly direction on McKee Road on the north side in close
proximity to the bus stop.  She also then observed this individual
to run across McKee Road in a southerly direction towards the park
located on the opposite side of the street.  This individual, once
on the other side of the street, was out of her view.

I then asked Ms. Soriano to describe this individual she saw
running away from the restaurant area and she replied it appeared
to her to be a black male adult, possibly in his 20's, and that
this black male adult was quite short.  I asked Ms. Soriano how
short she meant and she replied, "Well, I'm 5'2" and he was maybe
an inch taller."  Ms. Soriano said this black male had very short
hair and a shiny head.

I asked Ms. Soriano if she recalled the clothing worn by this black
male and she replied the individual was wearing dark clothing and
that it appeared that this individual was wearing a dark-colored
flannel shirt that was not tucked in at the waist.  Ms. Soriano
cannot recall the type of pants worn other than that they were dark
in color and the individual was not wearing a hat.

Page Three
Stuart Kirchick
January 22, 1998


Ms. Soriano stated that, after making these observations of the
possible suspect fleeing, she went to the rear of the restaurant
and picked up the cordless telephone and called 911 and then after
that called her father.

Ms. Soriano advised this investigator that she had seen Mr. Garrett
on prior occasions in the adjacent parking lot at this shopping
center and also that he had purchased food at their restaurant on
occasion.  Ms. Soriano said Mr. Garrett never caused a problem at
the restaurant other than on occasion she would have to tell Mr.
Garrett and his male companions not to sit at the outside tables in
front of the restaurant if they were finished eating, and they
always left at her request.

Ms. Soriano stated that she saw on TV the news report that a
suspect had been arrested in the shooting of Mr. Garrett and
observed a photograph of Ayanna Green as the person suspected and
in custody for this shooting.  Ms. Soriano then said that she had
waited on and served food to Ayanna Green on at least two maybe
three occasions approximately 2+ months before this shooting
occurred on 5/22/97.  Ms. Soriano said that she recalled Ayanna
Green to be quite tall and that Ms. Green was taller than the
person she saw running from the scene on McKee Road shortly after
the shots were fired.

I asked Ms. Soriano if Ayanna Green was in the company of anyone
else when at this restaurant and she replied she did not recall but
was sure that Ayanna Green was not in the company of Mr. Garrett.

I asked Ms. Soriano if she observed any unusual circumstances or
automobiles in the area prior to the shooting and she said she did
not.

I asked Ms. Soriano if she planned to be in California and
reachable during February 1998 and she replied she would be.  Ms.
Soriano then asked this investigator if she would be needed in
court to testify regarding this case, and I replied that she would
be and that she would probably receive a subpoena in the very near
future requiring her appearance to give testimony in this case.
Ms. Soriano stated that she would make herself available if
subpoenaed to testify at a future date.

Respectfully,

Thomas C. Davis

TCD:ddg

# EXHIBIT F

PEOPLE VS. AYANA GREEN/CLINTON FRED WAGNER
DOCKET NO. C9740812
SJPD
INTERVIEW OF: CANDICE HARRIS

1             white leggings. And her hair was braided in two

2             French braids going to the side.

3 FARQUHAR    Okay.

4 HARRIS       And then K.K. Also has a earring in her right ear

5             too.

6 FARQUHAR    Okay. What kind?

7 HARRIS $\partial 4^($   Oh, like a diamond like. I think it's blue.

8 FARQUHAR    A blue, blue diamond, like a stone?

9 HARRIS       Yeah.

10 FARQUHAR    In which side? The right side?

11 HARRIS       Yeah.

12 KIRBY        Can you uh, describe K.K.? About how, how tall she

13             is?

14 HARRIS $\partial 5^O$   Um, K.K. is like about my height.

15 FARQUHAR    How tall, about five- seven?

16 HARRIS       No. About five-nine and a half.

17 FARQUHAR    How much does she weigh?

18 HARRIS       Uh, I'm not sure. But she's uh, I'm smaller than

19             her. And I weigh about like one fifty five.

20 FARQUHAR    So she's probably, is she a lot bigger that you?

21 HARRIS $\partial 5\mathcal{S}$ She's, she's just, she's bigger than me. She's

22             like maybe one-eighty.

23 FARQUHAR    How 'bout her hair? The braid do you any ...

24 HARRIS       She's wears 'em like in different styles like

25      $\partial 5 7$ she'll wear it like with two. Like these are her

26

23

George W. Kennedy
District Attorney
County of Santa Clara
San Jose, California 95110

# EXHIBIT G

```
 1   DAYS AND I REMEMBERED EVERYTHING, YES.  JUST NOW I CAN'T
 2   REMEMBER LIKE THINGS.  BUT, YEAH.
 3   Q   SO YOU SEEM TO REMEMBER HER PARKING IN A PARKING LOT?
 4   A   YES.
 5   Q   DID YOU TELL HIM THAT, THAT C.W. DROPPED US OFF ON 3RD
 6   AND WE WALKED TO 2ND TO GET TO THE CAR?
 7   A   YES.
 8   Q   DROPPED YOU OFF ON 3RD BY BILLY'S TATTOO PARLOR, BY
 9   THE CHEVRON STATION ON SANTA CLARA?
10   A   YES.
11   Q   NOW, WHAT TIME DID YOU GET HOME THAT NIGHT?
12   A   I THINK AROUND -- LIKE A LITTLE AFTER 12:00 OR -- I
13   CAN'T REMEMBER.  IT WAS LIKE LATE, THOUGH, BEFORE 1:00
14   O'CLOCK, I THINK.
15   Q   WELL, THE SHOOTING HAPPENED APPROXIMATELY 9:00 P.M.
16   DOES THAT HELP YOU OUT TO ESTIMATE WHAT TIME YOU GOT HOME
17   AFTER YOU DROVE BACK DOWNTOWN, GOT DROPPED OFF?
18   A   ABOUT --
19              MR. BECKER:  YOUR HONOR, I'M GOING TO OBJECT TO
20   THIS.  THE DISTRICT ATTORNEY IS AGAIN TESTIFYING, GIVING
21   HER TIMES AND ASKING HER TO GUESS FROM THAT TIME, AND WE
22   MIGHT AS WELL PUT HIM ON THE STAND.
23              THE COURT:  OVERRULED.  GO AHEAD.
24              THE WITNESS:  ABOUT 11:00, 11:45, 12:00.  A
25   LITTLE AFTER 12:00 I GOT HOME.  I CAN'T REALLY REMEMBER.
26   Q   (BY MR. SCHON)  WHAT DID YOU DO BETWEEN THE SHOOTING
27   AND APPROXIMATELY 9:00 AND MIDNIGHT, THOSE THREE HOURS?
28   A   I JUST TOLD HER TO TAKE ME HOME AND SHE TOOK ME HOME.
```

# EXHIBIT H

| | | |
|---|---|---|
| 1 | | shooting, he dropped us off downtown, back to her |
| 2 | | car. |
| 3 | FARQUHAR | Okay.   But didn't you see Rochelle before the |
| 4 | | shooting? |
| 5 | HARRIS  36 | Yeah.   But that was like, like earlier like. |
| 6 | FARQUHAR | How did she get over there? |
| 7 | HARRIS | In K.K.'s car. |
| 8 | FARQUHAR | Okay.   So C.W. wasn't involved in that? |
| 9 | HARRIS | No. |
| 10 | FARQUHAR | Okay.   Okay.   I was confused.   Sorry about that. |
| 11 | | About, after the shooting about how long did you |
| 12 | | say you guys drove around? |
| 13 | HARRIS  41 | About maybe fifteen, twenty minutes. |
| 14 | FARQUHAR | Okay.   Do you remember when you drove? |
| 15 | HARRIS | We was just like driving around. |
| 16 | FARQUHAR | Kind of in circles? |
| 17 | HARRIS | Um huh. |
| 18 | FARQUHAR | And you ended up back downtown?   Do you remember |
| 19 | | where downtown? |
| 20 | HARRIS | It's, I think he dropped us off on Third and we |
| 21 | 45 | walked back to Second to get the car. |
| 22 | FARQUHAR | Do you remember the cross street? |
| 23 | HARRIS | Right there by, right there on the side, right |
| 24 | | across the street from Billy's.   Billy's, the tatoo |
| 25 | | place right there on Santa Clara. |
| 26 | | |

51

DOCKET NO. C9740812
SJPD
INTERVIEW OF: CANDICE HARRIS

```
 1              probably about, eleven or twelve o'clock at night
 2              by then?
 8  HARRIS      Uh huh.
 4  FARQUHAR    Where did you go?
 5  HARRIS      We went straight to my house, wait, yeah, we went
 6         6౨  straight to my house.  We went straight to my
 7              house.
 8  FARQUHAR    And then she dropped you off.
 9  HARRIS      Uh huh.
10  FARQUHAR    And then K.K. left?
11  HARRIS      Yeah.  When she left she said she was going over
12              this girl's, named Trina house.
13  FARQUHAR    Trina?  You know who Trina is?
14  HARRIS   67 Uh huh.  She lives on uh, Hostetter.
15  FARQUHAR    Okay.  Trina huh?
16  HARRIS      Um Hum, right.
17  FARQUHAR    Does she sleep there sometimes?
18  HARRIS      Naw that, she lives with her mom.
19  FARQUHAR    Okay.
20  HARRIS      And she drives a Honda Civic.
21  FARQUHAR    She lives on Hostetter huh?
22  HARRIS      Uh huh.  I forgot the street but I know how to get
23              there.
24  FARQUHAR    Okay.  And then when was the next time you saw
25              K.K.?
26
```

eorge W. Kennedy
District Attorney
County of Santa Clara
n Jose, California 95110

Case 3:08-cv-03422-JSW CONVICTION WAS OBTAINED AS THE RESULT OF
INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL.

Filed 07/16/2008    Page 25 of 35

Trial counsel was ineffective for failing to do his own investigation into the whereabouts of Sara Silva. Also knowing about Silva's direct connection to this case, via codefendant Wagner (S.J.P.D. Case No. 97-142-1247, pg. 91; 97-156-1275; 97-156-1088.), trial counsel failed to contact Debra Mike-Lee to attempt to locate Silva. New evidence came forth about the statements and credibility of Silva after she testified at the preliminary hearing, in regards to her original statement given to Sgt. Farquhar and Sgt.Kirby. Which was completely different from what she testified to. Also denying the petitioner's right to competent counsel during criminal proceedings. This newly discovered and credible evidence undermined the entire case of the prosecution. Plus counsel never conducted an investigation of Debra Mike-Lee in regards to Silva. There was no tactical reason for not questioning this material and favorable witness for the defense.

The trial Court denied the defenses motions for a mistrial, inviting counsel to renew the request "should these issues be explored further." No further motion for mistrial was made. (CAO 33.) Failure to research the law that causes counsel to omit a defense are grounds for ineffective assistance of counsel, as is a failure to move for dismissal when appropriate. "We cannot imagine that counsel needed more time to meet Walton's proffered testimony and there is no claim that he did." (CAO 32.) This being a tactic of trial counsel, it miserably backfired and revealed lack of preparation, which has too been deemed ineffectivness of counsel. Trial counsel was incompetent for failing to investigate properly and to develope an adequate defense. Counsel failed to investigate the facts in a manner of a

22

CLAIM SIX

1  diligent and conscientious advocate.

2      The petitioner was under the influence of alcohol and

3  large amounts of marijuana when arrested, Marijuana was also

4  found in the petitioner's vehical. (S.J.P.D. Case No. 97-142-

5  1247, Technical Evidence Log No. 22.) The lead investigating

6  sergeants Kirby and Farquhar did not charge the petitioner with

7  possession of marijuana, nor have her tested to know what type

8  of drugs were in her system, before of after they questioned

9  her. While under the influence of an illegal controlled sub-

10 stance, the petitioner did not intentional, knowing and intel-

11 ligently relinquish or abandon a known right (5th Amendment)

12 or privilege. Trial counsel did not use the appropriate, or

13 any, standard for reviewing the petitioner's unknown wavier of

14 her right. Thus, allowing the petitioner's statement into evi-

15 dence.

16     Trial counsel's conduct so undermined the proper function-

17 ing of the adversarial process that the trial cannot be relied

18 on as having produced a just result. Trial counsel's perfor-

19 mance was so deficient that it fell outside the range of rea-

20 sonable professional assistance. In the Court of Appeal's Opin-

21 ion it states "We note that neither defendant objected to some

22 of the challenged conduct by the prosecutor, and thus any claim

23 regarding such conduct is waived." (CAO 33.) Failure to object

24 or move to suppress inadmissible evidence will constitute

25 ineffective assistance of counsel. Even if admissibility were

26 arguable, trial counsel's duty was to fight for the petition-

27 er, not to open the gate to an overwhelming flood of dubious-

28 ly, daming evidence. Counsel failed to object to prosecutorial

CLAIM SIX

1  introductions of evidence ruled inadmissible by the court.
2  Some errors are so serious that they are not waived by failure
3  to object. As it is here. Counsel's deficient performance was
4  prejudicial to the petitioner. There is a reasonable probabi-
5  lity that but for counsel's unprofessional errors, the result
6  of the proceeding would have been different. Counsel must con-
7  duct careful investigations of fact and law available to the
8  petitioner. This was not done. This includes interviewing
9  available prosecution witnesses too.

10  Trial counsel's performance fell below an objective stan-
11  dard of reasonableness under prevailing professional norms.
12  His continuous failure or inability to correctly preform his
13  duties, throughout the court proceedings, prejudiced the
14  petitioner.

15
16
17
18
19
20
21
22
23
24
25
26
27
28

## VERIFICATION

I, Ayanna Z. Green state:

I am the petitioner in this action. I have read the forego-
ing petition for the Writ of Habeas Corpus and the facts stated
therein are true of my own knowledge, except as to matters that
are therein stated on my own information and belief, and as to
those matters I believe them to be true.

I declare under penalty of purjury that the foregoing is
true and correct and that this declaration was executed at Valley
State Prison for Women, Chowchilla, California 93610-0096 on
June 18, 2006.

Petitioner

W - 76617
CDC Number

# EXHIBIT A

| REPORT TYPE   ☑ SUPPLEMENTAL | SJPD CONTINUATION | CASE NO |
|---|---|---|
| HOMICIDE | | 97-142-1247 |

97-156-1288

1 ON 6-5-97, AT APPROXIMATELY 2145 HOURS, I ASSISTED OTHER UNITS

2 INCLUDING SGT. FARQUHAR AND SGT. KIRBY WITH THE ARREST OF

3 "C.W." -- CLINT WALNER -- AT N. 10TH /E. JULIAN IN SAN JOSE.

4 ONCE THIS SUBJECT WAS IN CUSTODY, IT WAS DETERMINED THAT THE

5 PASSENGER IN THE CAR HE WAS DRIVING WAS HIS LIVE-IN GIRLFRIEND,

6 DEBRA MIKE-LEE.

7 MIKE-LEE WAS CHECKED FOR WARRANTS AND PAROLE STATUS; SHE IS

8 ON ACTIVE PAROLE. BECAUSE "CW" LIVES WITH HER, SHE WAS ASKED

9 FOR CONSENT TO SEARCH HER APARTMENT WHICH IS LOCATED AT 855

10 N. BAYSHORE WEST, #D302. SHE GAVE HER CONSENT AND STATED THAT

11 THE ONLY OTHER PERSON LIVING THERE WAS HER SON, ROY LEE, A

12 CYA PAROLEE (FOR NARCOTICS SALES) HIMSELF. SGT. KIRBY DIRECTED

13 US TO SEARCH FOR EVIDENCE THAT WOULD DIRECTLY RELATE TO THE

14 MURDER OF THE VICTIM, SPECIFIC ITEMS OF CLOTHING BELONGING TO "CW",

15 AND OTHER ITEMS WHICH MIGHT TEND TO SHOW A CONNECTION BETWEEN "CW"

16 AND OTHER SUSPECTS.

17 AT MIKE-LEE'S APARTMENT, WE KNOCKED AT THE FRONT DOOR. ROY

18 LEE OPENED THE DOOR, AND AFTER HEARING OUR PURPOSE, ALLOWED US

19 TO ENTER. A PROTECTIVE SWEEP OF THE APARTMENT REVEALED A SECOND

20 PERSON IN ROY'S BEDROOM, SARA SILVA. A STRONG ODOR OF BURNT

21 MARIJUANA EMANATED FROM ROY'S BEDROOM AS WELL -- REFER TO SJPD

22 CASE # 97-56-1275 FOR FURTHER INFORMATION ON SILVA AND LEE'S

23 SUBSEQUENT ARREST.

24

25 PHYSICAL EVIDENCE: IN THE BEDROOM THAT "CW" SHARES WITH DEBRA

26 MIKE-LEE, I SEIZED A BLUE FLOPPY "KANGOL"

27 HAT, BLUE/WHITE "NIKE" HIGH-TOP SHOES, AND A PERSONAL CARD

28 TO MIKE-LEE SIGNED "C.W."; ALL THESE ITEMS BELONG TO "CW."

29 IN ROY LEE'S BEDROOM, I SEIZED A "CADILLAC

30 SEVILLE" OWNER'S MANUAL AND VARIOUS PHOTOGRAPHS WHICH DEPICT

| OFFICER'S NAME | ID NUMBER | DATE | SHIFT/DAYS OFF | SUPERVISOR REVIEW | ID NUMBER | DATE | PG 1 OF 2 |
|---|---|---|---|---|---|---|---|
| KAISER | 3138 | 6-5-97 | SWT /II | | | | |

200-3A 5/96

91

THE COURT ERRED IN FAILING TO RESPOND TO THE JURY'S QUESTION.

1     The trial Court commited prejudicial error in failing to

2  respond to a note the jury sent to the Court during its delib-

3  erations. This error was not harmless. On Monday, June 22, clos-

4  ing arguments were completed, the jury then proceeded to delib-

5  erate. On the fourth day of deliberation, at 4:40 p.m., June 25,

6  1998, the jury sent a note to the trial Court asking for guid-

7  ance. The note said: "There is a possibility that we will not be

8  finished with our deliberations and decisions by the end of

9  tomorrow, Friday June 26. We have one juror who already indi-

10  cated to you that he is not available the week of June 29 through

11  July 3. If we need to go beyond June 26, how do we proceed?" (CT

12  1184.) The next day, the jury met in the morning and began delib-

13  erating again. (CT 1192.) Fourty minutes later, still having no

14  answer or inquirment to their question, they advised the deputy

15  that they had reached a verdict. (CT 1192.)

16     When jury selection originally began on April 8, the estima-

17  ted time was that the trial would be over by May 13. (CT 1025;

18  RT 10.) On May 7, the trial Court continued the trial for approx-

19  imately a month in response to the prosecution's discovery vio-

20  lation. (CT 1102.) At the time of the continuance, the court

21  asked for the juror's indulgence and inquired if there were any

22  hardships. (RT 1574.) The court told the jurors that "we've al-

23  most finished the evidence in this case." (RT 1575.) The court

24  estimated that the trial would involve two weeks in June and

25  "reconvene on the 8th and go through the 19th." (RT 1575.) Two

26  alternate jurors were dismissed because of hardships. (RT 1581;

27  CT 1102.) One sitting juror, Juror No. 10, stated that he or

28  she could stay only until June 16, but the court opted to keep

25

CLAIM SEVEN

1    that juror on. (RT 1580.) On June 16, Juror No. 4 wrote a note

2    to the judge and the court met with counsel and the juror in

3    chambers. (See CT 1182.) The juror asked to be allowed to leave

4    early the next day and also stated that he or she would not be

5    available after June 26. (RT 2317-2326.) The court questioned

6    him as to whether the problem would affect his ability to be

7    fair and impartial. The juror responded that he was "not sure."

8    (RT 2322-2323.) (AOB 91.) The juror's answer was not reassur-

9    ing. Further, the juror indicated that "I've already talked to

10    everyone else" and "we all know this is a problem for me." (RT

11    2324.) The hearing ended without any real resolution of the

12    juror's concerns. Finally, yet another juror, No. 9, also sent

13    a note to the judge asking to "meet with you concerning my up-

14    coming vacation plans." (CT 1179.) Thus, the trial court had

15    already been alerted to possible distractions and problems

16    with the jury before the note on June 25.

17    At one point the juror noted that the jury had been "mis-

18    lead" regarding the length of the trial. (RT 2320.)

19    A trial court has an affirmative duty to respond to a

20    jury's request for guidance after deliberation has begun. The

21    note involved an important matter effecting deliberations. Jury

22    questions can present a court with particularly vexing challen-

23    ges. The urgency to respond with alacrity must be weighed again-

24    st the need for precision in drafting replies that are accurate,

25    responsive, and balanced. A trial court must do more than figu-

26    ratively throw up its hands and tell the jury it cannot help.

27    The court here did this by not responding to the jury's in-

28    quiry. The record does not disclose a reason for the trial

26

CLAIM SEVEN

1   court's failure to respond. The jury indicated it had a problem

2   still the jury got no response and was left to its own devices.

3   The trial court's failure to conduct a hearing sufficient to

4   determine whether there is good cause to discharge a juror(s)

5   is abuse of discretion.

6       In the context of this case, and with all the scheduling

7   problems that occured here, the effect of this failure to

8   reply was coercive. A trial judge may not explicitly or impli-

9   citly coerce a jury verdict. Coercion that results in a rea-

10  sonable possibility that certain jurors have relinquished

11  their views in favor of reaching a unanimous decision violated

12  the petitioner's rights. On these facts, it is proper to

13  characterize the trial court's actions as one of jury coercion

14  as opposed to a helpful attempt to accede to the jury's re-

15  quest in a manner reasonable.

16      The jury deliberated for four days. It is reasonably

17  probable that the misconduct improperly influenced the jury.

18  The jury was misdirected or misled on several issues. And the

19  evidence does not point unerringly to the guilt of the peti-

20  tioner. Thus, any deficiency that undermines the integrity of

21  the trial, introduces the taint of fundamental unfairness.

22      The record indicates that the jury received no response of

23  any knid to its inquiry. (CT 1178.) It is important to view this

24  note in context. The trial had taken far longer than anticipa-

25  ted, and there was clearly some resentment on the part of the

26  jurors. "The note did not indicate any more than 'a possibili-

27  ty' that deliberations would not be completed before the end of

28  the day on June 26." (CAO 43.) In fact, this note also stated:

27

CLAIM SEVEN

1  "We have one juror who has already indicated to you that he is
2  not available the week of June 29 (that following Monday)
3  through July 3. If we need to go beyond June 26, how do we
4  proceed?" Before the note on June 25, at least three jurors
5  had voiced specific concerns regarding impartiality might be
6  sacrificed. No doubt the trial court was frustrated by the
7  difficulties in scheduling. No doubt the jurors were frustrated
8  as well. The possibility that the jury deliberations were
9  effected by a "Let's get this over with" mentality is manifest.
10 With a distracted, frustrated, and "misled" jury on his hands,
11 the trial judge should have taken steps to assure that the
12 deliberations were unaffected by the scheduling problems. In-
13 stead, when confronted by a note that confirmed that the jury
14 had a problem, the judge failed or refused to act. This is a
15 miscarriage of justice and shows prejudice.

16
17
18
19
20
21
22
23
24
25
26
27
28

1358; United States V. Agurs (1976) 427 U.S. 97; United States V. Bagley (1985) 473 U.S. 667, 682; U.S. V. Vallejo (2000) 237 F.3d 1008, 1011; United States V. Young (9th Cir. 1994) 17 F.3d 1201, 1203-1204.

PENAL CODE

Section 1324

Date: June 19, 2005

AYNUUR GREEN
Pro Per

41

# EXHIBIT A

[38]     The exchange went as follows:

The Court:      Let me ask you this, Juror No. 4, do you think
                that the level of your concern affects your
                ability to be fair and impartial in this case?

Juror No. 4:    If I cannot leave to pick up my daughter, . . .
                that's going to weigh heavily on my mind,
                absolutely.

The Court:      Are you saying you wouldn't be able to deliberate
                in this case and be fair and impartial to both
                sides if the case is not decided by the 25th or
                26th?

Juror No. 4:    I'm not sure I follow you.

The Court:      Well, let's say that you are in the jury room on
                the 26th and you know of the Court's insistence
                that you remain as a juror in this a case and my
                admonition to you to find alternatives.   All
                right.   On the 26th, are you going to be -- is
                that going to be foremost in your mind, in
                appropriate time to reach a verdict?

Juror No. 4:    I guess I haven't really thought about it till you
                asked it that way. . . I was assuming you would
                again poll the jury and that was going to be my
                appropriate time to come forward and say I have a
                problem.   I'm not sure.

(RT 2322-2323.)

91

OF KEY WITNESS CANDICE HARRIS IN THE PRELIMINARY HEARING
AND IN THE TRIAL.

1    On November 24, 1997 Deputy District Attorney John C. Schon

2    filed a "EX PARTE MOTION FOR COURT ORDER REQUIRING WITNESS TO

3    ANSWER QUESTIONS AND BE GRANTED USE IMMUNITY FROM USE OF

4    TESTIMONY IN ANY FUTURE PROSECUTIONS PURSUANT TO PENAL CODE

5    SECTION 1324 AND SUPPORTING DECLARATION." Stating: "to order

6    CANDICE HARRIS to testify and produce evidence and thereafter be

7    granted USE immunity from use of her testimony against her in any

8    further proceeding...involving the events surrounding the killing

9    og Harry Garrett III and her association with Ayana Green and

10   Clinton Wagner from May 15, 1997 to and including May 29, 1997

11   and including any report made to the police thereafter until

12   November 24, 1997 on account of any question, fact, or thing

13   which, in accordance with this order, the witness was required

14   to answer or produce, pursuant to Penal Code Section 1324.

15   CANDICE HARRIS is a necessary witness for the People and the

16   testimony of this witness is material, competent and relevant."

17   Candice Harris violated this agreement when she admitted to

18   lying to the investigating Officers, as well as admitted perjury

19   on the stand while under oath. Violating the ·Petitioner's

20   Constitutional rights to due process and a fair trial. Candice

21   Harris was caught in an uncounted amount of lies while

22   testifying. Yet the prosecution continued to allow this

23   perjured testimony to be presented to the jury. Nor was Harris

24   prosecuted or subjected to penalty for violating her immunity

25   agreement. The jury was unable to consider evidence that

26   someone else commited the crime and determine whether it

27   presents all kinds of fantasy possibilities, or whether it

28   presents legitimate alternative theories for how the crime

29

CLAIM EIGHT

1    occured because of Candice Harris' perjured testimony.

2       The petitioner's conviction was obtained by the

3    prosecution's knowing use of perjured testimony.(Exhibits "A".)

4       1) Candice Harris continually stated: "She had no

5    knowledge of KK's (the petitioner Green's nickname) conflicts

6    with Harry (Garrett)." (S.J.P.D. Case No. 97-142-1247; pg. 62,

7    Ln. 11.) "I never heard K.K. say any thing about killing

8    Harry or shooting him or anything like that." (Harris/Sgt.

9    Farquhar Interview; Doc. No. C9740812; pg. 58, Ln. 10-11.)

10    In a private interview at Harris' home, conducted by P.I.

11    T. Davis on August 20, 1997, outside the presence of anyone

12    else, the following statements were made: "I then asked Ms.

13    Harris if she ever overheard KK prior to 5/22/97 mention the

14    victims name (Harry) or that she was having any problem with

15    Harry and she replied "No". I then read the last paragraph

16    on page 102 of the police report wherein it states that

17    Harris said she overheard KK and another person talking

18    when KK said she was going to get Harry. Ms.Harris said she

19    never overheard such a statement made by KK prior to

20    5/22/97." (Harris/Davis Interview; 8/20/97; pg. 3, 4th

21    paragraph.) Harris then testified under oath with USE immunity.

22    Harris was asked: "Did she ever say anything about Harry Garrett,

23    that she was going to do anything because of this fight?" Harris

24    answer was "No." She was then asked: "Did you tell the police

25    she told you that she was going to get Harry?" Harris stated:

26    "Yes, I told the police that." Admitting she lied about this

      alleged statement. (CT 203.) (Exhibits "B".)

27       2) During this same private interview with P.I. Davis on

28

30

## CLAIM EIGHT

1    8/20/97, Harris also stated: "she has never known KK to carry

2    any sort of a weapon particularly she had never observed KK

3    to be in the possession of any handgun." (Harris/Davis

4    Interview; pg. 1, 2nd paragraph.) Harris also testified to this

5    fact. Harris was asked: "Did you ever see KK with a weapon

6    before you were over at King and McKee?" Harris replied "No."

7    She was then asked: "Did you ever see C.W. (Clinton Wagner, the

8    petitioner's co-defendant.) with a weapon that night?" Harris

9    again replied "No." (CT 163.) But Harris is known for keeping

10   a weapon of some sort on her person at all times. (See Clayborn

11   Turner and Eric Gardner's sworn statements.) Harris was then

12   asked: "Have you ever seen Miss Green with a gun before?"

13   Harris stated "No, never." (CT 432.) (Exhibits "C".)

14      3) Candice Harris' statement remained the same until she

15   was threatened by the police. When Harris first spoke to Sgt.

16   Farquhar, she asked: "Did you talk with the lawyer yet?" The

17   response was : "You want some more water. Want me to get you

18   some more water? I'm going to get a little bit more water,

19   then I'll sit here." Never answering her question. (S.J.P.D.

20   Doc. No. C9740812; pg. 1, Ln. 8-11.) Sgt.Farquhar then went

21   on to encourage Harris to speak to him. Stating in part: "And

22   you have, I understand that you're very, you're very scared?"

23   To which Harris responded: "Yeah. He wrecked my life." Not

24   "she" or "KK", but "He wrecked my life." (Ln. 19-24.) In Harris'

25   8/20/97 interview with Davis she admitted how severly the

26   police threatened her, and some of what was said: "I then asked

27   Ms.Harris if the Police had threatened her in any way for her

28   to give them information as to KK's whereabouts or as it

31

CLAIM EIGHT

1    relates to any knowledge she has about this homicide and she
2    replied "Oh, yes. - They said they were going to charge me with
3    an accessory to murder if I didn't cooperative with them."
4    Ms.Harris said one of the police detectives said that she could
5    be sent to prison for 15 years as an accessory if she did not
6    give them a statement about what she knew as it relates to this
7    homicide." (Harris/Davis Interview; pg. 5, 2nd paragraph.)
8    Harris also testified to this. (CT 267.) Admitting that Officer
9    Campagna and Officer Trayer were two of the Officers who
10   threatened her "when they came to my house." (CT 268.) These
11   direct threats to Harris lead to the arrest of the petitioner.
12   Even though there is no physical or biological evidence linking
13   the petitioner to this murder. Harris went on to state that
14   the police were going to come get her at 4:00 O' Clock and
15   arrest her for attempted murder or accessory to murder.
16   (CT 275.) These investigating Officers were connected with
17   the prosecution, and knew because of their threats Candice
18   Harris testimony was perjured, and persisted in using it
19   against the petitioner. (Exhibits "D".)

20       4) Harris stated when this crime occured she was in the
21   back seat alone, the petitioner got out of the car and "she
22   went around the front." One of the few reliable witnesses who
23   veracity was untainted, was Mr. John Turner. Turner stated he
24   spoke to Garrett on this night and was standing a few feet
25   from wher the shooting took place. "When the vehical came to
26   a complete stop, Mr.Turner observed the passenger door behind
27   the driver on the drivers side open an individual who was
28   wearing dark clothing exit the vehical. This individual also

32

1 │ had a hood pulled up from the upper garment over their head.

2 │ Once this individual was out of the vehical and shut the door,

3 │ the vehical immediately pulled away driving westbound on

4 │ McKee Road toward King Road. Mr.Turner said he observed the

5 │ individual who exited this vehical to run quickly over to

6 │ Mr.Garrett at which time the individual with their left arm

7 │ (Harris is left handed) extended fired four to five shots in

8 │ quick succession at Mr.Garrett who then fell to the ground as

9 │ if he had been shot." (Turner/Davis Interview; 9/22/97; pg. 2,

10 │ 4th & 5th paragraphs.) "Mr.Turner stated that he had told the

11 │ officer who was interviewing him at the Elmwood Facility

12 │ days after this homicide occured that he didn't think that

13 │ the shooter was KK because she is taller than he is and the

14 │ shooter was shorter than him. (pg. 3, 5th paragraph.) This

15 │ witness not only states the shooter was where Harris

16 │ testified she was, the back seat, Turner also describes the

17 │ shooter, which fits Harris' description. (Exhibits "E".)

18 │ 5) Harris told Sgt.Farquhar "I have a best friend" named

19 │ "Chavonne Anderson". Through whom she came to know Garrett.

20 │ (S.J.P.D. Doc. No. C9740812; pg. 67, Ln. 14-22.) Harris'

21 │ best friend Ms.Anderson informed the police of Harris and

22 │ Garrett's "confrontation". (See Exhibit "A".) When Harris

23 │ testified she was asked: "Did you like Harry?" She responded:

24 │ "I -- I really didn't know Harry, but I knew him as in like if

25 │ I seen him, like what is up, or I knew him like that. But I

26 │ didn't know him like --.like -- like as in a friend." (CT 179.)

27 │ (Exhibit "F".)

28 │ 6) While speaking to Sgt.Farquhar, Harris stated: "And

33

CLAIM EIGHT

1  then um, we met up uh, my friend C.W." Then Sgt.Farquhar

2  questioned that statement and Harris changed it, now saying:

3  "This is her friend. She did. His name is C.W. I couldn't

4  remember his name at frist, but now I remember his name.

5  (S.J.P.D. Doc. No. C9740812; pg. 20, Ln. 15-22.) Harris was

6  then asked: "Have you ever been to C.W.'s house?" She replied

7  "No." Sgt.Farquhar then asked: "Do you have any idea where

8  C.W. lives?" Harris again stated "No." (pg. 50, Ln. 5-8.)

9  During Harris' interview with Davis, Davis stated: "I then

10  asked Ms.Harris how she came to know the black male adult

11  known as CW and she replied that she met CW through KK,

12  however, she claims never to have partied with or socialized

13  with CW other than brief meetings when CW would meet with KK

14  in the downtown San Jose area." (Harris/Davis Interview;

15  8/20/97; pg. 2, 1st paragraph.) Harris then testified that the

16  first time she met Mr.Wagner was on "The day of the murder."

17  (CT 146.) Harris later changed her testimony. Now not only

18  admitting to knowing Mr.Wagner, stating: "I knew him

19  personally., I knew him for like a month,...And I always would

20  be smoking weed, like quantities of weed with him, and

21  alcohol." Harris also admitted to perjuring herself, stating:

22  "I didn't want to -- only reason why I didn't know him was

23  my mother." This was an unfounded and misconstrued reason

24  for attempting to excuse perjury. Harris' reasons for lying

25  about Mr.Wagner could not conceivably be because "I didn't want

26  my mom to know I was hanging with him because he is a much older

27  man." (CT 440.) Her "mom" was not present when she spoke to

28  Sgt.Farquhar or P.I. Davis, when she repeatedly denied knowing

CLAIM EIGHT

1   Mr.Wagner. Or did Harris continue to lie about Mr.Wagner because
2   "He wrecked my life." as she previously stated? (See Exhibit
3   "D".) Harris was then asked: "When you were downtown would you
4   usually see him down there in the presence of Ayana Green?"
5   Harris replied "No." The prosecutor continued stating: "All
6   right. And on how many occasions would you say you saw him
7   downtown when you were with Ayana Green?" Harris responded
8   stating: "Once, we all -- we were downtown and C.W. had some
9   weed, and me, him, and KK were smoking weed," "This is -- it
10  was like -- like a month or so before the shooting," (CT 443.)
11  Now Harris admits that she has actually been to Mr.Wagner's
12  house. (CT 447.) This was in "April. I think it was in April."
13  The petitioner was not with her. (CT 448.) Harris left a pair
14  of jeans over at Mr.Wagner's house and she had on a pair of
15  his sweats. (CT 449-450.) Proving that not only do Harris and
16  Wagner know one another, they are also very comfortable with
17  one another. Harris then went on to testify that before she,
18  the petitioner and Wagner went to the crime scene "C.W. got
19  a page." "Yeah, because we stopped at a gas station that had
20  a phone." Then while on the phone "He called her out of the
21  car," "Like wave KK out of the car over to him." "That was
22  when he got off the phone." For "like maybe two or three
23  minutes." (CT 180-184.) Harris then changed her testimony
24  again stating she could not remember who was on the phone,
25  and the petitioner motioned for Mr.Wagner to come over while at
26  this gas station. (CT 437.) No gas stations in any of the areas
27  Harris mentioned had a video tape, or other evidence to
    coroborate her story. (Exhibits "G".)
28

35

CLAIM EIGHT

7) Candice Harris has had many behavior problems and was a ward of the Juvenile Court for many years. Harris' teacher, Mr. Kevin Collins, stated: "Candice was reported as doing poorly academically. Candice's chance to graduate from high school is very slim." On 9/04/95 when Harris was placed in Gray's Group Home, "there was problems with hygiene, authority figures, inappropriate play with condoms and an isolated incident of sexuall acting out." On 12/01/95 Harris' Quarterly Report stated: "It is recommended she remain at Gray's Group Home at this time." (Exhibits "H".)

CANDICE HARRIS not only had motive for killing Harry Garrett, but was given an opportunity by the investigating officers to get away with it by accusing the petitioner.

This ground not only set forth the facts that establish perjury and knowledge thereof by the prosecution, it also shows that those facts existed independently of the contradictions appearing at the trial. The petitioner had no opportunity to present the alleged true matter at the trial, that is, that there was such suppression of the truth by the authorities, and the fact that the petitioner's trial attorney refused to allow her to testify, that she was precluded from using it at the trial.

CONCLUSION

For the above reasons, writ of habeas corpus should be granted and the conviction reversed.

Dated:                                Respectfully Submitted,

                                      _____
                                      Ayanna Z. Green
                                      In Pro Per

36

# EXHIBIT A

1   GEORGE KENNEDY, DISTRICT ATTORNEY
    JOHN C. SCHON, Deputy District Attorney
2   STATE BAR NUMBER 062678
    County Government Center, West Wing
3   70 West Hedding Street
    San Jose, California  95110
4   Telephone: (408) 299-7400

5   Attorneys for the People

6

7              IN THE MUNICIPAL COURT OF THE STATE OF CALIFORNIA
8                   IN AND FOR THE COUNTY OF SANTA CLARA

9   PEOPLE OF THE STATE OF CALIFORNIA,     CASE NO.:C9740812

10                  Plaintiff,             EX PARTE MOTION FOR COURT
11                                         ORDER REQUIRING WITNESS
                     -vs-                  TO ANSWER QUESTIONS AND
12                                         BE GRANTED USE IMMUNITY
                                           FROM USE OF TESTIMONY IN
13  AYANA GREEN AND CLINTON FRED WAGNER    ANY FUTURE PROSECUTIONS
                                           PURSUANT TO PENAL CODE
14                                         SECTION 1324 AND
                     Defendants,           SUPPORTING DECLARATION
15  _____/

16

17            TO THE HONORABLE JUDGE OF THE ABOVE·ENTITLED COURT:

18            THE PEOPLE OF THE STATE OF CALIFORNIA REPRESENTED BY THE

19  DISTRICT ATTORNEY OF SANTA CLARA COUNTY move this Honorable court

20  to order CANDICE HARRIS to testify and produce evidence and

21  thereafter be granted USE immunity from use of her testimony

22  against her in any further proceeding including any Juvenile

23  Petition under Welfare and Institutions Sections 601 AND 602

24  involving the events surrounding the killing of Harry Garrett III

25  and her association with Ayana Green and Clinton Wagner from May

26
                                   1

1   15, 1997 to and including May 29, 1997 and including any reports
2   made to the police thereafter until November 24, 1997 on account
3   of any question, fact, or thing which, in accordance with this
4   order, the witness was required to answer or produce, pursuant to
5   Penal Code Section 1324.

6       I, JOHN C. SCHON, declare that:

7       I am an attorney licensed to practice law in the State Of
8   California;

9       I am a Deputy District attorney employed by the County of
10  Santa Clara;
11
        I am assigned to the prosecution or this case;
12
        The above captioned matter is now Pending in the Municpal
13
    Court and the preliminary examination is now in progress wherein
14
    the defendants are charged with Penal Code Section 187 MURDER as
15
    well as other offenses.
16

17      CANDICE HARRIS is a necessary witness for the People and the
18  testimony of this witness is material, competent and relevant.

19      This witness will testify in substances as follows:

20      She was with defendant's Green and Wagner on May 22 1997 in
21  a vehicle driven by Clinton Wagner when it stopped in the area of
22  McKee and King Rds in San Jose.  Green exited the vehicle while
23  Wagner drove around the corner.  Green shot Garret and rejoined
24  them in the vehicle and threatened Harris with harm if she told
25  anyone about what had just happened.

26

2

1    It is expected Harris will refuse to answer questions and
2    produce evidence on the ground that the witness might be
3    incriminated thereby.

4    The use of Harris as a witness is not contrary to the public
5    interest and could not subject the witness to criminal prosecution
6    in another jurisdiction.

7    WHEREFORE, the District attorney of Santa Clara County
8    respectfully requests that, pursuant to the provisions of Penal
9    Code Section 1324, an order be issued forthwith, by this Honorable
10   Court requiring CANDICE HARRIS to fully, fairly, and in good faith
11   answer such questions and produce such evidence in the above
12   entitled action, which but for Penal code Section 1324, would be
13   privileged to withhold on the grounds that such testimony might be
14   self-incriminating.

15

16   I DECLARE UNDER THE PENALTY OF PERJURY that the above
17   statement is true and correct.

18   Dated: November 24, 1997

19

20   _____
     JOHN C. SCHON
21   DEPUTY DISTRCT ATTORNEY

22

23

24

25

26

3

1  GEORGE KENNEDY, DISTRICT ATTORNEY
   JOHN C.SCHON, Deputy District Attorney
2  STATE BAR NUMBER 062678
   County Government Center, West Wing
3  70 West Hedding Street
   San Jose, California  95110
4  Telephone: (408) 299-7400

5  Attorneys for the People

6

7          IN THE MUNICIPAL COURT OF THE STATE OF CALIFORNIA
                 IN AND FOR THE COUNTY OF SANTA CLARA
8

9  PEOPLE OF THE STATE OF CALIFORNIA,    CASE NO.:C9740812

10              Plaintiff,            ORDER REQUIRING WITNESS
                                      TO ANSWER QUESTIONS
11              -vs-                  UNDER PENAL CODE
                                      SECTION 1324
12  AYANA GREEN AND CLINTON FRED WAGNER

13              Defendants,
                                        /
14

15      THE COURT has read and considered the DECLARATION submitted

16  by the District Attorney of Santa Clara County under Penal Code

17  Section 1324 requesting that CANDICE HARRIS, a necessary witness,

18  be required to answer questions and produce evidence in the

19  Municipal Court, County of Santa Clara, State of California,

20  CANDCE  HARRIS
    -FERNANDO-ZEPEDA, said person as a witness, having had a hearing

21  upon an order to show cause why such an order should not issue.

22

23      THE COURT believes the allegations in the DECLARATION to be

24  true;

25      THE COURT finds there is no good cause why this ORDER should

26  not be made;

1   THE COURT finds this ORDER is not contrary to public
2   interest;

3   THE COURT finds that CANDICE HARRIS can not be subjected to
4   a criminal proceeding in another jurisdiction through compliance
5   with this Court's ORDER;

6   IT IS HEREBY ORDERED that CANDICE HARRIS shall answer such
7   questions and produce such evidence by testifying Fully, fairly,
8   and in good faith as to the witness knowledge of the facts from
9   which the charges arose in the case(s) of People v. AYANA GREEN
10  AND CLINTON FRED WAGNER; as may be material, competent and
11  relevant to the case(s) and which otherwise, but for the
12  provisions of Penal Code Section 1324, the witness would be
13  privileged to withhold on the ground that answering such questions
14  and producing such evidence might be self-incriminating.
15

16  After complying fully with this ORDER, the testimony of
17  CANDICE HARRIS, shall not be used against her in any further or
18  future proceeding including any petition under Welfare and
19  Institutions sections 601 or 602 involving the events surrounding
20  the killing of Harry Garrett III and her association with Ayana
21  Green and Clinton Fred Wagner from May 15, 1997 to and including
22  May 29, 1997 as well as any reports or statements to the police
23  thereafter until November 24, 1997.

24  Dated: November 24, 1997

25

26                                    JUDGE OF THE MUNICIPAL COURT
                                      OF THE COUNTY OF SANTA CLARA

| REPORT TYPE ☑SUPPLEMENTAL | SJPD CONTINUATION | CASE NO. |
|---|---|---|
| 187  HOMICIDE | | 97-144-0503 |

1 OF A JUVENILE, CHAVON ANDERSON D.O.B. ▮▮▮▮▮,
2 WHO HAD DISCOVERED THAT THE MISSING PERSON, CANDICE
3 HARRIS WAS IN DANGER. I CALLED CHAVON ANDERSON &
4 RECEIVED THE FOLLOWING STATEMENT REGARDING CASE # 97-144-0503

6 STATEMENT OF CHAVON ANDERSON : CHAVON IS THE BEST FRIEND OF
7                                            CANDICE. BOTH WERE FRIENDS OF
8 HARRY GARRETT. CHAVON HEARD THAT HARRY HAD BEEN KILLED
9 AND KNEW THAT CANDICE WAS INVOLVED IN A CONFRONTATION
10 AGAINST HARRY A FEW DAYS PRIOR TO HARRY'S DEATH.
11      CANDICE IS ALSO A GOOD FRIEND OF "K.K.".
12 "K.K." HAS BEEN HANGING AROUND THE AREA OF RANCHO
13 RDE & MCKEE RD TRYING TO SELL DRUGS. "K.K."
14 IS NOT FRIENDS WITH HARRY AND CLAIM THAT SHE
15 WAS JUMPED BY HARRY AND FRIENDS A FEW DAYS
16 PRIOR TO HARRY'S DEATH.
17      I ASKED CHAVON "WHY DID ALL OF THIS CONFLICT START?"
18 SHE EXPLAINED THAT A COUPLE OF WEEKS AGO THERE WAS
19 A STABBING ON N. KING RD SOMEWHERE IN THE AREA
20 OF ALUM ROCK AVE. THE SUSPECTS SOMEHOW INCLUDED HARRY
21 & THE VICTIM WAS EUSEF WILLIAMS (UNKNOWN SPELLING).
22 WILLIAMS IS A GOOD FRIEND OF K.K'S. THIS INCIDENT
23 COMBINED WITH K.K. TRYING TO SELL DRUGS IN HARRY'S
24 AREA, AND K.K. GETTING JUMPED, LED TO K.K'S INVOLVEMENT
25 IN HARRY'S DEATH.
26      CHAVON RECEIVED HER INFORMATION FROM CANDICE &
27 CARLOS (HARRY'S BEST FRIEND) CHAVON BELIEVES THIS IS WHY
28 CANDICE RAN AWAY & CHAVON HEARD THAT GANG MEMBERS
29 WERE AFTER CANDICE TO REVENGE HIS DEATH.

| OFFICER'S NAME | ID NUMBER | DATE | SHIFT/DAYS OFF | SUPERVISOR REVIEW | ID NUMBER | DATE | |
|---|---|---|---|---|---|---|---|
| Raya | 3341 | 05-27-97 | DAYS/MTW | | | | PG 3 OF 7 |

# EXHIBIT B

| REPORT TYPE ☒ SUPPLEMENTAL | CONTINUATION | 97-142-1247 |
|---|---|---|
| 187 P.C. MURDER | | |

1. ON 5-25-97 AT APX 0730 HRS I.F.C. CAMPAGNA #5275
2. & I CONTACTED CANDICE HARRIS TO ASK HER FOR MORE INFOR-
3. MATION ON "K.K"
4.

5. STATEMENT OF CANDICE HARRIS: CANDICE SAID SHE KNEW VERY
6.                                 LITTLE ABOUT K.K. AND HAS
7. NO WAY TO CONTACT HER. SHE BELIEVES K.K. IS HOMOSEXUAL
8. BUT WOULD NOT EXPLAIN WHY. SHE SAID THAT K.K IS
9. A POPULAR RAP ARTIST WHO RECENTLY COMPETED IN A
10. RAP TALENT SHOW AT THE SAN JOSE STATE EVENT CENTER.
11. SHE HAD NO KNOWLEDGE OF K.K.'S CONFLICTS WITH HARRY.
12.

13. I RE-CONTACTED CHAVON ANDERSON REGARDING CANDICE'S
14. TESTIMONY. CHAVON SAID THAT CANDICE IS K.K.'S BEST FRIEND
15. & CANDICE TOLD HER MUCH MORE THAN SHE TOLD ME.
16.

17. STATEMENT OF CHAVON ANDERSON CONT; CHAVON SAID THAT K.K.
18.                                   IS DEFINATELY HOMOSEXUAL AS
19. SHE HAS MADE PASSES AT CHAVON ON NUMEROUS OCCASSIONS.
20. SHE ALSO SAID THAT CANDICE IS LYING TO US BECAUSE
21. SHE DOESN'T WANT TO GET HER GOOD FRIEND K.K. IN
22. TROUBLE. CHAVON HAS SEEN K.K & PROVIDED THE
23. FOLLOWING DESCRIPTION:
24.                        BLACK FEMALE ADULT
25.                        APX 5-10" WITH LONG BRAIDS
26.                        "BUILT LIKE A MAN, MUSCULAR"
27.                        APX 18-20 YEARS OLD.
28.
29. SFC. CAMPAGNA & I CONTACTED A WITNESS "TIGER" AT HIS
30. HOME OFF. OF EL RANCHO VERDE.

| OFFICER'S NAME | ID NUMBER | DATE | SHIFT/DAYS OFF | SUPERVISOR REVIEW | ID NUMBER | DATE | PG 5 OF 7 |
|---|---|---|---|---|---|---|---|
| TRAN | 3361 | 5-27-97 | 045/MTW | | | | |

XO-3A 5/96

ORIGINAL

DOCKET NO. C9740812
SJPD
INTERVIEW OF: CANDICE HARRIS

| | | |
|---|---|---|
| 1 | | had told me that you guys had... |
| 2 | FARQUHAR | Called. |
| 3 | HARRIS | Called.  And... |
| 4 | FARQUHAR | Then it was probably really scary. |
| 5 | HARRIS | Yeah.  It was really bad. |
| 6 | FARQUHAR | Yeah. |
| 7 | HARRIS /47 | And I didn't know, I mean, I was just riding with |
| 8 | | 'em, and it just happened. |
| 9 | FARQUHAR | Yeah. |
| 10 | HARRIS | I never heard K.K. say any thing about killing |
| 11 | | Harry or shooting him or anything like that. |
| 12 | | 'Cause I would have angled myself away from her |
| 13 | | until she you know. |
| 14 | FARQUHAR | Did what she needed to do whatever. |
| 15 | INTERVIEWER | Candice, do you have a middle name? |
| 16 | HARRIS | Yes I do. |
| 17 | INTERVIEWER | What is it? |
| 18 | HARRIS | Arabia. |
| 19 | INTERVIEWER | Can you spell it please. |
| 20 | HARRIS | A-r-a... |
| 21 | INTERVIEWER | Uh huh. |
| 22 | HARRIS | ...b-i-a. |
| 23 | FARQUHAR | Okay.  Harris right? |
| 24 | HARRIS | Uh huh. |
| 25 | FARQUHAR | How old are you? |
| 26 | | |

58

Page Three
Stuart Kirchick
August 20, 1997

vehicle and that this occurred before they drove over to the area
near the Mexican restaurant. This conversation would have occurred
in the downtown San Jose area prior to CW driving out to the
parking lot near the Mexican restaurant. I asked Ms. Harris if
they made any stops from the downtown San Jose area to the Mexican
restaurant area and she replied "No".

Ms. Harris then stated that she and KK visited with a woman named
Rochelle who lives in the downtown San Jose area prior to meeting
CW for the second time in the downtown area before the homicide
occurred.

I then asked Ms. Harris where everyone was seated in CW's vehicle
prior to their arrival in the parking lot across from the Mexican
restaurant. Ms. Harris responded by stating that she was seated in
the right rear passenger seat behind the right front passenger who
was KK and the vehicle was driven by CW.

I then asked Ms. Harris if she ever overheard KK prior to 5/22/97
mention the victims name (Harry) or that she was having any problem
with Harry and she replied "No". I then read the last paragraph on
page 102 of the police report wherein it states that Harris said
she overheard KK and another person talking when KK said she was
going to get Harry. Ms. Harris said she never overheard such a
statement made by KK prior to 5/22/97.

I then asked Ms. Harris to describe for me what she observed KK to
do once KK exited the vehicle which was stopped in the parking lot
directly opposite the Mexican restaurant. Ms. Harris responded by
stating that KK did not say anything as she exited the right front
passenger side door of CW's vehicle and she observed KK to walk
quickly around the front of the vehicle toward the front of the
Mexican restaurant where she observed a young black male adult to
be standing alone. Ms. Harris said KK approached this young black
male who was standing and got within she estimates five to ten feet
at which time she saw KK point what appeared to be a handgun in the
direction of this individual and then heard and saw the flash from
the handgun being fired by KK in the direction of this black male.

Ms. Harris said that as soon as the first shot or two were fired CW
drove the vehicle away from where it was stopped in the parking lot
opposite from the Mexican restaurant around the corner onto King
Road, turning right and then stopping a short distance past a 7-11
store on the street.

Ms. Harris said that after the car was moved to its second location
by CW she looked out the rear window and saw KK running from the
parking lot area toward the car and she could see the black colored
hand gun still in KK's hand.

1   A    I DON'T KNOW.

2   Q    YOU DON'T REMEMBER?

3   A    NO.

4   Q    ALL RIGHT.  BUT IN ANY EVENT THEY CONVERSED OUTSIDE OF

5   THE CAR WHEN MISS GREEN MOTIONED FOR C.W. TO COME OVER.  IS

6   THAT THE WAY YOU REMEMBER IT?

7   A    YES.

8   Q    NOW, YOU INDICATED YESTERDAY THAT IT WAS ON MONDAY

9   THAT YOU NOTICED THAT MISS GREEN HAD A FAT LIP OR A CUT

10  LIP?

11  A    UH-HUH.

12  Q    IS THAT YES?

13  A    YES.

14  Q    NOW, WHEN YOU DISCUSSED THAT WITH HER, THE FAT LIP AND

15  HER ALTERCATION WITH THE DECEDENT, HARRY GARRETT, AND

16  CARLOS AND SOME OTHER INDIVIDUAL, DID SHE EVER SAY ANYTHING

17  ABOUT HARRY GARRETT, THAT SHE WAS GOING TO DO ANYTHING

18  BECAUSE OF THIS FIGHT?

19  A    NO.

20  Q    DID YOU TELL THE POLICE SHE TOLD YOU THAT SHE WAS

21  GOING TO GET HARRY?

22  A    YES, I TOLD THE POLICE THAT.

23       MR. KIRCHICK:  I'M SORRY, I COULDN'T HEAR THE

24  WITNESS.

25       THE WITNESS:  YES.

26       MR. KIRCHICK:  WHAT WAS THAT LAST WORD?

27       MR. SCHON:  SHE TOLD THE POLICE THAT.

28       MR. KIRCHICK:  OKAY.

# EXHIBIT C

# THOMAS C. DAVIS & ASSOCIATES

*Investigative and Legal Services*

59 North Santa Cruz Avenue
Suite K
Los Gatos, California 95030
(408) 395-3161
FAX (408) 395-2453

August 20, 1997


Client:          Stuart Kirchick

Re:              People v. Ayana Green

Interview of:    Candice Harris, witness
                 Date of birth:  1/26/80
                 Residence address:  388 Green Park Way, San Jose, CA
                 Residence telephone:  (408) 578-6498


Tuesday, August 19, 1997

This investigator responded to the residence address associated to
Candice Harris in an effort to interview her.  Upon my arrival at
2:30 p.m. Candice Harris answered the front door at which time I
presented her a business card and stated that I represented Ayana
Green and her attorney Stuart Kirchick regarding the current
homicide charge filed against Ms. Green.  Ms. Harris stated that
she was aware of this situation and invited me into the residence
stating she would answer whatever questions I might have as it
relates to her knowledge of this homicide.  I asked Ms. Harris if
her mother or father were at home and she stated they were not and
could not be reached at this time.

I first asked Ms. Harris if she could tell me how long and under
what circumstances she has known Ayana Green.  Ms. Harris responded
that she knows Ayana Green as "KK" and that they met approximately
six months prior to 5/22/97 and that it was only a few weeks before
5/22/97 that they associated with each other on a regular basis.
During this time frame Ms. Harris stated that she has never known
KK to carry any sort of a weapon particularly she had never
observed KK to be in the possession of any handgun.

Ms. Harris said that she has never observed KK to sell or consume
any illegal narcotic.

Ms. Harris said that she knew that KK lived with another young
black woman named Jessica and that they were sisters (not
biological).

I asked Ms. Harris what type of vehicle has she seen KK in
possession of and driving and she replied it was a small grey in
color 2-door vehicle, possibly a Nova.

*All information contained here is confidential*

Thomas C. Davis  Lic.-A-6198

Clay Turner DMA275
885 n. San Pedro st.
San Jose, CA 95110
To the Court,                                                          Aug.14,2001

My name is Clayborn Sidner Turner 2, and everything I am about to say is true under penalty of purgury. this letter is in regards to an incedent that happened on or about MAY13,1997. IT was a sunday, and my cousin Ayanna Green asked me if I could drive her and a couple of our friends, Candice (I don't remember her last name), and her brother Nicolas, to Sacramento in Ayanna's car. The reson I was asked to drive is I had a driver's licence. I was asked at about, 9:30 or 10:00 in the morning, but I said we'd have to wait till at least 1:00pm. to leave because I was in the proccess of moving out of my apar-tment and I had noone there to watch over things till 1 o'clock. Ayanna agreed to wait till one, and we had a couple of beers, while I packed up.We left the apartment on Hoffman court at just after one, with me driving, Ayanna in the passenger seat, and Candice and Nick in the back seat.We stopped for gas I believe on the corner of Blossem Hill and Almeden, then we jumped on the freeway,I can not re-call the exact route we took to get to Sacramento, but I do know we got there just after dark. When we got there Ayanna instructed me to drive to an apartment, belonging to a female introduced to me as only Ayanna's either wife or ex-wife. If I was told her name I do not remember it because I of how short of a ti I was around her. When we got there we bought some weed through Ayanna's ex-wife, because the weed we had was smoked on the way up to Sacramento. We also got some fast-food and I know I got a 40 oz. of old English Malt liquor. I believe Candice may have gotten some alchohol as well but I'm not sure. By this time it was late and the drink and weed were starting totake affect on us all after our ride up there so it was decided we go to sleep and we'd head back to San Jose in the morning Monday the 19. Ayanna slept in the room with her ex-wife nick slept on the couch in the living room and Candice and I slept on the living room floor, sharing a blanket. The next morning Ayanna came in to wake us up, wereing just her boxer's and top we cracked some jokes to her about her Ex having a "spell" on her. Ayanna said nothing happened then said something about Candice and I sleeping on the floor together being how we at one time were a "couple", even though nothing happened, except sleep. At that point Ayanna's ex braided Ayanna's hair then left to get something to eat while Ayanna tooka shower.After Ayanna got out of the shower Candice told us to come check out what she found. She had a green Army type bag with handles and a zipper on it. Candice opened the bag and took out what I reconized as a "Tech-9" semi-auto pistole and two, 30-round clips. Candice passed the wepon to me,wich I noticed was not loaded but the clips were. There was also two boxes of nine millimeter amunition in the bag. I wiped my finger prints off of the gun and gave it back to candice asking her what is she going to do with it. She said,"take it I got something I could use it for." Candice took the whole bag down to Ayanna's car and returned.Soon after Ayanna's ex returned with food and cigarrets,and after a quick meal,we (Ayanna, myself, Candice, and Nick) left

saying  we were going to just go to the liquor store and we'll be back.  WE didn't go to
the liquor store we went to the gas station, were I tryed to fit the gun under the hood
of the car, but it was too big.  So we put the gun in the trunk, got gas and headed back
to San Jose with me taking extra care to follow all of the road rules.  Upon getting back
to the apartment were I was staying, on Hoffman court Candice and Nick took thegun in it's
bag put it into a back-pack and jumped on the bus.  Ayanna and me were going to a neighbor'
apartment to get more weed because we left our's in Sacramento. After we got our weed
Ayanna left. The gun was with Candice  and to the best of my knowledge stayed with her.

   The statement above is true, to the best of my memory, I, Clayborn S. Turner, swear
to this under the penalty of purgury.

With all respect,

Clayborn S. Turner 2

Declaration of Information by

I, Eric Gardner, hereby declare with penalty of perjury as follows:

On or about May 15, 1997, I remember Ayanna Jackson telling me that she was going with this guy named Lewis. I also remember being downtown with Ayanna, Candice, and Candice's brother Nick, with no ride, because Ayanna and neither her brother or this guy Lewis didn't have a car at that point of time. During May 17, 1997, Ayanna got a female she knew to take her to her mechanic's place on the east side of San Jose. All of us didn't go, because this female was tripping on taking all of us, so me, Candice, and Nick stayed downtown. Me, were suppose to wait on Ayanna to come back and get us. But Candice had got into it with one guy name Hi-Dog. Hi-Dog was kind a drunk, and Candice didn't like the way Dude was getting at her. He tried to touch one of her breast, and her and Nick start fighting with Hi-Dog. Someone yelled the police was coming, so me, Candice, and Nick went to their mom's house on the east side. I called Ayanna to let her know that we wasn't downtown no more and to come get us at Candice house. When a hour past by, I tried paging Ayanna, but she didn't respond to my pages. So I ended up staying at Candice's house all night. That night me and Candice almost got intimate, we didn't because her mother woke up. The next morning May 18, 1997 Ayanna came and picked us up. And she went to a K-Mart or some store just to get Nick some presents for he'd chosen in the end, we also got some food from a McDonald's inside the office, and Ayanna she got some Roxeks. We then went to the homie "21's" house to be chillin. I don't know "21" real name.

1   SCRATCHED THE TOP OF YOUR HEAD, RIGHT?

2   A   YES.

3   Q   IS THAT WHAT YOU DID AFTER SHE GOT BACK IN THE CAR AND

4   THE CAR PROCEEDED TO MISS GREEN'S VEHICLE?

5   A   YES.

6   Q   YOU DON'T KNOW WHAT HAPPENED TO THAT GUN?

7   A   NO, I DON'T.

8   Q   DID YOU SEE MR. WAGNER PASS THAT GUN TO MISS GREEN

9   BEFORE SHE GOT OUT OF THE CAR?

10  A   NO.

11  Q   HAD YOU EVER SEEN MISS GREEN WITH A GUN BEFORE?

12  A   NO, NEVER.

13  Q   HAD YOU EVER SEEN ROCHELLE WITH A GUN?

14  A   NO.

15  Q   DO YOU KNOW WHETHER -- WHETHER ANY OF THEM EVER

16  ACTUALLY OWNED A GUN?

17  A   NO.

18  Q   SO YOU DIDN'T SEE WHAT HAPPENED TO THAT GUN ONCE

19  MISS GREEN GOT BACK IN THE CAR?

20  A   NO, I DIDN'T.

21  Q   DID YOU SEE IT IN THE CAR?

22  A   NO.

23  Q   YOU NEVER SAW THAT GUN --

24  A   NO.

25  Q   -- WHEN SHE GOT BACK IN THE CAR?

26  A   NO, NEVER SEEN THE GUN.

27  Q   WHAT ABOUT WHEN SHE WAS SHOOTING, HOW DID YOU KNOW IT

28  WAS BLACK?

# EXHIBIT D

PEOPLE VS. AYANA GREEN/CLINTON FRED WAGNER
DOCKET NO. C9740812
SJPD
INTERVIEW OF: CANDICE HARRIS

| | | |
|---|---|---|
| 1 | INTERVIEWER | When you leave out of here, when you leave out of |
| 2 | | here, remember what me and Sarge talked about? |
| 3 | HARRIS | Uh huh. |
| 4 | INTERVIEWER | Whenever, world that you're in, is a world of |
| 5 | | people that you're going to get to know.  When you |
| 6 | | step out of that world you won't see those people |
| 7 | | here.  (inaudible). |
| 8 | HARRIS | Did you talk with the lawyer yet? |
| 9 | INTERVIEWER | You want some more water (inaudible).  Want me to |
| 10 | | get you some more water? I'm going to get a little |
| 11 | | bit more water, then I'll sit here. |
| 12 | INTERVIEWER | Yeah.  If you could, if you could say what exactly |
| 13 | | (inaudible). |
| 14 | INTERVIEWER | (Blows nose)  What you're going to tell the officer |
| 15 | | in ~~home~~ HERE too.. |
| 16 | HARRIS | The whole truth. |
| 17 | HARRIS | (inaudible) |
| 18 | INTERVIEWER | (inaudible) |
| 19 | FARQUHAR | (voices in background: inaudible)  Candice, first |
| 20 | | of all I want to, I want to tell you that I |
| 21 | | appreciate you're making the right decision. |
| 22 | | You're doing the right thing.  And you have, I |
| 23 | | understand that you're very, you're very scared? |
| 24 | HARRIS  4 | Yeah.  He wrecked my life. |
| 25 | FARQUHAR | And that's what I want to talk about.  I want |
| 26 | | |

1

George W. Kennedy
District Attorney
County of Santa Clara
San Jose, California 95110

Page Five
Stuart Kirchick
August 20, 1997

stated at that time she did not know where KK was but would try to
reach her and have her call the police detective who left a pager
number.  According to Ms. Harris, she then paged KK who called her
back at her home on Sunday, and KK told Ms. Harris she was not
going to call the police especially if she had to leave a number on
a police pager for them to return the call.

I then asked Ms. Harris if the police had threatened her in any way
for her to give them information as to KK's whereabouts or as it
relates to any knowledge she has about this homicide and she
replied "Oh, yes.  They said they were going to charge me with an
accessory to murder if I didn't cooperative with them."  Ms. Harris
said one of the police detectives said that she could be sent to
prison for 15 years as an accessory if she did not give them a
statement about what she knew as it relates to this homicide.

I asked Ms. Harris if her photograph was ever taken by the police
officers investigating this homicide and she replied that one
photograph was taken of her at her home on Monday and then when she
was taken downtown to the Police Department and questioned further
another photograph of her was taken at the police department on
Monday.

I asked Ms. Harris why she first told the police that she knew
nothing about this homicide when she was first contacted and she
replied "I was scared because I was there and they threatened me."

It should be noted that Ms. Harris could be physically described as
a young black female, approximately 5' 11" to 6', 175 to 180
pounds, tall, somewhat thin with broad shoulders and a very dark
skin complexion.  Ms. Harris on this date was wearing her long
straight black hair, combed back and to the bottom of the neck.
Ms. Harris said that she wore her hair this way on the evening of
5/22/97.

                              Respectfully,


                              Thomas C. Davis

TCD:jr

# EXHIBIT E

PEOPLE VS. AKANA GREEN/CLINTON FRED WAGNER
DOCKET NO. C9740812
SJPD
INTERVIEW OF: CANDICE HARRIS

1            right?

2   HARRIS  *375*   Uh huh.  And they pulled up to about right there.

3   FARQUHAR     Where?

4   HARRIS       Real fast.  He liked jerked the brakes real fast.

5   FARQUHAR     Okay.

6   HARRIS       And she just ran out the car.

7   FARQUHAR     So.

8   HARRIS       And she just, when I turned around she just was

9                shooting him, when I turned around.  I was...

10  FARQUHAR     Okay.  When did K.K., where was she sitting when

11               the car stopped right here?

12  HARRIS       She was in the passenger seat.

13  FARQUHAR     Front passenger seat.  And you were in the back?

14  HARRIS  *37*   And I was in the back on...

15  FARQUHAR     Which side?

16  HARRIS       On the uh...

17  FARQUHAR     Passenger side?

18  HARRIS       Yeah.  I was like, like leaning back like this.

19  FARQUHAR     Okay.  So K.K. jumps out?

20  HARRIS       Uh huh.

21  FARQUHAR     And which way does she go?  Around the front or

22               around the back of the car?

23  HARRIS  *382*   She went around the front.

24  FARQUHAR     Like this?

25  HARRIS       Um hum.

26                                33

Page Two
Stuart Kirchick
September 22, 1997


toward the Mexican restaurant.    According to Mr. Turner, Mr.
Garrett said he was looking for a black male approximately 40 years
of age named Louis who owed him some money and that he was going to
meet Louis at or near this Mexican restaurant.  Mr. Turner stated
that Mr. Garrett was calm and did not appear to be agitated or
anxious in any way.

Mr. Turner said that he then stopped walking his bicycle at the bus
stop while Mr. Garrett continued walking on alone toward the front
of the Mexican restaurant a short distance away.

Mr. Turner stated that it was within moments of talking with Mr.
Garrett that he observed a vehicle whose color now he states he
cannot recall and does not recall telling the investigating officer
it was possibly maroon in color.  Mr. Turner said that the vehicle
was definitely a 4-door and of a foreign non-American make.   Mr.
Turner does not recall telling the investigating officer that it
looked like a Jetta.  Mr. Turner stated that there were definitely
four people seated inside this vehicle and the windows were tinted
so all he could see were four heads and no distinct facial features
such as race or gender.   Mr. Turner said that none of the
individuals in the vehicle to the best of his recollection were
wearing hats.   This vehicle then drove up and stopped over the
sidewalk area at the entry exit driveway between the bus stop and
the Mexican restaurant.

When the vehicle came to a complete stop, Mr. Turner observed the
passenger door behind the driver on the drivers side open and an
individual who was wearing dark clothing exit the vehicle.   This
individual also had a hood pulled up from the upper garment over
their head.   Once this individual was out of the vehicle and shut
the door, the vehicle immediately pulled away driving westbound on
McKee Road toward King Road.

Mr. Turner said he observed the individual who exited this vehicle
to run quickly over to Mr. Garrett at which time the individual
with their left arm extended fired four to five shots in quick
succession at Mr. Garrett who then fell to the ground as if he had
been shot.

Mr. Turner said he could not see the handgun because the clothing
worn by the indivudal who was doing the shooting was baggy or loose
and covered up the hand of the shooter.

Mr. Turner said that there was no conversation between the shooter
and Mr. Garrett and that it all happened very quickly and that the
shooter then immediately turned and ran on the sidewalk directly
toward Mr. Turner who was still standing holding his bicycle at the
bus stop.  According to Mr. Turner, the individual ran by

Page Three
Stuart Kirchick
September 22, 1997


approximately three to four feet from him westbound on the sidewalk
on McKee Road toward King Road.  Mr. Turner stated that he turned
his back when this individual was running toward him thinking that
the individual might shoot him as running by.  Mr. Turner said that
he said nothing to this individual and the individual said nothing
to him while running by.  Mr. Turner said he assumed this person
was black and possibly a male but that he could not tell the gender
or the skin color.  Mr. Turner did state that the person who ran by
him was shorter than he was and he is 5' 9".  I asked Mr. Turner
how much shorter and he said at least 1" to 2".  Mr. Turner said
that he did not see where this indivudal ran to and did not look
after the person ran by him to see where the person was going.

Mr. Turner stated that the shooter was definitely left handed and
that the left arm was extended when the shots were being fired.

Mr. Turner did state that he had heard rumors and talk on the
streets after this homicide occurred that KK had been looking for
Mr. Garrett because of a prior fight that she and Mr. Garrett had
been in.

Mr. Turner said that he could not identify the vehicle if shown
photographs of vehicles.

Mr. Turner stated that he told the officer who was interviewing him
at the Elmwood Facility days after this homicide occurred that he
didn't think that the shooter was KK because she is taller than he
is and the shooter was shorter than him.  Mr. Turner said that the
Officer who interviewed him at the Elmwood Facility told him that
if he helped them they would help him in his case.  After telling
the Officer what he knew, the Officer told Mr. Turner he wasn't
telling them enough and then left.  Mr. Turner said he still has
the Officers business card who interviewed him at the Elmwood
Facility.  Mr. Turner said he has not been contacted or interviewed
since that time.

I asked Mr. Turner if he wore glasses and he stated no.  I asked
Mr. Turner if he was on any medication and he said Prozac.  I asked
Mr. Turner if he had consumed any alcohol or drugs on the evening
prior to making these observations and he stated that he had
consumed several beers and a joint of marijuana and considered his
state to be "high".  Mr. Turner said he consumed no cocaine on the
evening prior to making these observations.

Respectfully,

Thomas C. Davis

TCD:jr

# EXHIBIT F

PEOPLE VS. AVANT GREEN/CLINTON FRED WAGNER
DOCKET NO. C9740812
SJPD
INTERVIEW OF: CANDICE HARRIS

1  FARQUHAR    Uh huh.

2  HARRIS      I mean...

3  FARQUHAR    Well that's, that's why you're here.  Because

4              that's not something that you're capable of doing.

5              You don't understand how somebody can do that.

6              That hurts you.  And I can, I can see that.

7  HARRIS  ＿  It hurt me, it hurt me a lot.  Especially when I

8              heard Harry was dead.

9  FARQUHAR    Yeah.  But I can uh, you'll come out okay

10             (inaudible).  Okay?

11 HARRIS      Okay.

12 FARQUHAR    You're doing the right thing.  You'll come out okay

13             in this.

14 KIRBY       Can I ask you just one uh, other question?  How,

15             how did you come to know Harry?  Did you know him

16             for a while?

17 HARRIS      Uh, well, I have a best friend that I don't know, I

18             first heard a champion.

19 KIRBY       Uh huh.

20 HARRIS      And then they talked to my best friend.

21 KIRBY       What's her name?

22 HARRIS      Chavonne Anderson.

23 KIRBY       Chavonne?  Okay.

24 HARRIS      Uh, that's my best friend and uh, she's just moved

25             to Verde not too long ago.  And like she started

26

67

# EXHIBIT G

| | | |
|---|---|---|
| 1 | | talking to the police. And she's all, you just |
| 2 | | remember what I told you. |
| 3 | FARQUHAR | Okay. Let's talk about the night that uh, the |
| 4 | | shooting happened okay? When, first of all, where |
| 5 | | were you when, when K.K. found you on the night |
| 6 | | that the shooting happened? |
| 7 | HARRIS | I was, okay, I was downtown. |
| 8 | FARQUHAR | Uh huh. |
| 9 | HARRIS  /7⁴ | And I met K., K.K., I have seen K.K.. And then me |
| 10 | | and K.K. we started kicking it from there.   And |
| 11 | | then we was downtown for a minute. |
| 12 | FARQUHAR | About what time was that? |
| 13 | HARRIS  /%6 | It was in the daytime.   It was like, I can't |
| 14 | | remember the time, but it was in the daytime.  Like |
| 15 | | /7⁸ we was kicking it for a minute. And then um, we |
| 16 | | met up uh, my friend C.W.. |
| 17 | FARQUHAR | Who's friend? |
| 18 | HARRIS | Uh, her friend, see... |
| 19 | FARQUHAR | Your friend. |
| 20 | HARRIS | ...no. This is her friend. She did . His name is |
| 21 | ∂₀/ | C.W.  I couldn't remember his name at first, but |
| 22 | | now I remembered his name.  Um, his name is C.W. |
| 23 | | And uh, we was just riding around. |
| 24 | FARQUHAR | Was C.W. downtown also? |
| 25 | HARRIS | Was he downtown?  No.  It was just like she called |
| 26 | | |

20

#orge W. Kennedy
District Attorney
County of Santa Clara
n Jose, California 95110

| | | |
|---|---|---|
| 1 | HARRIS | No. I had just, really didn't met him and, she'd |
| 2 | | just say get in the car. When we first |
| 3 | | (inaudible), well she told me, she just say get in |
| 4 | | the car, we fixing to go chill. |
| 5 | FARQUHAR | Have you ever been to C.W.'s house? |
| 6 | HARRIS $2^4$ | No. |
| 7 | FARQUHAR | Do you have any idea where C.W. lives? |
| 8 | HARRIS | No (inaudible). |
| 9 | FARQUHAR | Okay. |
| 10 | HARRIS $25$ | 'Cause this always, when I'm with K.K. it's always |
| 11 | | just like me and her and girls. |
| 12 | FARQUHAR | Okay. Rochelle wasn't with you guys? She wasn't |
| 13 | | involved in all that? |
| 14 | HARRIS | No. She was at home with her baby. |
| 15 | FARQUHAR | Okay. Candice will you sign this for me right |
| 16 | | here? Just sign you name on (inaudible). |
| 17 | | FARQUHAR |
| 17 | | I signed it right below. Okay. Where did you guys |
| 18 | | drop off C.W. when you, when you went to Rochelle's |
| 19 | | house? |
| 20 | HARRIS | No. He had dropped us off. |
| 21 | FARQUHAR | Oh, okay. |
| 22 | HARRIS | Back down, back downtown 'cause she parked her car |
| 23 | | on Second street's parking. |
| 24 | FARQUHAR | So C.W. dropped uh, both of you off at Rochelle's? |
| 25 | HARRIS $3^f$ | No. Not at Rochelle's. He dropped us, after the |
| 26 | | |

50

Page Two
Stuart Kirchick
August 20, 1997

I then asked Ms. Harris how she came to know the black male adult
known as CW and she replied that she met CW through KK, however,
she claims never to have partied with or socialized with CW other
than brief meetings when CW would meet with KK in the downtown San
Jose area.  According to Ms. Harris, these contacts between CW and
KK were strictly social to her knowledge and did not involve any
drugs or criminal activity.

I then asked Ms. Harris if she could describe the clothing worn by
CW on the evening of 5/22/97 and she replied to the best of her
recollection he was wearing burgundy colored long pants with a
burgundy long sleeved shirt, possibly tennis shoes (color unknown)
and a black and white baseball cap with the NIKE logo on the front.

I   asked   Ms.   Harris   if   she   could   describe   CW's   physical
characteristics and she replied that he was a black male adult,
approximately 25 years old, dark complexion, approximately 6' to 6'
1", thin, with no hair on his head and a diamond earring in his
right ear.

I then asked Ms. Harris if she could describe her own clothing worn
on the evening of 5/22/97 and she replied that she was wearing a
dark blue long sleeved light weight pull over jacket with the
Michigan State yellow lettering across the front, blue jeans and
white and blue tennis shoes.   I asked Ms. Harris if the blue
Michigan State light weight jacket had a hood and she replied no.

I then asked Ms. Harris to describe the clothing worn by KK on the
evening of 5/22/97 and she replied that KK was wearing a black long
sleeved shirt, black long pants and black and white NIKE tennis
shoes.   I then asked Ms. Harris if KK was wearing anything on her
head and she replied "No, not until she put on CW's black and white
NIKE baseball cap" which KK put on just prior to exiting the
vehicle moments before the homicide occurred.

I then asked Ms. Harris if she could describe the vehicle driven by
CW on the evening of 5/22/97 and she replied that it was a burgundy
colored small 4-door vehicle with a grey interior and was possibly
a Toyota.

I then asked Ms. Harris if she could recall what conversation was
taking place between the three of them in CW's car prior to the
homicide occurring and she replied that she could recall no
conversation between the three of them because CW had the music
turned up in the car very loud. Ms. Harris said she did not see CW
and KK talking at all before they arrived in the parking lot just
opposite the Mexican restaurant where the homicide occurred.

Ms. Harris then stated that she remembers that KK and CW had a
conversation outside the vehicle while Ms. Harris was inside the

# EXHIBIT H

## Attachment 5(a) To Petition For Disclosure
## Of Juvenile Court Records

Petitioner seeks juvenile records of child CANDICE HARRIS, in order to prepare an adequate defense to a murder charge against Petitioner presently pending in case No. 201285. The only evidence against Petitioner in the murder prosecution against her is the testimony of child, CANDICE HARRIS. Petitioner faces prison exposure of 35 years to life. There is no physical evidence linking Petitioner to the murder. There are no other witnesses that have identified Petitioner as being involved in the murder except child CANDICE HARRIS.

Thus far, child CANDICE HARRIS has lied to the police, admitted perjury at the Preliminary Examination under her own admission of doing so, and has been given complete immunity by the prosecution. Based upon information and belief, child CANDICE HARRIS was a ward of the juvenile court for many years. It is our information and belief that documents and reports have been filed with the juvenile court by a probation officer, social worker, and possibly court appointed special advocates. Such documents will aid in the defense of Petitioner in that there may be further disclosure of child lacking credibility and other relevant evidence.

12

13  Candice is an 17 year old adolescent, who is very active in sport. She is joining a

14  school basketball team and will play basketball for Summer League Basketball this

15  summer. Candice has been attending Abraham Lincoln High School since 11/7/96.

16  Even though the school is far away from her home now, she wants to continue going

17  there and plans to play for the school basketball team next year. Candice was reported

18  as doing poorly academically. According to Candice's teacher, Mr. Kevin Collins,

19  Candice is functioning as a tenth grader. She is on a contract to attend two periods a

20  day because of absenteeism and behavior problems. She will earn more periods when

21  she has good attendance for two weeks. However, Candice still is not meeting her

22  contract. Mr. Collins had 2 parent/teacher conferences this year with the mother. To

23  Mr. Collins, the mother seems concerned about her daughter, but he is not sure how

24  much she follows through with Candice at home. Mr. Collins also indicated that

25  Candice's behavior is generally decent. She has several friends and gets along well

26  with them.

1  **CASE PLAN PROGRESS: (Cont'd)**

2  During the phone conversation with Mr. Collins at on 5/20/97, Mr. Collins said that

3  Candice's chance to graduate from high school is very slim. At this time, Mr. Collins

4  does not know what can he do to help her. This worker has constantly talked to

5  Candice and her mother in regarding to Candice attending school and earning her

6  diploma. The mother said she has tried to talk to her, but Candice seems to be

7  reluctant to get up for school. Candice appears to feel insecure about school because

8  she is behind in her studies. Candice has talked about enrolling in Broadway

9  Community School for one semester to make up more credit in order to graduate from

10  high school, but she didn't want to miss playing basketball at Lincoln High School.

11

12  This summer, Candice plans to go summer school at Gunderson or Willow Glen High

13  School. She also plans to work part-time this summer. She has applied for a job at the

14  ▮▮▮▮▮▮▮▮ located near her home. Candice also participates in the Independent

15  Living Program at Bill Wilson Center. In this program, she attends group and individual

16  counseling and after school activities. Candice is working individually with her

17  counselor Kerry Kress once per week. Please see attached progress report prepared

18  by Kerry Kress.

# QUARTERLY REPORT

**RESIDENT NAME:** Harris, Candice                    **DOB:** 01/26/80

**DATE OF PLACEMENT:** 09/04/95

**REPORT DATE:** 12-01-95

## BACKGROUND INFORMATION:

Candice is a 15 year old female who was admitted to Gray's Adolescent Group Home following her removal from home after her mother tested positive for substance use. Candice was surprised that her mother was tested and that her mother's test was positive. She is the oldest of four children (one brother and two sisters) all of whom have different fathers. Candice does not have a history of psychological or psychiatric treatment and currently denies any symptoms of behavior change. She has never been separated from mother before and has requested to have daily contact with her mother during her placement in Gray's Group Home.

## CURRENT STATUS:

Candice has improved significantly during the first quarter at Gray's Group home. Initially she had difficulties adjusting to the Group Home Community. For example, there were problems with hygiene, authority figures, inappropriate play with condoms and an isolated incident of sexually acting out. Currently, these behaviors are not observed to be problem areas attributed to her positive response to the high structure and consistent environment she is experiencing in placement. And she has responded well to the strong behavioral management program, reflective in her improved psychosocial functioning. Candice has established good relationships with both the staff and the other residents. She participates in individual therapy and is working in treatment work through the loss and grief she has

12/08/1995  09:26   1406246

able to deal more effectively in situations that frustrate her on a daily basis.    Although she has demonstrated significant improvement since her admit to the group home, continued placement is required to determine the long term effectiveness of the desired behavior.  It is recommended she remain at Gray's Group Home at this time.

Sincerely,

Mary A. Demers, LMFCC
Clinical Director
Gray's Adolescent Group Home


Beatrice Gray
Executive Director
Gray's Adolescent Group Home

TABLE OF AUTHORITIES (Continued)
CASES

Bentley (1955) 131 Cal.App.2d 687; People V. Fusaro (1971) 18 Cal.App.3d 877, 886; People V. Herring (1993) 25 Cal.Rptr.2d 213; Izazaga V. Superior Court (1991) 54 Cal.3d 356, 364-365; Brady V. Maryland (1963) 373 U.S. 83; Donnelly V. DeChrisoforo (1974) 416 U.S. 637, 646-648; Suniga V. Bunnell (9th Cir. 1993) 998 F.2d 664, 668; People V. Haskett (1882) 30 Cal.3d 831, 863; Hance V. Zant (1993) 696 F.2d 940; Griffin V. California (1965) 380 U.S. 609; United States V. Kessi (9th Cir. 1987) 868 F.2d 1097, 1106; People V. Kirkes (1952) 32 C.2d 719, 726, 249 P.2d 1; Darden V. Wainwright (1986) 477 U.S. 168; Jackson V. Virginia (1979) 443 U.S. 307; In re Winship (1970) 397 U.S. 358; People V. Irby (1924) 67 Cal.App. 520, 227 P. 920; United States V. Nolasco (9th Cir. 1990) 901 F.2d 799, 806; People V. Mendoza (1974) 37 Cal.App.3d 717, 726; Kyles V. Whitley (1995) 514 U.S. 419, 434.

PENAL CODE

Section 1054.7

## CLAIM TWO

Berger V. United States (1953) 295 U.S. 78, 88; People V. Kelley (1977) 75 Cal.App.3d 672, 690; People V. Gay (1972) 28 Cal.App.3d 661, 675; People V. Dorsey (1974) 43 Cal.App.3d 953, 964; Bruno V. Rushen (9th Cir. 1983) 721 F.2d 1193, 1194-1195; United States V. Smith (9th Cir. 1992) 962 F.2d 923, 934-936; People V. Lyons (1956) 47 Cal.2d 311, 324; People V. Chambers (1964) 231 C.A.2d 23, People V. Luparello (1986) 187 Cal.App.3d 410, 426; People V.

37

Pitts (1990) 223 Cal.App.3d 606, 691; People V. Hill (1998)
17 Cal.4th 800, 819; People V. Benson (1990) 52 Cal.3d 754,
793; People V. Ford (1948) 89 C.A.2d 467, 200 P.2d 867; 89
C.A.2d 471; People V. Watson (1956) 46 Cal.2d 818; People V.
Mendoza 37 Cal.App.3d 717, 726; United States V. Sands (10th
Cir. 1990) 899 F.2d 912, 915; Chapman V. California (1967)
386 U.S. 18; Viereck V. United States (1943) 318 U.S. 236;
Estelle V. McGuire (1991) 502 U.S. 62; U.S. V. Russell (1973)
411 U.S. 423; People V. Hudson (1981) 126 Cal.App.3d 733.
Fourteenth Amendment and Article I, Section 16.
                         PENAL CODE
1181(5).

## CLAIM THREE

Pointer V. Texas (1965) 380 U.S. 400, 403-405; Mattox V. United
States (1895) 156 U.S. 237, 242-243; In re Montgomery (1970) 2
Cal.3d 863, 865; People V. Louis (1986) 42 Cal.3d 969, 982;
People V. Enriquez (1977) 19 Cal.3d 221, 235; Berger V, Califor-
nia (1969) 393 U.S. 314, 315; Chambers V. Mississippi (1973) 410
U.S. 284, 295; California V. Green (1970) 399 U.S. 149, 158;
People V. Mendieta (1986) 185 Ca.App.3d 1932, 1036; People V.
Price (1991) 1 Cal.4th 324, 424; People V. Sanders (1995) 11 Cal.
4th 475, 523; People V. Cummings (1993) 4 Cal.4th 1233, 1296-
1297; Chapman V. California (1967) 386 U.S. 18, 24; People V.
Stritzinger (1933) 34 Cal.3d 505, 520; U.S. V. Valenzuela-
Bernal (1932) 458 U.S. 858; People V. Leyba (1981) 29 Cal.3d
591. 596-597.
                  EVIDENCE CODES

West's Ann.Evid.Code Section 1291
Federal Rule of Evidence 801

## CLAIM FOUR

People V. Holt (1984) 37 Cal.3d 453; Pointer V. Texas (1965) 380
U.S. 400, 403; People V. Collup (1946) 27 Cal.2d 829; Lee V.
Illinois (1986) 476 U.S. 530, 540; People V. Jones (1984) 155
Ca.App.3d 653, 663; In re Cindy L. (1997) 17 Cal.4th 15, 27;
People V. Rios (1985) 163 Cal.App.3d 852, 863; Ohio V. Roberts
(1980) 448 U.S. 56, 66; Idaho V. Write (1990) 497 U.S. 805, 814;
People V. Sutton (1993)  19 Cal.App.4th 795, 799-802; In re
Harris (1961) 56 Cal.2d 879; People V. Clark (1980) 109 Cal.App.
3d 88, 91; Douglas V. Alabama (1956) 380 U.S. 415; People V.
Pierce (1969) 269 C.A.2d 193, 204; Dutton V. Evans (1970) 400
U.S. 74; Rovario V. U.S. (1957) 353 U.S. 53; Grey V. Netherland
(1996) 516 U.S. 152; In re Carpenter (1995) 38 C.R.2d 665; People
V. Irby (1924) 67 Cal.App. 520; People V. Allen (1978) 144 Cal.
Rptr. 6; Albert V. McKay & Co. (1917) 174 Cal. 451, 456.

EVIDENCE CODES
West's Ann.Evid.Code Section 352

West's Ann.Evid.Code Section 1200(a), (b)

West's Ann.Evid.Code Section 1235
PENAL CODES
1181(5)
AMENDMENTS
California Constitution Article I, Section 15


## CLAIM FIVE

Strickland V. Washington (1984) 466 U.S. 668; Kyles V. Whitley
(1995) 415 U.S. 419; In re Marquez (1992) 1 C.4th 584, 596; In re
Hall (1981) 179 Cal.Rptr. 223; United States V. Valenzuela-Bernal
(1982) 102 S.Ct. 3440; People V. Fosselman (1983) 189 Cal.Rptr.
855; People V. Sutton (1887) 73 Cal. 243, 247-248; People V.

39

Martinez (1984) 205 Cal.Rptr. 852; Mak V. Blodgett (9th Cir.
1992) 970 F.2d 614 (applying Strickland V. Washington); People
V. Guizar (1986) 180 Cal.App.3d 487.


## CLAIM SIX

Strickland V. Washington (1984) 466 U.S. 668; United States V.
Cronic (1984) 466 U.S. 648; People V. Coffman (1969) 2 Cal.App.
3d 681; People V. Marquez (1986) 188 Cal.App.3d 363, 369; In re
Smiley (1967) 66 Cal.2d 606; In re Lopez (1970) 2 Cal.3d 141;
People V. Dorado (1965) 398 P.2d 361; Miranda V. Arizona (1966)
384 U.S. 436; People V. Ledesma (1987) 43 Cal.3d 171, 216-218;
In re Williams (1985) 164 Cal.App.3d 979, 983; People V.
Fosselman (1983) 189 Cal.Rptr. 855; People V. Martinez (1984)
205 Cal.Rptr. 852.


## CLAIM SEVEN

People V. Epps (1973) 109 Cal.Rptr. 734; Powell V. United States
(9th Cir. 1965) 347 F.2d 156; People V. Butler (1975) 47 Cal.App.
3d 273, 281; People V. Carter (1968) 68 Cal.2d 810; People V.
Gainer (1977) 19 Cal.3d 835, 849-852; Jiminez V. Myers (9th Cir.
1994) 40 F.3d 976, 979; People V. Friend (1957) 47 Cal.2d 749.


## CLAIM EIGHT

Goodwin V. Johnson (5th Cir. 1997) 132 F.3d 162; Killian V. Poole
(9th Cir. 2002) 282 F.3d 1204, 1208, 1211; O'Neal V. McAninch
(1995) 513 U.S. 432, 437-438; Sullivan V. Louisiana (1993) 508
U.S. 275, 279; Thompson V. Calderon (9th Cir. 1996) 109 F.3d